FILE COPY

1  RONALD O. KAYE, SBN 145051
2  MARILYN E. BEDNARSKI, SBN 105322
   CAITLIN S. WEISBERG, SBN 262779
3  Email: rok@kmbllp.com
4  KAYE, McLANE & BEDNARSKI LLP
   234 East Colorado Boulevard, Suite 230
5  Pasadena, Ca. 91101
6  Tel: (626) 844-7660
   Fax: (626) 844-7670
7
8  Attorneys For Plaintiff
9  FRANCISCO CARRILLO, JR.

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12  FRANCISCO CARRILLO, JR.,          CASE NO: CV11- 10310 SVW (AGRx)

13      Plaintiff,                    **COMPLAINT FOR DAMAGES:**

14
15      vs.                          **(1) DEPRIVATION OF CIVIL
                                          RIGHTS, 42 U.S.C. §1983, *BRADY*
16  COUNTY OF LOS ANGELES;                VIOLATIONS;**
17  CRAIG DITSCH; AND DOES          **(2) JOINT ACTION/ CONSPIRACY
    1-10, INCLUSIVE;                     TO INTERFERE WITH CIVIL
18                                       RIGHTS, 42 U.S.C. §1983, *BRADY*
19      Defendants.                      VIOLATIONS;**
                                     **(3) DEPRIVATION OF CIVIL
20                                       RIGHTS, 42 U.S.C. §1983,
21                                       *MANSON/BIGGERS*
                                         VIOLATIONS;**
22                                   **(4) JOINT ACTION/ CONSPIRACY
23                                       TO INTERFERE WITH CIVIL
                                         RIGHTS, 42 U.S.C. §1983,
24                                       *MANSON/BIGGERS*
25                                       VIOLATIONS;**
                                     **(5) DEPRIVATION OF CIVIL
26                                       RIGHTS, 42 U.S.C. §1983,
27                                       *MONELL* VIOLATIONS.**
28
                                     **DEMAND FOR JURY TRIAL.**

                          1

# I.

## JURISDICTION AND VENUE

1.    This action is brought by Plaintiff Francisco Carrillo, Jr. ("Plaintiff" or "Carrillo") pursuant to 42 U.S.C. §1983.

2.    This Court has jurisdiction under 28 U.S.C. §1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §1983, and under 28 U.S.C. §1331.

3.    The acts and omissions complained of commenced on January 18, 1991 and continued until March 16, 2011 within the Central District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

# II.

## INTRODUCTION

4.    On January 24, 1991, Los Angeles County Sheriff's Department deputies arrested Plaintiff Francisco Carrillo, Jr. for the murder of Donald Sarpy, a murder of which Mr. Carrillo has never been lawfully convicted, and the commission of which he has adamantly denied for over 20 years. Mr. Carrillo was convicted in 1992 based solely upon the now completely discredited testimony of six eyewitnesses.  At the hearing on Mr. Carrillo's Petition for Writ of Habeas Corpus the Los Angeles Superior Court vacated Mr. Carrillo's conviction and found:

> In this proceeding, Carrillo has established that the eyewitness evidence against him was either false, tainted, or both. No witnesses are able to place him in the car that night, much less identify him as the shooter. None of the witnesses were able to identify the shooter because the car was too far away, it was too dark, and it happened too fast.

(Findings of Fact and Conclusions of Law, at p. 14, ¶2.)

5.    This unequivocal position by the Court was based, in part, on the Court's own observation of a re-enactment of the crime under lighting conditions

equivalent to those that existed on the night of the crime. The reenactment determined whether there was sufficient illumination for any eyewitness to identify the occupants of the vehicle from which the shots were fired.  The Court concluded:

> In the stopped position, where one would expect to be able to view the facial details of the occupants of the vehicle, the Court was unable to see anything more than a dark silhouette of a person in the front seat, wearing a baseball cap, a driver, and a rear seat passenger. The light was insufficient to illuminate the details of the face of the front passenger, the purported shooter.

> Although there were streetlamps on the opposite side of the street, any light from them was not shining on the passenger's face as it was being shadowed by the roof of the car. When the car was in motion, this same view of a dark silhouette was only momentary. Making an accurate identification of the front passenger, even when the car was stopped, was virtually impossible.

(Findings of Fact and Conclusions of Law at ¶¶ 12-13.)

      6.    Ultimately, the Court found:

> Carrillo testified and denied shooting Donald Sarpy, denied being in the car involved in the shooting, and denied participating in any way in the shooting. . . . At the time of the shooting, Carrillo said he was home with his father. The Court finds that Carrillo's testimony at the hearing was credible, believable, and unimpeachable, including his statement that he had nothing to do with this crime and that he was at home with his father at the time of the incident.

(Findings of Fact and Conclusions of Law at p.13, ¶42.)

      7.    Mr. Carrillo spent 20 years in prison as a result of the actions of the Los Angeles County Sheriff's deputies. The deputies' created a false identification of Mr. Carrillo which was adopted by each of the six eyewitnesses. Without the deputies wrongful, unconstitutional conduct, Mr. Carrillo would not have been

1    arrested or convicted for the Sarpy murder; he would not have spent 20 years in

2    prison.  The deputies' conduct violated Mr. Carrillo's civil and constitutional

3    rights.

4         8.    In addition, the polices and customs of the Los Angeles County

5    Sheriff's Department, in particular relating to the conduct of deputies belonging to

6    an internal gang in the Sheriff's Department named the "Lynwood Vikings," a

7    known neo-Nazi, white supremacist police gang whose members routinely violated

8    the constitutional rights of minority residents in Lynwood, and the lack of

9    supervision of its officers, were motivating forces behind the violations of Mr.

10   Carrillo's rights. As a result of these actions, Mr. Carrillo was deprived of the one

11   thing all innocent people deserve: freedom.

12        9.    On March 16, 2011, after hearing evidence which completely

13   undermined Mr. Carrillo's conviction, Los Angeles Superior Court Judge Paul A.

14   Bacigalupo granted Mr. Carrillo's Petition for a Writ of Habeas Corpus, vacated

15   the conviction and ordered that Mr. Carrillo be released if the prosecution did not

16   file new charges. On April 4, 2011, the Los Angeles County District Attorney's

17   Office advised the Court that it would not be filing new charges against Mr.

18   Carrillo.

19                              **III.**

20                            **PARTIES**

21        10.   Plaintiff Francisco Carrillo, Jr. is a resident of the State of California

22   and resided within the jurisdiction of the State of California at all times herein

23   alleged.

24        11.   At times relevant herein, Defendant Craig Ditsch was employed by and

25   working on behalf of the Los Angeles County Sheriff's Department and resided

26   within the jurisdiction of the State of California. In his capacity as a Los Angeles

27   County Sheriff's deputy, he actively participated in the investigation resulting in

28

the prosecution of Plaintiff Carrillo.  Defendant Ditsch is sued in his individual capacity.

12.   Defendant County of Los Angeles is, and at all times herein alleged was, a public entity organized and existing under the laws of the State of California. The Los Angeles County Sheriff's Department is, and at all times herein alleged was, an agency of the County of Los Angeles.

13.   Plaintiff is informed and believes and thereon alleges that Defendants sued herein as Does 1 through 10, inclusive, were deputies of the Los Angeles County Sheriff's Department, and were at all relevant times acting in the course and scope of their employment and agency.  Each Defendant is the agent of the other.  Plaintiff alleges that each of the Defendants named as a "Doe" was in some manner responsible for the acts and omissions alleged herein, and Plaintiff will ask leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained.

## IV.

## GENERAL ALLEGATIONS

14.   Plaintiff is informed and believes, and thereon alleges, that, at all times herein mentioned, each of the Defendants was the agent and/or employee and/or co-conspirator of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the scope of such agency, employment and/or conspiracy, and with the permission and consent of other co-Defendants.

15.   Each paragraph of this complaint is expressly incorporated into each cause of action which is a part of this complaint.

16.   The acts and omissions of all Defendants were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Plaintiff.

# V.

# FACTUAL ALLEGATIONS

## A.   BACKGROUND

17.   At the time of Mr. Sarpy's murder, Mr. Carrillo was a 16-year-old teenager living in the County of Los Angeles. He was in tenth grade, attending Schurr High School in the City of Montebello. He was living with his father in Maywood, California, and purposely stayed away from the City of Lynwood in order to focus on his studies and avoid conflict.  He had no criminal convictions. There was no evidence that Mr. Carrillo ever owned or used a firearm.

18.   After seventh grade until the end of ninth grade, Mr. Carrillo considered himself a member of the Young Crowd gang, but his identification came more from living in the Young Crowd territory than from participating in any illegal activities. Correspondingly, Mr. Carrillo never had a gang tattoo either before or throughout his prison term. Further, other than the wrongful conviction for Mr. Sarpy's murder, at the time he was arrested to this day, Mr. Carrillo has never been convicted of any illegal conduct – neither property crimes nor violent crimes.

19.   Mr. Carrillo was in custody for over twenty years, from his arrest on January 24, 1991, to March 16, 2011, when his conviction was vacated. Mr. Carrillo served much of his 20 years in custody in various maximum security prisons and was therefore subject to the severe limitations and indignities inherent in such settings. Mr. Carrillo experienced the fear and anxiety of being imprisoned with the state's most serious and violent offenders. More fundamentally, Mr. Carrillo lost his youth and the years during which he would have gone to school, pursued a career, and raised his son. Mr. Carrillo was finally released from prison on March 16, 2011.

20.   Throughout the 20 years in custody, Mr. Carrillo proclaimed his innocence and relentlessly worked to procure his release by establishing that a

6

miscarriage of justice had occurred. In pursuit of relief, he filed his own *pro se* Petition for Writ of Habeas Corpus prior to filing the successful petition in which he was represented by counsel. He wrote countless letters asserting his innocence, emphasizing the injustice of his conviction. These included letters to the Los Angeles County District Attorney's Office, the California Office of the Inspector General, Innocence Projects in both California and New York, the Mexican American Legal Defense Fund, the ACLU of Southern California, the National Association of Criminal Defense Lawyers and numerous private attorneys.

21. From the day of his arrest to his release, Mr. Carrillo adamantly refused to accept any plea bargain that would entail an explicit or implicit admission of guilt.

22. During his time in custody, while working to prove his innocence, Mr. Carrillo dedicated his time to improving his mind and character and helping others. While in Folsom Prison, Mr. Carrillo was part of The Blind Project – an organization which transcribed regular print into Braille for people without sight. In addition, he worked in the Optical Department where he would refurbish used eye glasses and provide them for those in need. Along with this work for those with disabilities, Mr. Carrillo also worked in the prison's Youth Diversion Program, whose goal is to influence at risk youth to avoid a future of crime.

23. Mr. Carrillo's resilience and outstanding character allowed him to survive and even be productive while in prison, but tragically, some of the best years of his life were taken from him based on the unconstitutional acts of deputies of the Los Angeles County Sheriff's Department. He was deprived of the rights and privileges our society holds most dear: the ability to raise a family and pursue a career.

## B.   PRE-ARREST INVESTIGATION

24. On a Friday evening, January 18, 1991, in Lynwood, California, six African-American teenagers aged 15 to 18 were gathered at the south curb line

near the front of 4220 Lugo Avenue.   At approximately 7:00 p.m., well after dark, one of the boys' father, Donald Sarpy, began walking from his house to where the boys were gathered. As Mr. Sarpy approached the boys, an automobile drove slowly past the group. When the car had passed the group and was at least several houses away, the front passenger leaned out of the window with a handgun and fired in the direction of the group. One of the bullets hit Mr. Sarpy, and he died a few hours later at the hospital.

25.   Although Los Angeles County Sheriff's deputies arrived just minutes after the shooting, all but two of the six victim witnesses had already left the scene. The two remaining witnesses, the victim's son, Dameon Sarpy, and Jeff Munnerlyn, were interviewed at the scene. The other four were interviewed by phone shortly afterwards. Both the witnesses and the deputies who interviewed them were aware of the ongoing gang rivalry between the Hispanic gang Young Crowd and the African-American gang Neighborhood Crips or "N-Hood." Four of the witnesses reported hearing someone in the suspect vehicle yell something out as shots were fired. Two heard "fuck N-Hood," and another heard "Young Crowd Locos." Although the witnesses were upset and "wanted to help the police get who did it," they were unable to provide any details or descriptions in their initial interviews, other than describing the people in the car as Hispanic male teenagers. Not one of the six witnesses, when interviewed immediately after the shooting, said that he knew the shooter, could identify the shooter, or could provide anything more than the general description, "Hispanic male."   The crime report concludes that there was no "suspect named or known," no "unique suspect identifiers," and only a "general suspect description." The witnesses also provided only a vague description of the car, offering that it was large, dark, and possibly an Oldsmobile or Buick.

26.   A few hours later, at approximately 1:00 a.m., deputies transported five of the teenagers (all except Montrai Mitchell who was not formally interviewed

until months later) to the Lynwood Sheriff's sub-station for questioning. While waiting to be interviewed, the boys talked among themselves about who had shot at them and killed Dameon Sarpy's father. None of them told any of the others that they recognized or knew the shooter.

27. Between 1:15 a.m. and 2:30 a.m., the five bystander witnesses at the Lynwood Sheriff's sub-station were interviewed separately for a second time. Although the Sheriff's deputies tried to develop details about the automobile, its distance from the witnesses when the shots were fired, the number of shots fired, and the description of the shooter, there was no single, consistent version

28. The final witness to be interviewed, sometime after 2:35 a.m., was Scott Turner, age 16. As did Mr. Sarpy and Mr. Coleman, Mr. Turner mentioned the rivalry between N-Hood and Young Crowd. Mr. Turner said Young Crowd had recently shot at the house of his neighbor, who belonged to N-Hood, and one of the bullets had struck Mr. Turner's house.

29. Mr. Turner's interview differed from the others in two known respects: First, his was the only interview that was conducted by Defendant Deputy Craig Ditsch. Defendant Ditsch was a member of the Lynwood sub-station's Operation Safe Streets, or OSS, the gang enforcement unit, and he knew Mr. Turner from previous gang-related cases and contacts in Lynwood. Defendant Ditsch was known to be associated with the "Lynwood Vikings," a police gang within the Lynwood sub-station that had a practice of violating the rights of citizens under their jurisdiction, particularly minority residents.

30. Mr. Turner's interview was also different from the other eyewitnesses in that he was the only person shown photographs at the Lynwood sheriff's station that night. Before showing Mr. Turner a six-pack – a collection of six photographs – Defendant Ditsch showed Mr. Turner a gang book with hundreds of photographs of Latino teenagers and men who purportedly were members of the Young Crowd gang out of Lynwood. While looking through the gang book, Mr. Turner

randomly picked several photos, but after each selection, Defendant Ditsch told him he was incorrect, that Turner's selection could not be the suspect. Ultimately, Mr. Turner chose Mr. Carrillo's photo from the gang book, to which Defendant Ditsch responded that his selection was correct.

31.   After guiding Mr. Turner to select Mr. Carrillo's photograph, Defendant Ditsch presented a six-pack to Mr. Turner with Mr. Carrillo's photograph in position number 1.  Having already been led by Defendant Ditsch to select Mr. Carrillo's photograph from the hundreds of photographs in the gang book, Mr. Turner selected Mr. Carrillo's photograph in the number 1 position as the perpetrator of the Sarpy murder.

32.   Although Defendant Ditsch has testified that he assembled the six-pack of photographs himself for the purpose of having Mr. Turner select the perpetrator of the Sarpy murder, in fact, another deputy from the Lynwood gang enforcement unit had created the six-pack weeks earlier for an earlier un-related shooting on December 28, 1990 (the "Sarabia" case, named after the victim of the shooting, Frank Sarabia).  Mr. Carrillo was charged in that case, in the City of Lynwood, *People v. Francisco Carrillo,* TA011972, based on a six-pack identification – again using the same six-with Mr. Carrillo in position number 1 – but the charges were later dropped when an eyewitness testified at the preliminary hearing that she could not identify Mr. Carrillo.  Further, the witness testified that Deputy Loy Luna, another member of the Lynwood Sheriff's OSS gang enforcement unit, and a member of the Lynwood Vikings, had urged her to select the photograph of Mr. Carrillo, stating that Mr. Carrillo was from the Young Crowd gang.  That case, TA011972, was dismissed based on the complete absence of any reliable identification of Mr. Carrillo.

33.   While showing witness Turner the photo of Mr. Carrillo, Defendant Ditsch improperly and unlawfully influenced Mr. Turner's identification by advising Mr. Turner that Mr. Carrillo was the perpetrator of the crime.  Then,

Defendant Ditsch falsely and erroneously represented in his police report that Mr. Turner had independently picked out Mr. Carrillo as the perpetrator of the crime.

34. Although Scott Turner could not see the man who shot the firearm at Mr. Sarpy on January 18, 1991, and chose Mr. Carrillo's photograph only after Defendant Ditsch advised him that Mr. Carrillo was the shooter, Defendant Ditsch wrote in a January 19, 1991 police report that Mr. Turner selected Mr. Carrillo's photograph and that Mr. Turner advised him that Mr. Carrillo was "the person Turner saw shooting a small semi-automatic pistol from the right front passenger seat of the suspect vehicle." This statement written by Defendant Ditsch was fabricated and false.

35. The Los Angeles Sheriff's Department appears to have conducted no further investigation of the Sarpy murder after Mr. Turner's reported identification of Mr. Carrillo. The investigators did not even show the six-pack to the other four witnesses who were still at the station that night.

36. After Defendant Ditsch manipulated Mr. Turner's selection of Mr. Carrillo's photograph, Mr. Turner advised the other eyewitnesses that he picked number 1 of the six-pack – Mr. Carrillo – thereby creating an identification for the other witnesses when previously they had none.

37. On July 9, 1991, nearly six months after Mr. Carrillo's arrest and just before the preliminary hearing was about to begin, the remaining five bystander eyewitnesses were brought to the district attorney's office and shown the six-pack photo display for the first time.

38. Defendant Ditsch's improper conduct with regard to Mr. Turner's identification of Mr. Carrillo -- in essence, the fabrication of false evidence -- as set forth in ¶¶ 30-33 above, was not disclosed to either the prosecution or the defense in the course of Mr. Carrillo's two trials in 1991-1992. Mr. Carrillo discovered the information in the course of his habeas investigation.

11

39.   Other than the testimony of the six eyewitnesses who falsely and incorrectly identified Mr. Carrillo, there is no evidence whatsoever -- no clothes, no blood, no murder weapon, no ammunition, no vehicle, no co-conspirator's statements, no incriminating statements, nothing -- linking Mr. Carrillo to the shooting on January 18, 1991.

## C. SUPERIOR COURT TRIAL PROCEEDINGS

### First Trial

40.   Mr. Carrillo's first trial began on January 2, 1992.  The prosecution's case consisted entirely of the eyewitness identifications made by the six teenagers in the darkness of night.

41.   Scott Turner identified Mr. Carrillo as the shooter on January 18, 1991, and specifically testified that the police came to the scene, but Mr. Turner did not talk to them. Turner further testified that after he chose Mr. Carrillo's photo, Turner told his friends that he had seen the shooter, recognized him and picked out his picture.

42.   The other five teenage eyewitnesses who had been influenced by Scott Turner identified Mr. Carrillo as the shooter.

43.   On January 14, 1992, after two full days and two partial days of deliberation, the jury declared that it was hopelessly deadlocked, 7 to 5 for not guilty, and the court declared a mistrial.

### Second Trial

44.   The second trial was held between June 18 and June 30, 1992.  Prior to his testimony, the prosecution's primary witness, Scott Turner, informed the parties that his identification of Mr. Carrillo had been a mistake and that he could no longer testify against him.

45.   In response to this recantation, Defendant Ditsch met with Mr. Turner in the lock-up area, where inmates are detained inside the courthouse before appearing in the courtroom.  In response to Mr. Turner's recantation, Defendant

Ditsch threatened Mr. Turner that that there would be negative consequences for recanting his identification of Mr. Carrillo once Mr. Turner was on the street.

46.   At the second trial, Mr. Turner testified that Mr. Carrillo was not the shooter and he (Mr. Turner) had been mistaken when he had identified Mr. Carrillo.  However, based on his fear of retaliation from Defendant Ditsch and other members of the Lynwood Sheriff's sub-station, also known as the Vikings, Mr. Turner did not disclose to the jury that Defendant Ditsch had suggested to him that Mr. Carrillo was the shooter.

47.   In order to attack Mr. Turner's recantation, Defendant Ditsch falsely testified in the second trial that he spoke to Scott Turner at the scene and that Mr. Turner said he could identify the shooter.   This at-the-scene description of Mr. Turner advising Defendant Ditsch that he could identify the shooter was contradicted by: a) Mr. Turner's testimony at the first trial that he never spoke with any officers at the scene; b) the fact that the police reports have no record of either Defendant Ditsch or Mr. Turner being at the scene immediately after the shooting; and c) Mr. Turner's testimony that he did not tell the police he could identify anyone until he was at the hospital visiting the victim, Mr. Sarpy, because "[the police] weren't really paying attention to me."

48.   Although Mr. Turner had recanted his identification in the second trial, the other eyewitnesses maintained their identifications, albeit tainted by Mr. Turner's original influence on them, that Mr. Carrillo was the shooter.

49.   After deliberating a few hours, the jury in the second trial unanimously voted for guilt on all counts. Based on convictions for murder and attempted murder, on December 3, 1992, the Los Angeles Superior Court, in Case No. TA011653, sentenced Mr. Carrillo to a term of twenty-five years to life in prison, with a consecutive life term and an additional 5 year enhancement for the use of a firearm.

13

**D.  AS THE RESULT OF THE COUNTY OF LOS ANGELES SHERIFF'S POLICIES, CUSTOMS AND PRACTICES VIOLATING THE RIGHT TO BE FREE FROM IMPROPER AND SUGGESTIVE EYEWITNESS IDENTIFICATIONS, SUGGESTIVE EYEWITNESS IDENTIFICATION PROCEDURES WERE EMPLOYED WITH AN EYEWITNESS IN THIS CASE.**

50.   The Los Angeles County Sheriff's Department had no established or clear policy  regarding the following issues pertaining to eyewitness identification: a) ensuring that eyewitness identification procedures complied with the requirements of due process, including those set out in *Manson v. Braithwaite* and *Neil v. Biggers*; b) ensuring that Sheriff's deputies, whether through inadvertence or design, did not provide information to potential eyewitnesses that influenced the identification; c) fully and completely documenting Sheriff's deputies' interactions with eyewitnesses; d) training Sheriff's deputies to provide exculpatory eyewitness identification information to the prosecutor(s) in the case in which the in which the eyewitness was making an identification; and e) supervising Sheriff's deputies in to provide exculpatory eyewitness identification information to the prosecutor(s) in the case in which the in which the eyewitness was making an identification

51.   To the extent that the Los Angeles County Sheriff's Department had policies regarding the issues set out in the foregoing paragraph, the policies were not implemented by Sheriff's deputies in cases in which an eyewitness was used. Not only were any such titular policies not implemented or followed, but the Los Angeles County Sheriff's Department had a custom and practice of a) failing to ensure that eyewitness identification procedures complied with the requirements of due process, including those set out in *Manson v. Braithwaite* and *Neil v. Biggers*; b) failing to ensure that Sheriff's deputies, whether through inadvertence or design, did not provide information to potential eyewitnesses that influenced the identification; c) failing to ensure that Sheriff's deputies fully and completely documented their interactions with eyewitnesses; d) failing to properly or

14

adequately train Sheriff's deputies to provide exculpatory eyewitness identification information to the prosecutor(s) in the case in which the eyewitness was making an identification; and e) failing to properly or adequately supervise Sheriff's deputies to provide exculpatory eyewitness identification information to the prosecutor(s) in the case in which in which the eyewitness was making an identification.

52.   The actions and inactions of the Los Angeles County Sheriff's Department set forth in the preceding two paragraphs were known or should have been known to the policy makers responsible for the Los Angeles Sheriff's Department and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and or to the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise or discipline in areas where the need for such training was obvious.

53.   The actions and omissions of the Los Angeles Sheriff's Department set forth in the preceding three paragraphs were a motivating force behind the violations of Mr. Carrillo's constitutional rights as set forth in this complaint.

**E.   AS THE RESULT OF THE UNCONSTITUTIONAL POLICY, PRACTICE AND CUSTOM OF THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT IN TOLERATING, RATIFYING AND PERMITTING THE UNCONSTITUTIONAL CONDUCT OF DEPUTIES AT THE LYNWOOD STATION, ESSENTIAL EXCULPATORY INFORMATION WAS WITHHELD FROM, AND NOT DISCLOSED TO, DISTRICT ATTORNEYS WHO WERE PROSECUTING CASES OF YOUNG MEN WHO ALLEGEDLY WERE MEMBERS OF LOCAL GANGS.**

54.   In December of 1991, eleven months after Mr. Carrillo's wrongful arrest for the Sarpy murder, and prior to his conviction, the Los Angeles County Board of Supervisors appointed retired Judge James G. Kolts as Special Counsel to conduct a review of the Los Angeles County Sheriff's Department.  As part of its review, the Kolts Commission's reviewed evidence reflecting the existence of racist deputy gangs within the Sheriff's Department; in particular, the Lynwood

Vikings.  The Commission found that "some deputies at the Department's Lynwood Station associate with the 'Viking' symbol, and appear at least in times past to have engaged in behavior that is brutal and intolerable and is typically associated with street gangs."  The Commission quoted District Court Judge Terry Hatter from the class action lawsuit, *Thomas v. County of Los Angeles*, CV 90-5217-TJH, finding that "many incidents . . . involved a group of Lynwood area deputies who are members of a neo-nazi, white supremacist gang – the Vikings – which exists with the knowledge of departmental policy makers."

55.   At the time of the Sarpy murder, deputies belonging to the Lynwood Vikings were engaged in a "street war" against the Young Crowd gang in the City of Lynwood.  The campaign by the Lynwood Vikings against the Young Crowd gang involved legitimate law enforcement objectives of stopping crime in the City of Lynwood, but also included a gang-like tactics against members of the Young Crowd gang.  Members of the Lynwood Vikings engaged in a pattern, practice and custom of physically assaulting young crowd members and fabricating evidence in order to procure convictions against alleged Young Crowd members.

56.   At the time of the investigation of the Sarpy murder, Defendant Ditsch and Deputy Loy Luna were both members of the Lynwood Vikings, operating out of the OSS gang enforcement unit within the Lynwood sub-station.  At the trial of Mr. Carrillo, no information was provided to the District Attorney's Office that Defendant Ditsch and Deputy Loy Luna were members of the Lynwood Vikings.

57.   Prior to and during the time of the Sarpy murder investigation, supervisors of the Los Angeles County Sheriff's Department were aware of the existence of the white supremacist gang located in the Lynwood station known as the Vikings and were aware of the unconstitutional practices of deputies of the Lynwood station belonging to the Vikings. Defendant County of Los Angeles had a duty to adequately train, supervise, and control its officers to prevent the deputies' affiliation with the Lynwood Vikings from affecting the investigation

1    and apprehension of suspects and the interviewing of witnesses and conducting

2    photo identifications.

3        58.   Further, Defendant County of Los Angeles had a duty to monitor and

4    supervise the deputies within the Lynwood Vikings and to intervene and thereby

5    disband this white supremacist gang.

6        59.   In addition, Defendant County of Los Angeles had a duty to

7    disseminate to Deputy District attorneys prosecuting cases in which a deputy was

8    to testify, including prosecutors who represented Defendant County of Los

9    Angeles during Mr. Carrillo's preliminary hearing and trials, that the deputy – in

10   this case Defendant Ditsch – was a member of the internal Sheriff's gang, the

11   Lynwood Vikings. The County of Los Angeles' failure to do so resulted in the

12   prosecutors in Mr. Carrillo's case, and in turn the Mr. Carrillo's defense counsel,

13   not having access to this impeachment information with regard to Defendant

14   Ditsch's affiliation with the Lynwood Vikings at the time of Mr. Carrillo's

15   conviction.  Disclosure of information reflecting Defendant Ditsch's affiliation

16   with the Lynwood Vikings would have revealed Defendant Ditsch's motivation to

17   produce fabricated evidence against an alleged member of the Young Crowd gang.

18       60.   Based on the County of Los Angeles' failure to share information

19   pertaining to gang affiliation of Sheriff's deputies with Deputy District Attorneys

20   prosecuting the case in which the deputy was to testify, and the failure to train

21   Sheriff's personnel to disseminate information pertaining to Sheriff's deputies

22   gang affiliation, the County of Los Angeles had a pattern, practice and custom of

23   using unreliable testimony of deputies out of the Lynwood sub-station to secure

24   criminal convictions by permitting Sheriff's deputies to testify at trial without

25   disclosing significant impeachment information reflecting the Sheriff's deputy's

26   motivation to fabricate evidence and commit perjury through such testimony.

27

28

**F.   MR. CARRILLO'S PETITION FOR WRIT OF HABEAS CORPUS**

61.   From March 7, 2011, to March 16, 2011, the Los Angeles Superior Court for the County of Los Angeles, Hon. Paul A. Bacigalupo presiding, held an evidentiary hearing with regard to Mr. Carrillo's Petition for Writ of Habeas Corpus.  During that hearing, Scott Turner testified about his inability to pick out Mr. Carrillo's photograph and the actions of Deputy Ditsch in leading him to identify Mr. Carrillo as the shooter in the Sarpy murder.

62.   Mr. Turner was cross-examined by Deputy District Attorney Brentford Ferreira at that evidentiary hearing.

63.   Other than one eyewitness who invoked his Fifth Amendment Right against self incrimination, the other four eyewitnesses recanted their identification of Mr. Carrillo, and advised the Court that it was because of Mr. Turner or another eyewitness saying he chose Mr. Carrillo from the six-pack photo array that they chose Mr. Carrillo's photograph.

64.   After hearing Mr. Turner's testimony, the testimony of the other eyewitnesses and Defendant Ditsch's testimony at the evidentiary hearing, the Court found that:

a.  "Turner's selection of Carrillo was not based on his observation of the shooter; and that none of the bystander witnesses could have accurately identified anyone in the passenger seat on the night of the crime;"

b.  "Testimony at the hearing established that the other bystander witnesses were unable to identify the shooter based on their own observations and were influenced by Turner's identification;"

c.  "[Contrary to Deputy Ditsch's statement that he assembled the six-pack after Mr. Turner allegedly chose Mr. Carrillo from the gang book] the six-pack that was shown to Turner following Mr. Sarpy's death was in existence prior to that interview session.  The six-pack was the same one used in a prior

1    case in which Mr. Carrillo was charged with a shooting which took place in

2    December of 1990.  (6 HRT 75.)"

3    d. "Turner credibly admitted during the hearing that he was not able to make

4        any identification at the time of the shooting (2 HRT 77; 3 HRT 107).

5        Turner's testimony is bolstered by the Court's own view of the crime scene

6        under similar conditions."

7    65.   On July 26, 2011, the Court issued its Findings of Fact and Conclusions

8    of Law granting Mr. Carrillo's Habeas Petition. The District Attorney's Office

9    elected to not re-try Mr. Carrillo, and not appeal the Superior Court's decision.

10   Accordingly, he is an innocent man as a matter of law.

11   66.    When Mr. Carrillo was released from the custody of Defendant County

12   of Los Angeles on March 16, 2011, he had been wrongfully and continuously held

13   in custody since January 24, 1991, more than 20 years.

14   **G.     PARTICIPATION, STATE OF MIND AND DAMAGES**

15   67.   All Defendants acted without authorization of law.

16   68.   Each Defendant participated in the violations alleged herein, or directed

17   the violations alleged herein, or knew of the violations alleged herein and failed to

18   act to prevent them. Each defendant ratified, approved or acquiesced in the

19   violations alleged herein.

20   69.   As joint actors with joint obligations, each defendant was and is

21   responsible for the failures and omissions of the other.

22   70.   Each Defendant acted individually and in concert with the other

23   Defendants and others not named in violating Plaintiff's rights.

24   71.   Each Defendant acted with a deliberate indifference to or, reckless

25   disregard for, an accused's rights for the truth in withholding evidence from

26   prosecutors, and /or for the Plaintiff's right to an eyewitness identification free

27   from improper suggestion, and/or for the Plaintiff's right to due process of law.

28

72.   As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the Defendants, Plaintiff has suffered great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Plaintiff to sustain damages in a sum to be determined at trial.

73.   Due to the acts of the Defendants, Plaintiff has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish as well as mental and physical pain and injury. For such injury, Plaintiff will incur significant damages based on psychological and medical care.

74.   As a further result of the conduct of each of these Defendants, Plaintiff has lost past and future earnings in an amount to be determined according to proof at trial.

75.   As a further result of the conduct of each of these Defendants, Plaintiff has been deprived of familial relationships, including not being able to get married and raise a family.

76.   The aforementioned acts of the Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith and done with reckless disregard or with deliberate indifference to the constitutional rights of the Plaintiff, entitling Plaintiff to exemplary and punitive damages from each defendant other than defendant County of Los Angeles in an amount to be proven at the trial of this matter.

77.   By reason of the above described acts and omissions of Defendants, Plaintiff was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988.

# FIRST CLAIM FOR RELIEF

## DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983 – *BRADY* VIOLATIONS
### (Against Defendant Ditsch and Does 1-10)

78.   Plaintiff realleges paragraphs 1 through 77, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

79.   Defendant Ditsch and Does 1-10, while acting under color of law, deprived Plaintiff of his civil rights by violating his right to have material exculpatory evidence and information as required by *Brady v. Maryland*, 373 U.S. 83 (1963) (hereafter *Brady* information) turned over to the prosecutors handling his case so that it could in turn be provided to the Carrillo defense.

80.   The actions of each defendant in withholding evidence from prosecutors were done with deliberate indifference to or reckless disregard for Plaintiff's rights or for the truth.

81.   The *Brady* violations asserted herein encompass, but are not limited to:

A.      Failure to disclose Defendant Ditsch and Does 1 – 10's role in providing information to Scott Turner that steered him toward his identification of Mr. Carrillo, including the fact that: a) Mr. Turner chose several other photographs prior to selecting Mr. Carrillo; b) after every selection made by Mr. Turner prior to his selection of Mr. Carrillo, Defendant Ditsch specifically advised him that the individual in the photograph could not be the suspect shooter in the Sarpy murder; c) after his selection of Mr. Carrillo, Defendant Ditsch advised Mr. Turner that he made the right choice; d) that the photo six-pack presented to Mr. Turner had been previously used in the Sarabia investigation; e) that Deputy Loy Luna influenced the witnesses in the Sarabia investigation to select Mr. Carrillo's photograph from the same photo six-pack used in the Sarpy murder investigation; and f) when he learned that Mr. Turner was recanting his testimony at Mr. Carrillo's second trial, Deputy Ditsch threatened that Mr.

21

1   Turner would face negative consequences when he was out of custody and

2   on the street.

3   B.    Failure to disclose his membership in the Lynwood Vikings, a white

4   supremacist internal gang dedicated to wiping out the Young Crowd gang,

5   including the use of fabricated evidence to obtain false convictions.

6   82.   The constitutional source of the obligation to provide *Brady*

7   information is primarily the due process clause of the Fifth and Fourteenth

8   Amendments, and Plaintiff's due process rights were violated by the conduct

9   alleged herein. Plaintiff brings this claim as both a procedural and a substantive

10  due process violation. To the extent that any court were to conclude that the source

11  of Plaintiff's right to *Brady* information is any constitutional source other than due

12  process (such as the Fourth Amendment), this claim is brought on those bases as

13  well.

14  83.   Defendant Ditsch and the other Doe defendants were each jointly and

15  severally responsible to provide *Brady* information to the prosecutors handling the

16  Carrillo case so that it could in turn be provided to the Carrillo defense. Each

17  engaged in, knew or should have known of the unconstitutional conduct alleged

18  herein and failed to prevent it, which each had a responsibility to do, and each

19  ratified, approved or acquiesced in it.

20  84.   As a result of defendants', and each of their, violations of Mr. Carrillo's

21  constitutional right to have *Brady* information turned over to the prosecutors

22  handling his case, Mr. Carrillo was damaged as alleged above.

### SECOND CLAIM FOR RELIEF

**JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS – 42 U.S.C. §1983 – *BRADY* VIOLATIONS**
**(Against Defendants Ditsch and Does 1-10)**

27  85.   Plaintiff realleges paragraphs 1 through 84, as well as any subsequent

28  paragraphs contained in the complaint, as if fully set forth herein.

22

86.   Defendants Ditsch and Does 1-10 were jointly and severally responsible as investigators assigned to the Carrillo case to share material case information with each other, and to ensure that *Brady* information was turned over to the prosecutors handling the Carrillo case.

87.   Defendants Ditsch and Does 1-10, acting under color of state law, acted in concert, conspired and agreed to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States, in particular the right to have *Brady* information of which they were aware provided to the prosecutors prosecuting the Carrillo case, as elaborated above. Each failure to provide *Brady* information, as well as other actions related to them, constitutes an overt act in furtherance of said conspiracy.

88.   Alternatively as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of the other.

89.   As a result of defendants', and each of their, violations of Mr. Carrillo's constitutional right to have *Brady* information turned over to the prosecutors handling his case, Mr. Carrillo was damaged as alleged above.

### THIRD CLAIM FOR RELIEF

### DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. §1983 – *MANSON/BIGGERS* VIOLATIONS
### (Against Defendants Ditsch and Does 1-10)

90.   Plaintiff realleges paragraphs 1 through 89, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

91.   Defendants Ditsch and Does 1 through 10, while acting under color of law, deprived Plaintiff of his civil rights by violating his right to have an eyewitness identification by Scott Turner that was free from suggestion or influence by police, as set forth in *Manson v. Brathwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972). The actions of each defendant in violating Plaintiff's right to have an eyewitness identification by Scott Turner that was free

1  from suggestion or influence by police were done with deliberate indifference to

2  and/or reckless disregard for Plaintiff's rights or for the truth.

3      92.   The constitutional source of the obligation to conduct eyewitness

4  identifications free from improper suggestion or influence is the due process clause

5  of the Fifth and Fourteenth Amendments. Plaintiff's due process rights were

6  violated by the conduct alleged herein. Plaintiff brings this claim as a procedural,

7  or alternatively as a substantive, due process violation. To the extent that any court

8  were to conclude that the source of Plaintiff's right to eyewitness identifications

9  free from improper suggestion or influence is any constitutional source other than

10 due process (such as the Fourth Amendment), this claim is brought on those bases

11 as well.

12     93.   The acts of improper suggestion and influence include not only the

13 conduct of the defendants during the original eyewitness identification by Scott

14 Turner but also their threatening to retaliate against Scott Turner prior to his

15 testimony at Mr. Carrillo's second trial, thereby intimidating and preventing him

16 from disclosing to the court, the prosecutor or the jury in the Carrillo case that

17 Defendant Ditsch and the Doe defendants had created Mr. Turner's false

18 identification.

19     94.   Defendants Ditsch and Does 1-10 were each jointly and severally

20 responsible to ensure that any identification procedure was free from suggestion or

21 influence by police, and violated that responsibility. Each engaged in, knew or

22 should have known of the unconstitutional conduct alleged herein, and ratified,

23 approved or acquiesced in it.

24     95.   As a result of defendants', and each of their, violations of Mr. Carrillo's

25 constitutional rights as alleged above, Mr. Carrillo was damaged as alleged above.

26

27

28

24

## FOURTH CLAIM FOR RELIEF

### JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS – 42 U.S.C. §1983 – *MANSON/BIGGERS* VIOLATIONS
### (Against Defendants Ditsch and Does 1-10)

96.   Plaintiff realleges paragraphs 1 through 95, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

97.   Defendants Ditsch and Does 1 - 10 were jointly and severally responsible as investigators assigned to the Carrillo case to share material case information with each other, and to ensure that any eyewitness identification by Scott Turner was free from suggestion or influence by police.

98.   Defendants Ditsch and Does 1 - 10, acting under color of state law, conspired and agreed to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States, in particular the right to have the eyewitness identification by Scott Turner occur free from suggestion or influence by police, as elaborated above. Each act of improper influence, as well as other actions related to them, constitutes an overt act in furtherance of said conspiracy.

99.   Alternatively as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of the other.

100. As a result of defendants', and each of their, violations of Mr. Carrillo's constitutional rights as alleged above, Mr. Carrillo was damaged as alleged above.

## FIFTH CLAIM FOR RELIEF

### DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. §1983 – FALSE EVIDENCE VIOLATIONS
### (Against Defendants Ditsch and Does 1-10)

101. Plaintiff realleges paragraphs 1 through 100, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

102. Defendant Ditsch and Does 1-10, while acting under color of law, deprived Plaintiff of his civil rights, more particularly, his right to due process of

25

law, by providing false evidence in reports and statements outside of live testimony that resulted in a deprivation of liberty because they set in motion a reasonably foreseeable chain of events leading to the presentation of false evidence at Plaintiff's 1991 and 1992 criminal trials, his conviction and incarceration.

103. Each defendant knew or should have known the evidence was false, and the defendants' conduct was done with deliberate indifference to and/or reckless disregard for Plaintiff's rights or for the truth.

104. Each defendant deliberately mischaracterized Turner's eyewitness identification, and used interviewing techniques so abusive that they knew or should have known that they would, and are known to, yield false evidence.

105. The false evidence asserted herein encompasses, but is not limited to: Defendant Ditsch and Does 1 – 10's role in providing information to Scott Turner that steered him toward his identification of Mr. Carrillo. Defendant Ditsch and Does 1-10 knew or should have known that Mr. Turner could not identify Mr. Carrillo as the shooter, or in any way as a participant in the shooting of Mr. Sarpy on January 18, 1991. As a result of their deliberate influence over Mr. Turner's false selection of Mr. Carrillo's photograph, Defendant Ditsch and Does 1-10 knew or should have known that Mr. Turner's selection of Mr. Carrillo did not provide any evidence pointing to Mr. Carrillo's guilt, and that he was providing false evidence.

106. The constitutional source against using false evidence is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to not have false evidence use against him is any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

26

107. Defendant Ditsch and the other Doe defendants were each jointly and severally responsible to not use false evidence against Mr. Carrillo. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

108. As a result of defendants', and each of their, violations of Mr. Carrillo's constitutional right to not have false evidence turned over to the prosecutors handling his case, Mr. Carrillo was damaged as alleged above.

## SIXTH CLAIM FOR RELIEF

## JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS – 42 U.S.C. §1983 – FALSE EVIDENCE VIOLATIONS
### (Against Defendants Ditsch and Does 1-10)

109. Plaintiff realleges paragraphs 1 through 108, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

110. Defendants Ditsch and Does 1-10 were jointly and severally responsible as investigators assigned to the Carrillo case to not use false evidence.

111. Defendants Ditsch and Does 1-10, acting under color of state law, acted in concert, conspired and agreed to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States, in particular the right to not have false evidence used in the Carrillo case, as elaborated above. The use of false evidence, as well as other actions related to the use of such evidence, constitutes an overt act in furtherance of said conspiracy.

112. Alternatively as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of the other.

113. As a result of defendants', and each of their, violations of Mr. Carrillo's constitutional right to not have false evidence used against him, Mr. Carrillo was damaged as alleged above.

## SEVENTH CLAIM FOR RELIEF

### DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. §1983
### (Against Defendant County of Los Angeles) – MONELL VIOLATIONS

114. Plaintiff realleges paragraphs 1 through 113, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

115. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, Defendants County of Los Angeles and Does 1 - 10, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff, engaged in the unconstitutional conduct and omissions as is specifically elaborated in ¶¶ 50-60 et seq. above, which consist of the following customs and/or policies:

(a)  The knowing presentation of false evidence by deputies;

(b)  The deliberately indifferent presentation of false evidence by deputies;

(c)  The presentation of false evidence by deputies in reckless disregard for the truth or the rights of the accused;

(d)  Deputies' failure to provide exculpatory evidence to prosecutors;

(e)  Failing to adequately train, supervise and control its deputies in the investigation and questioning of eyewitnesses, including the prevention of unconstitutional influence of eyewitnesses, and thereby preventing the use of fabricated eyewitness identifications;

(f)  Failing to adequately train, supervise and control its deputies to disclose to the District Attorney's Office exculpatory and impeachment evidence, or any other evidence which constitutes *Brady* information;

(g)  Knowingly failing to disband deputy gangs within the Los Angeles County Sheriff's Department which engage in unconstitutional conduct against residents, particularly minorities, including, among

other things, the fabrication of evidence in criminal cases and
engaging in acts of excessive force;

(h) Failing to adequately discipline deputies involved in dishonesty or
otherwise abusing their authority;

(i) Failing to adequately discipline deputies involved in deputy gangs
which engage in unconstitutional conduct;

(j) Condoning and encouraging deputies in the belief that they can
violate the rights of persons such as Mr. Carrillo with impunity, and
that such conduct will not adversely affect their opportunities for
promotion and other employment benefits;

(k) Failing to adequately investigate incidents involving the fabrication
of evidence, wrongful influence of identifications, belonging to
deputy gangs, or other misconduct by its deputies;

(l) Conducting investigations in such a manner as to conceal the
misconduct of its deputies; and

(m) Condoning and encouraging the fabrication of evidence including but
not limited to the filing of materially false police reports, the use to
techniques to influence eyewitness identifications, and/or making
false statements to prosecution authorities to obtain the filing of false
charges.

116.  The actions and inactions of the Los Angeles County Sheriff's
Department set forth in ¶¶ 50-60 were known or should have been known to the
policy makers responsible for the Los Angeles County Sheriff's Department and
occurred with deliberate indifference to either the recurring constitutional
violations elaborated above, and/or to the strong likelihood that constitutional
rights would be violated as a result of failing to train, supervise or discipline in
areas where the need for such training and supervision was obvious.

117. The actions of the Los Angeles County Sheriff's Department set forth herein were a motivating force behind the violations of Mr. Carrillo's constitutional rights as set forth in this complaint.

118. As a direct and proximate result of Defendant County of Los Angeles' acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of Defendants Ditsch and Does 1 - 10 acts and omissions, Plaintiff sustained injury and damage as proved.

119. As a result of defendants', and each of their, violations of Mr. Carrillo's constitutional rights as set forth herein, Mr. Carrillo was damaged as alleged above.

WHEREFORE, Plaintiff, Francisco Carrillo, Jr., requests relief on his own behalf as follows, and according to proof, against each Defendant:

1.   General and compensatory damages in an amount according to proof;

2.   Special damages in an amount according to proof;

3.   Exemplary and punitive damages against each Defendant, except the County of Los Angeles, in an amount according to proof;

4.   Costs of suit, including attorneys' fees, under 42 U.S.C. §1988; and,

5.   Such other relief as may be warranted or as is just and proper.

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

DATED:   December 12, 2011      By: _____
                                    RONALD O. KAYE
                                    Attorneys for Plaintiff
                                    Francisco Carrillo, Jr.

**JURY DEMAND**

Trial by jury of all issues is demanded.

KAYE, McLANE & BEDNARSKI, LLP

DATED: December 12, 2011        By:

RONALD O. KAYE
Attorneys for Plaintiff
Francisco Carrillo, Jr.

31