RONALD O. KAYE (No.145051)
MARILYN E. BEDNARSKI (105322)
CAITLIN S. WEISBERG (No. 262779)
KAYE, McLANE & BEDNARSKI
234 E. Colorado Blvd. Suite 230
Pasadena CA 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
E-mail: rok@kmbllp.com

Attorneys for Plaintiff,
FRANCISCO CARRILLO, JR.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| FRANCISCO CARRILLO, JR., <br><br> Plaintiff, <br><br> vs. <br><br> COUNTY OF LOS ANGELES, CRAIG DITSCH AND DOES 1 THROUGH 10, inclusive, <br><br> Defendants, | CASE NO. CV 11-10310 SVW (AGRx) <br><br> **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR COLLATERAL ESTOPPEL AS TO ISSUES DECIDED BY EARLIER STATE COURT RULING ON PLAINTIFF'S PETITION FOR WRIT OF HABEAS CORPUS; DECLARATIONS; EXHIBITS** <br><br> DATE:       June 18, 2012 <br> TIME:       1:30 p.m. <br> COURT:    Hon. Steven V. Wilson <br><br> Action Filed: December 14, 2011 <br> Pretrial Conference: October 1, 2012 <br> Trial: October 16, 2012 |

PLEASE TAKE NOTICE that on Monday, June 18, 2012 at 1:30 p.m. in Courtroom 6 of the United States Courthouse, 312 North Spring Street, Los Angeles, CA 90012, Plaintiff will move the Court to issue a ruling of Affirmative Collateral Estoppel with regard to multiple written findings of the Superior Court which granted Mr. Carrillo's Petition for Writ of Habeas Corpus.

1    Pursuant to Local Rule 7-3, counsel for Plaintiff held a conference with
2  counsel for Defendants on April 30, 2012. Defendants do not consent to the relief
3  requested in this motion.

4    This motion is based on Plaintiff's Memorandum of Points and Authorities,
5  the attached declarations and exhibits, all pleadings and papers on file herein, the
6  hearing on this motion, and on such other and further matters as the Court deems
7  necessary or appropriate.

8

9                              Respectfully submitted,

10

11  DATED: May 15, 2012          KAYE, McLANE & BEDNARSKI, LLP

12

13                         By_____/S/_____
14                              RONALD O. KAYE
                                Attorneys For Plaintiff
15                              Francisco Carrillo, Jr.

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES CITED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . 1

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    PLAINTIFF'S ALLEGATIONS IN THIS CASE. . . . . . . . . . . . . . . . 1

III.   FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.    Investigation and Criminal Prosecution. . . . . . . . . . . . . . . . . . 3

       B.    Mr. Carrillo's Petition for Writ of Habeas Corpus. . . . . . . . . . 4

       C.    Respondents' Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       D.    Evidentiary Hearing for Mr. Carrillo's Petition. . . . . . . . . . . . 7

             1.    Petitioner's Presentation of Evidence. . . . . . . . . . . . . . . 7

             2.    Respondent's Presentation of Evidence. . . . . . . . . . . . . 8

       E.    Superior Court's Findings of Fact and
             Conclusions of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.    REQUESTED FINDINGS TO BE ADMITTED INTO
       EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.     LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VI.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       A.    The Policies Underlying the Doctrine of Collateral Estoppel
             Support the Result Requested by Mr. Carrillo. . . . . . . . . . . . 13

       B.    The Issues Presented by Plaintiff for Preclusive Effect Were
             Actually Litigated and Necessarily Decided by the Superior
             Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       C.    Under California Law, Defendants County of Los Angeles
             and Craig Ditsch Are in Privity with the Los Angeles County
             DA's Office. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       D.    Precluding Relitigation of Decided Issues in This Case Does
             Not Violate Defendants' Due Process Rights. . . . . . . . . . . . . 22

V.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**FEDERAL CASES**

3
*Allen v. McCurry,* 449 U.S. 90 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

4
*Ashe v. Swenson,* 397 U.S. 436 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

5
*City of Los Angeles v. Heller*, 475 U.S. 796 (1986). . . . . . . . . . . . . . . . . . . . . . . . 25

6
*Heck v. Humphrey,* 512 U.S. 477 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

7
*Migra v. Warren City School Dist. Bd. of Education*, 465 U.S. 75 (1984). . . . . . 12

8
*Montana v. United States*, 440 U.S. 147 (1979). . . . . . . . . . . . . . . . . . . . . . . . 14, 19

9
*Thomas v. County of Los Angeles,* CV 90-5217-TJH. . . . . . . . . . . . . . . . . . . . . . . . 2

10
*White v. City of Pasadena,* 671 F.3d 918 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . 18

11

12

**STATE CASES**

13
*Aronow v. Lacroix,* 219 Cal. App. 3d 1039 (Ct. App. 1990). . . . . . . . . . . 18, 22, 23

14
*Brown v. Rahman*, 231 Cal. App. 3d 1458 (Cal. Ct. App. 1991). . . . . . . . . . . . . . 22

15
*Cal. Physicians' Serv. v. Aoki Diabetes Research Institute*,

16
163 Cal. App. 4th 1506 (Cal. Ct. App. 2008). . . . . . . . . . . . . . . . . . . . *passim*

17
*Ceresino v. Fire Ins. Exchange*,

18
215 Cal. App. 3d 814 (Cal. Ct. App. 1989). . . . . . . . . . . . . . . . . . . . . . 19, 20

19
*Clemmer v. Hartford Insurance Co.*, 22 Cal. 3d 865 (1978). . . . . . . . . . . . . . 17, 22

20
*County of Butte v. Superior Court,*

21
176 Cal. App. 3d 693 (Cal. Ct. App. 1985). . . . . . . . . . . . . . . . . . . . . . . . . 25

22
*Dyson v. Cal. State Personnel Bd.,*

23
213 Cal. App. 3d 711 (Cal. Ct. App. 1989). . . . . . . . . . . . . . . . . . . . . *passim*

24
*Gikas v. Zolin*, 6 Cal. 4th 841 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

25
*Hernandez v. City of Pomona*, 46 Cal. 4th 501 (2009). . . . . . . . . . . . . . . . . . . . . 16

26
*Lewis v. County of Sacramento,* 218 Cal. App. 3d 214 (Cal. Ct. App. 1990). . . . 20

27

28

## TABLE OF AUTHORITIES (CONT.)

*Lucido v. Superior Court,* 51 Cal. 3d 335 (Cal. 1990). . . . . . . . . . . . . . . . . . *passim*

*Lynch v. Glass,* 44 Cal. App. 3d 943 (Cal. Ct. App. 1975).. . . . . . . . . . . . . . . 13

*Miller v. Superior Court,* 168 Cal. App. 3d 376 (Cal. Ct. App. 1985).. . . 14, 15, 20

*Mooney v. Caspari,* 138 Cal. App. 4th 704 (Cal. Ct. App. 2006). . . . . . . . . . . . 24

*People ex rel. State of Cal. v. Drinkhouse,*

    4 Cal. App. 3d 931 (Cal. Ct. App. 1970). . . . . . . . . . . . . . . . . . . 17, 20, 23

*People v. Garcia,* 39 Cal. 4th 1070 (2006). . . . . . . . . . . . . . . . . . . . . . 14, 18, 25

*People v. Ochoa*, 191 Cal. App. 4th 664 (Cal. Ct. App. 2011). . . . . . . . . . . . . . 18

*People v. One 1964 Chevrolet Corvette Convertible*,

    274 Cal.App.2d 720 (Cal. Ct. App. 1969). . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Sims,* 32 Cal. 3d 468 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Stafford v. Russell*, 117 Cal. App. 2d 319 (Cal. Ct. App. 1953).. . . . . . . . . . . . 19

*Teitelbaum Furs, Inc. v. Dominion Ins. Co.,* 58 Cal. 2d 601 (1962). . . . . . . . . . 20

*Zapata v. Department of Motor Vehicles*,

    2 Cal. App. 4th 108 (Cal. Ct. App. 1983). . . . . . . . . . . . . . . . . . . . . . . . . 21


**FEDERAL STATUTES AND CONSTITUTION**

28 U.S.C. § 1738. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Article IV, § 1 of the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . 12


**STATE STATUTES**

Cal. Gov't Code § 815.2(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Cal. Gov't Code §§ 25300, 25303.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Cal. Gov't Code §§ 995, 825(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

iii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

After a six day evidentiary hearing, the Los Angeles Superior Court granted Mr. Carrillo's Petition for Habeas Corpus. Based on the substantial and unique role the Los Angeles Sheriff's Department ("LASD") played in the Los Angeles District Attorney's ("DA") investigation and litigation of that case (*see* attached declarations of Deputy DAs Brent Ferreira and Juan Mejia), and the shared emphasis by both the LASD and the DA with regard to LASD's potential liability (unnecessary for the habeas), Plaintiff requests that the Court find that Defendants County of Los Angeles and Craig Ditsch are collaterally estopped from relitigating the Findings of the Superior Court. *See* Ex. A, Findings of Fact and Conclusions of Law, and Ex. B, Modification of Findings. This result is supported by the principles of judicial economy and comity that underlie the doctrine of collateral estoppel, and ensures that this case focuses on the liability of the Defendants rather than Mr. Carrillo's wrongful conviction, which has already been proven.

## II.   PLAINTIFF'S ALLEGATIONS IN THIS CASE

In this case, Plaintiff alleges that Defendant Craig Ditsch—a member of the gang enforcement unit of the Lynwood Sheriff's Station of the LASD and an admitted member of the Lynwood Vikings[1]—improperly and intentionally

---

[1]   Defendant Ditsch testified at the evidentiary hearing on Mr. Carrillo's Petition that "the Vikings was the mascot of Lynwood station, so I was a Viking in fact that I trained there and I worked there, Yes. . . The Vikings were hardworking men and women . . ." Kaye Decl., Ex. C, Excerpts of Hearing, at PFC 1705-06.

A much different description was revealed by judicial and legislative evaluation of the Vikings. In December of 1991, eleven months after Mr. Carrillo's wrongful arrest, the Los Angeles County Board of Supervisors appointed retired Judge James G. Kolts as Special Counsel to conduct a review of the Los Angeles County Sheriff's Department. As part of its review, the Kolts Commission's reviewed evidence reflecting the existence of racist deputy gangs within the Sheriff's Department; in particular, the Lynwood Vikings. The Commission found that "some deputies at the Department's Lynwood Station associate with the 'Viking' symbol, and appear at least in times past to have engaged in behavior that is brutal and intolerable and is typically associated with street gangs." The Commission quoted District Court Judge Terry Hatter from the class action

1  influenced Scott Turner to falsely identify Mr. Carrillo as the perpetrator of a drive-

2  by shooting on January 18, 1991 that resulted in the death of Donald Sarpy.

3       Mr. Turner, then a 15 years old gang member, was taken to the Lynwood

4  Sheriff's Station with four of the other eyewitnesses on the night of the shooting.

5  The other four witnesses were interviewed by the lead investigators on the case. Mr.

6  Turner, however, was interviewed by Defendant Ditsch, with whom he had a prior

7  relationship. Mr. Turner was the only eyewitness who was shown photographs,

8  although all of the eyewitnesses gave similar vague descriptions of the perpetrators

9  in interviews earlier that night, including Mr. Turner who stated in a telephone

10  interview before his meeting with Defendant Ditsch that he "only saw (2) male

11  Hispanics (NFD) in the [perpetrator] vehicle."

12       Mr. Turner has testified that Defendant Ditsch guided him to select Mr.

13  Carrillo's photograph as the perpetrator of the Sarpy murder. Mr. Turner has

14  testified that he did not see the perpetrator on January 18, 1991 well enough to

15  recognize him. All Mr. Turner knew on the night of January 18, 1991 was that the

16  drive-by shooting was likely perpetrated by members of the Young Crowd gang, a

17  rival gang to his gang, information that was likewise known to Defendant Ditsch.

18  Mr. Carrillo's photograph was, at that time, included in the Young Crowd gang

19  book although he was no longer a gang member and had moved out of Lynwood.

20       Mr. Turner has testified that he told the other eyewitnesses that he had made

21  an identification, described the person he identified, and stated that the photograph

22  was in the number one position in the six-pack. The other five witnesses later

23  identified the same photograph and testified against Mr. Carrillo in both criminal

24  trials. Mr. Turner and Defendant Ditsch also testified in both criminal trials. Prior to

25  the second trial and in his testimony at the second trial, Mr. Turner recanted his

26  _____

27  lawsuit, *Thomas v. County of Los Angeles*, CV 90-5217-TJH, finding that "many
    incidents . . . involved a group of Lynwood area deputies who are members of a

28  neo-nazi, white supremacist gang – the Vikings – which exists with the knowledge
    of departmental policy makers."Ex. D, Excerpt of Kolts Report.

1  identification of Mr. Carrillo, unbeknownst to the other eyewitnesses. At each trial,

2  and particularly during the second trial, Defendant Ditsch was called in large part to

3  bolster Mr. Turner's original identification.

4  **III.   FACTUAL BACKGROUND**

5       The drive-by shooting at issue in this case occurred on January 18, 1991, at

6  approximately 7:00 p.m. on Lugo Avenue in Lynwood, California. At the time of

7  the shooting, six African American teenagers—ages 15 to 18—were present at the

8  scene, one of whom was the son of the victim, Donald Sarpy. The nature of the

9  shooting, the existence of a well-known gang rivalry, and the perpetrators' use of

10  gang jargon led to the conclusion that the crime was gang-related.

11       **A.   Investigation and Criminal Prosecution**

12       The six eyewitnesses were interviewed by investigating officers of the LASD

13  on the same night as the shooting. During initial interviews on the scene and by

14  telephone, the eyewitnesses gave vague descriptions of the perpetrators (*e.g.*,

15  "hispanic male") and inconsistent descriptions of the vehicle. Later that night, one

16  of the witnesses, Scott Turner, allegedly made an identification of Plaintiff,

17  Francisco Carrillo, Jr., from a photo array of six photographs ("six pack"). Mr.

18  Carrillo's photograph was in the number one position of the six pack, at the top left

19  corner. Based on Mr. Turner's identification, Mr. Carrillo was arrested.

20       Approximately six months later, immediately prior to the preliminary

21  hearing, the same six pack was shown to the other five eyewitnesses. With varying

22  degrees of confidence, each of the eyewitnesses selected Plaintiff's photograph, still

23  in the number one position. Based *exclusively* on these identifications, the DA's

24  office prosecuted Plaintiff for the murder of Donald Sarpy and the attempted

25  murder of the six eyewitnesses.

26       The first trial resulted in a hung jury; the second trial resulted in a conviction.

27  On December 3, 1992, Plaintiff was sentenced to a term of twenty-five years to life

28  in prison.

**B.      Mr. Carrillo's Petition for Writ of Habeas Corpus**

Throughout his two trials and after his conviction, Mr. Carrillo maintained his innocence. With the assistance of pro bono counsel, Mr. Carrillo sought to overturn his conviction by establishing that the eyewitness testimony against him was false and that other known persons committed the drive-by shooting on January 18, 1991. In interviews and later in sworn declarations, five of the six eyewitnesses recanted, in whole or in part, their original identification of Mr. Carrillo. This and other evidence was presented to the Los Angeles County DA's Office prior to the filing of Mr. Carrillo's Petition for Writ of Habeas Corpus ("Petition") on September 23, 2010 in the Los Angeles County Superior Court.

In support of the Petition, Mr. Carrillo presented evidence of the eyewitness recantations, expert testimony that the lighting conditions on January 18, 1991 would not have allowed reliable identifications, and evidence that three other individuals, and not Mr. Carrillo, were the perpetrators of the crime. In addition, Mr. Carrillo alleged that the original false identification by Scott Turner was the result of improper influence by the LASD officer who interviewed him, Defendant Ditsch. Ex. E, Petition ¶¶ 20-22, 81; Ex. F, Memo ISO at 5-6. The Petition further alleged that the other five eyewitness identifications were derivative of Mr. Turner's identification. Ex. E, Petition ¶¶ 81-83; Ex. F, Memo ISO at 5-6.

**C.      Respondents' Investigation**

In July through October, 2010, Deputy DA Juan Mejia, in conjunction with Senior DA Investigator John Callichio, independently reviewed the record of Mr. Carrillo's conviction, interviewed the percipient witnesses of the January 18, 1991 shooting, and observed the lighting at the scene of the crime. Mejia Decl. ¶¶ 2-14. After reviewing this record and independently investigating the case, on November 23, 2010, the DA's Office initially decided to concede the Habeas petition concluding that Mr. Carrillo had met his burden of proof. Mejia Decl. ¶¶ 15, 16; Ferreira Decl. ¶ 6. The results of the DA's investigation were shared with the

1    LASD, in particular, Chief William McSweeney – who commands the LASD

2    Detective Bureau. Mejia Decl. ¶ 17; Ferreira Decl. ¶ 7.

3        In response to this notification, from December 2, 2010 through December

4    21, 2010, LASD representatives began their own investigation, requested

5    investigation materials from the DA, and expressed concerns about the evidence

6    supporting Mr. Carrillo's Petition. Mejia Decl. ¶¶ 19-23. On December 21, 2010, at

7    the request of the LASD, a meeting was held by high ranking LASD and DA

8    representatives to discuss Mr. Carrillo's Petition. Mejia Decl. ¶ 24; Ferreira Decl.

9    ¶ 9. The LASD disagreed with the DA's findings and decision to concede the

10   Petition, and requested time for further investigation by the LASD. Mejia Decl.

11   ¶ 24; Ferreira Decl. ¶ 9. As a result of the meeting, the LASD and the DA's Office

12   decided that the case would be re-investigated by the LASD, thereby abandoning

13   the DA's proposed decision to concede Mr. Carrillo's Petition. Ferreira Decl. ¶ 9.

14   On January 14, 2011, LASD and DA representatives made a joint appearance

15   before the Superior Court to request a continuance of the deadline for responding to

16   Mr. Carrillo's Petition. The purpose of the continuance was to give respondents

17   time to conduct the follow-up investigation requested by the LASD. *Id.*

18       In December, January, and February, the LASD conducted its own

19   investigation of Mr. Carrillo's petition in cooperation with the DA's Office. Mejia

20   Decl. ¶ 22-53.  The follow-up investigation included re-interviewing the

21   eyewitnesses from the shooting, who were recanting; interviewing other witnesses

22   who were suspects or affiliated with suspects to the murder as well as a confidential

23   informant; and gathering archived investigation records. *See id.*; Declaration of

24   Ronald Kaye ¶ 2.

25       As part of this investigation, LASD representatives traveled to Folsom prison

26   to interview Mr. Carrillo. Mejia Decl. ¶ 27. Although Mr. Carrillo was represented

27   by counsel, neither his counsel nor the DA's Office were notified of this interview.

28   *See* Mejia Decl. ¶ 27; Ex. G, Letter of Habeas counsel.  In that interview, Sergeants

Biddle and Hall specifically inquired:

> We then asked Carrillo, who he thought was responsible for him being in prison. He replied that Sheriff's Detectives had rushed the original investigation which "snow balled" and led to the witnesses misidentifying him as the shooter. . . . [We] asked him if he or his attorneys were expecting a large pay out if it worked out his way. Carrillo said it was not an issue, because he was not intending to sue anyone.

Ex. H, LASD Report of Investigation at 9.  Thus, the civil liability stemming from Mr. Carrillo's case was overtly an issue in the LASD investigation. After raising the issue of whether he was going to sue the Sheriff's Department, one of the LASD interviewers asked Mr. Carrillo whether he would accept parole—a decision which would preclude a civil suit—in order to leave custody. In response, Mr. Carrillo said he would not, because he innocent of the crime. Kaye Decl. ¶ 3.

In addition to the independent re-investigation of the case, LASD representatives drafted specific discovery requests for the DA's Office to present to Mr. Carrillo's habeas team. Mejia Decl. ¶¶ 26, 45; Ex. I, Email of Juan Mejia with attached LASD Discovery Request. The requested items included materials inherently designed for the impeachment of Mr. Carrillo's witnesses, such as interview notes and recordings. On February 1, 2011, Mr. Carrillo's counsel provided responses to LASD's discovery request, which were relayed to LASD representatives. Mejia Decl. ¶ 45; Ex. J, Letter from Habeas counsel re Discovery.

On February 4, 2011, a second meeting of high ranking LASD and DA representatives was held, this time for the LASD to present the findings of its investigation. Mejia Decl. ¶¶ 47, 49. At that meeting, the decision was made to contest Mr. Carrillo's habeas petition and request an evidentiary hearing. Mejia Decl. ¶ 49; Ferreira Decl. ¶ 10. Accordingly, the DA's Office filed a Return to Mr. Carrillo's petition which emphasized the evidence gathered by the LASD with regard to inconsistencies in the eyewitness' accounts and the evidence of third party culpability. Ferreira Decl. ¶ 10; Kaye Decl. ¶ 4.

The Return also forcefully challenged Mr. Carrillo's allegation that Deputy

1  Craig Ditsch had engaged in any suggestive influence over witness Scott Turner

2  (which is the subject of the instant lawsuit). Ex. K at 3, ¶ 8, Return and

3  Memorandum ISO. To rebut Mr. Carrillo's allegation, Defendant Ditsch signed a

4  declaration contesting the facts presented by Mr. Carrillo regarding Turner's

5  identification. The declaration was attached as the second exhibit to the Return in

6  opposition to the Petition's allegation. Ex. K at p. 3, ¶ 8, Ex. L, Declaration of

7  Deputy Ditsch, offered as Exhibit 2 to the Return.

8      The investigation by the LASD and DA continued up until the evidentiary

9  hearing began on March 7, 2011. Ferreira Decl. ¶ 11. As described by Mr. Ferreira,

10 Deputy in Charge of the Habeas Corpus Litigation Team of the DA's Office:

11     In the nearly ten years that I have been the Deputy in Charge of the
       Habeas Corpus Litigation Team this is the first case in which a law-
12     enforcement agency has requested a joint reinvestigation of a habeas
       corpus proceeding based upon the agency's disagreement with the
13     findings of the Los Angeles County District Attorney's Office.

14 Ferreira Decl. ¶ 1, 12.

15     **D.     Evidentiary Hearing for Mr. Carrillo's Petition**

16      On March 7, 2011, the Los Angeles Superior Court began an evidentiary

17 hearing on Mr. Carrillo's Petition for Writ of Habeas Corpus, which included six

18 full days of witness testimony and argument. On March 14, 2011, the court granted

19 Mr. Carrillo's Petition.

20     **1.     Petitioner's Presentation of Evidence**

21      During the hearing, five of the six eyewitnesses recanted their trial testimony,

22 stating that they could not see who the shooter was on the night of the murder.  The

23 sixth eyewitness – James Munnerlyn – invoked his Fifth Amendment right against

24 self incrimination. The eyewitnesses testified (as Mr. Munnerlyn stated in his sworn

25 declaration) that they chose Mr. Carrillo's photograph because they were told that

26 Scott Turner picked the person in position number one of the photo six-pack – Mr.

27 Carrillo – as the shooter.

28      In support of the position that the eyewitnesses could not see who the shooter

was, Mr. Carrillo presented the testimony of a luminosity expert who tested the available lighting that existed at the time of the shooting.  Further, on this point, the Superior Court Judge attended a nighttime re-enactment of the events at the scene of the murder on Lugo Avenue, in order to personally observe whether there was sufficient lighting to recognize the facial features of the shooter.

In addition, Mr. Carrillo presented evidence demonstrating that three other individuals—Oscar Rodriguez, Jermaine Sembrano, and Hector Mercado—who were members of the Young Crowd gang at the time of the Sarpy murder, were responsible for the shooting.  Notes by Oscar Rodriguez written shortly after Mr. Carrillo's trial, were authenticated and admitted into evidence. In the notes, Mr. Rodriguez admitted to shooting Mr. Sarpy on January 18, 1991 and provided details of the crime. When Mr. Rodriguez, Mr. Sembrano and Mr. Mercado took the stand, all invoked their Fifth Amendment right against self incrimination.

### 2.     Respondent's Presentation of Evidence

At the outset of the hearing, Deputy DA Ferreira requested that the Court designate "two [Investigating Officers] on this case, DA Investigator Calicchio and Sergeant Biddle of the Sheriff's Department."  Ex. C, Excerpts of Hearing Transcript at PFC 1018. The Court granted that request and LASD Sergeant Biddle remained at counsel's table throughout the hearing, providing assistance to the DAs. *Id* at PFC 1018-19, 1138, 1257, 1367, 1501, 1643. In addition to Sergeant Biddle, LASD Chief William McSweeny, and other LASD representatives, observed the entire hearing from the gallery of the courtroom. Ferreira Decl. ¶ 11.

At the hearing, Deputy DAs Ferreira and Mejia vigorously cross-examined the five recanting eyewitnesses, Mr. Carrillo, his luminocity expert witness, and former defense investigator David Lynn, in an effort to undermine the eyewitness' recantations and uphold the original conviction.  Ferreira Decl. ¶ 11. Repeatedly, during the cross-examination of Mr. Carrillo's witnesses, the Deputy DAs utilized the re-investigation interviews performed by LASD investigators to impeach.  For

1   example, the eyewitnesses were confronted with the following statements made to

2   LASD representatives during their re-investigation:

- On examination by the DA, recanting eyewitness Marcus Stewart is impeached by his statement to Sergeants Biddle and Hall on December 13, 2010 where he told Sergeants Biddle and Hall that he testified truthfully (contrary to his recantation) at Mr. Carrillo's trial. Ex. C - PFC 1125-1127

- On examination by the DA, recanting eyewitness Jeffrey Coleman is confronted with a statement he made to LASD investigators that he was sure Mr. Carrillo was the shooter and that the defense investigator confused him, causing him to recant. Ex. C - PFC 1152.

- On examination by the DA, eyewitness Jeffrey Coleman was reminded that he told Sergeant Biddle and also Sergeant Prisell of LASD that his testimony from Mr. Carrillo's second trial in which he identified Mr. Carrillo as the shooter was true. Ex. C - PFC 1182-1183.

- On examination, the DA impeached eyewitness Scott Turner with the audio tape interview of Mr. Turner taken by LASD Sergeant Barry Hall. Ex. C - PFC 1265-66; 1282.

13   In addition, on March 11, 2011, LASD Chief McSweeney and Sergeant

14   Biddle presented Deputy DA Mejia with a list of approximately 20 questions and

15   several exhibits for cross-examination of investigator David Lynn. Mejia Decl. ¶

16   56.  Mr. Lynn's credibility was fundamental to Mr. Carrillo's Petition, in that Mr.

17   Lynn authenticated the notes written by Oscar Rodriguez who confessed to the

18   murder. Deputy DA Mejia then discussed the strategy for cross-examination of Mr.

19   Lynn with LASD Chief McSweeney, LASD Sergeant Biddle and Sr. DA

20   Investigator Calichio, and incorporated these questions and exhibits into his cross

21   examination. Mejia Decl. ¶ 56.

22   In its affirmative case, the DA called only one witness to testify—Lieutenant

23   Craig Ditsch—the defendant in the instant case. Ditsch was called to rebut Scott

24   Turner's testimony regarding improper influence and defend the legitimacy of the

25   identification procedures, thereby bolstering Mr. Turner's original identification

26   and, by extension, Mr. Carrillo's conviction. In addition, Ditsch specifically denied

27   exerting any type of influence on Scott Turner's identification of Mr. Carrillo,

28   making any threats to Mr. Turner, or engaging in any improper conduct. Prior to

testifying, Ditsch reviewed his declaration with LASD Sergeant Biddle. Ex. C at PFC 1708.

Deputy DA Ferreira began his closing argument, not with his critique of the eyewitnesses or any discussion of the evidence reflecting Mr. Carrillo's guilt, but rather with the following statement:

> There certainly has been no proof by a preponderance of the evidence that the Sheriff's Department committed any misconduct in this case.

Kaye Decl., Ex. C at PFC 1745. Thus, a fundamental aspect of the closing was to challenge Turner's position that Defendant Ditsch influenced his identification of Mr. Carrillo, the identical position of Defendants County and Ditsch in this lawsuit.

## E.     Superior Court's Findings of Fact and Conclusions of Law

On March 14, 2011, after six full days of testimony and argument, the Los Angeles Superior Court granted Mr. Carrillo's Petition and ordered his release from custody. Thereafter, on July 26, 2011, the Superior Court issued the Findings of Fact and Conclusions of Law supporting its decision. Ex. A.  On August 16, 2011, the Superior Court made minor modifications to its Findings of Fact and Conclusions of Law. Ex. B.

## IV.    REQUESTED FINDINGS TO BE ADMITTED INTO EVIDENCE

What follows are the issues which Mr. Carrillo requests be admitted at trial pursuant to this Motion. The first four issues are exact quotes of the state court's findings of fact. Issues 5 through 8 are compilations of multiple individual findings and conclusions by the state court. *See* Exs. A & B.[2]

1.     Donald Sarpy sustained fatal gunshot wounds in a drive-by shooting that occurred at approximately 7:00 p.m., on January 18, 1991.  This was approximately 1.5 hours past civil twilight and the only illumination in the area would have come from artificial sources, such as street lamps, and the moon. (Ex. A - FF 2).

---

[2]      Exhibit A, The Findings of Fact, Conclusions of Law, and Exhibit B, Modification of Findings of Fact are referred to as: FF – Findings of Fact; MFF – Modification of Findings of Fact; and CL – Conclusions of Law.

2.     In their first interviews all six witnesses -- Sarpy, Coleman, Munnerlyn, Stewart and Turner --  were unable to provide any details or descriptions of the people in the car from which the shots were fired other than stating the occupants were Hispanic male teenagers. None of the bystanders said that they recognized the perpetrators either immediately after the shooting or at the hospital later that night. (Ex. A - FF 4).

3.     All of the eyewitnesses at the second trial, with the exception of Sarpy, claimed that they had made their identification of the shooter at the time the front passenger stuck his head out of the car window and fired shots at the group.  This would have been when the car was approximately two to five houses down the street from where the group was standing. (Ex. A - FF 5).

4.     When LASD deputies arrived, just minutes after the shooting, only two of the witnesses, Sarpy and Munnerlyn, were present for interviews at the scene. The other four individuals (Turner, Stewart, Mitchell and Coleman) had left the scene.  Within a few hours afterwards, LASD deputies interviewed the other bystander witnesses by phone. (Ex. A - FF 6).

5.     The natural and artificial lighting conditions on January 18, 1991 at around 7:00 p.m. at 4220 Lugo Avenue, Lynwood, CA, at the time of the drive-by shooting which resulted in the death of Donald Sarpy, were such that it would be too dark for any observer to detect the facial features of the perpetrators or make a reliable identification. (Ex. A - FF 8-18, CL 2).

6.     The six eyewitnesses who testified during the first and second trials in *People v. Francisco Carrillo, Jr.*, Cr. No. TA011653 (L.A. Super. Ct.) were unable to see the facial features the perpetrator of the Sarpy murder on January 18, 1990 because the car was too far away, it was too dark, and it happened too fast.  (Ex. A - FF 4, 8-18, 27, 33-40, CL 2).

7.     A photo array ("six-pack") with Mr. Carrillo's photograph in the number one position was used for the six eyewitnesses. (FF 24, 31). The photo array was in existence prior to January 18, 1991 and was used in a prior case in which Carrillo was charged with a shooting that took place in December of 1990. (FF 24, MFF). The charges against Mr. Carrillo in that unrelated matter in which the six-pack was prepared were dismissed by the DA because the witnesses in the shooting, Frank Sarabia and Katrina Salway, affirmed that Mr. Carrillo was not the perpetrator. (Ex. B - MFF).

8.     Five of the six eyewitnesses were not shown the photo array (or asked to participate in any identification procedures) until July 9, 1991. (FF 31, CL 1). Those eyewitnesses' identifications of Mr. Carrillo as the perpetrator of the Sarpy murder were not based on their percipient observations, but rather based on information from Mr. Turner or other sources. (Ex. A - FF 30; CL 2).

These issues, as well as several others, were presented to counsel for

Defendants during the pre-filing meet and confer process. Kaye Decl. ¶ 5.

Defendants agreed to stipulate to certain factual findings for which no conflicting

evidence is known to exist. *Id.* Defendants did not agree to stipulate to the factual

1   findings listed above, for which the Superior Court at the Habeas hearing resolved

2   conflicting evidence. *Id.* As far as Plaintiff is aware, Defendants do not dispute the

3   articulation of the issues above as accurately reflecting the State court's findings of

4   fact.

5   **V.    LEGAL STANDARD**

6          The doctrine of collateral estoppel applies in full force in § 1983 actions to

7   give preclusive effect to underlying state court judgments. *Migra v. Warren City*

8   *School Dist. Bd. of Education*, 465 U.S. 75, 83-84 (1984); *Allen v. McCurry*, 449

9   U.S. 90, 96-97 (1980). It is well established that "a federal court must give to a

10  state-court judgment the same preclusive effect as would be given that judgment

11  under the law of the State in which the judgment was rendered." *Migra*, 465 U.S. at

12  81 (applying Ohio law to determine preclusive effect of state court judgment in

13  subsequent federal § 1983 action). This rule is mandated by 28 U.S.C. § 1738,

14  implementing Article IV, § 1 of the United States Constitution, which requires

15  federal courts give full faith and credit to state court decisions. *Id.* at 80-81. The

16  statute "reflects a variety of concerns, including notions of comity, the need to

17  prevent vexatious litigation, and a desire to conserve judicial resources." *Id.* at 84.

18  Because the earlier decision at issue in this motion is a decision by the Superior

19  Court of the State of California, the collateral estoppel determination in this case

20  depends on California law.

21         Under California law, collateral estoppel applies where the moving party

22  establishes the following five elements: "First, the issue sought to be precluded

23  from relitigation must be identical to that decided in a former proceeding. Second,

24  this issue must have been actually litigated in the former proceeding. Third, it must

25  have been necessarily decided in the former proceeding. Fourth, the decision in the

26  former proceeding must be final and on the merits. Finally, the party against whom

27  preclusion is sought must be the same as, or in privity with, the party to the former

28  proceeding." *Lucido v. Superior Court*, 51 Cal. 3d 335, 341 (Cal. 1990); *see*

*generally* Cal. Jur. 3d §158 (listing same requirements as four elements by merging the second and third *Lucido* elements).

In this case, the primary dispute before this Court is the fifth element—whether Defendants were in privity with the prosecution of the underlying habeas proceeding. The Defendants also dispute the first three elements. With regard to the fourth element, Defendants have informed Plaintiff that they do not dispute the finality of the Superior Court's decision. Kaye Decl. ¶ 6.

## VI.   ARGUMENT

### A.   The Policies Underlying the Doctrine of Collateral Estoppel Support the Result Requested by Mr. Carrillo

California courts have held that certain public policies "favor the application of collateral estoppel in a given case even though precise identity of the parties and issues may be lacking." *Lynch v. Glass*, 44 Cal. App. 3d 943, 947 (Cal. Ct. App. 1975). The primary public policies supporting collateral estoppel are "preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation." *Lucido*, 51 Cal. 3d at 343; *see also Allen*, 449 U.S. at 94. In addition, California courts have applied collateral estoppel to "further the finality of litigation in which public interests are involved [and] to promote the stability of adjudications in prior criminal actions." *Lynch*, 44 Cal. App. 3d at 947-48.

The overtaxed California court system has repeatedly relied on one or more of these policy considerations to give preclusive effect to earlier adjudications in a variety of contexts. *See, e.g.*, *People v. Sims*, 32 Cal. 3d 468, 488-89 (1982) (issues in criminal prosecution for welfare fraud precluded by earlier welfare fraud hearing by Department of Social Services); *Cal. Physicians' Serv. v. Aoki Diabetes Research Institute*, 163 Cal. App. 4th 1506, 1524 (Cal. Ct. App. 2008) (issues in declaratory judgment action for breach of contract precluded by earlier, unrelated CalPERS hearing despite fact that neither party in contract case was a party to the

1   earlier administrative proceeding); *Miller v. Superior Court*, 168 Cal. App. 3d 376,

2   385-86 (Cal. Ct. App. 1985) (issues in tort suit by rape victim against employer of

3   rapist precluded by earlier criminal case against rapist). In this case, all public

4   policy considerations favor the application of collateral estoppel.

5       "[T]he integrity of the judicial system is threatened whenever two tribunals

6   render inconsistent" findings based on the same evidence. *People v. Garcia*, 39 Cal.

7   4th 1070, 1097 (2006) (Chin, J., concurring and dissenting) (quoting *Lucido*, 51

8   Cal. 3d at 347). The inconsistency results in an erosion of public confidence and

9   renders both decisions suspect. *Id.* at 1079, 1097. "Application of both doctrines

10  [claim and issue preclusion] is central to the purpose for which civil courts have

11  been established, the conclusive resolution of disputes within their jurisdiction. . . .

12  To preclude [relitigation of decided issues] . . . fosters reliance on judicial action by

13  minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440

14  U.S. 147, 153-54 (1979). Here, clearly, applying collateral estoppel would serve

15  this interest.

16      Similarly, the application of collateral estoppel in this case would promote

17  judicial economy and prevent repetitive, unnecessary, and vexatious litigation.

18  Plaintiff's State court habeas proceeding involved six full days of witness testimony

19  and a nighttime re-enactment of the lighting conditions on January 18, 1991; it

20  resulted in a comprehensive set of factual findings based on the evidence presented

21  by both parties. In rendering its decision on Plaintiff's Petition, the State court

22  determined that Mr. Carrillo was wrongfully convicted based on evidence that was

23  "false, tainted, or both." Ex. A, at 14, ¶ 2. The issues decided by the State court

24  have been thoroughly considered at great personal expense to Plaintiff. Giving

25  preclusive effect to the state court's findings promotes the efficient allocation of

26  judicial resources, focuses this case on the central question of Defendants' liability,

27  and protects the Plaintiff from having to, once again, defend his innocence.

28

In addition to the three traditional policy justifications for collateral estoppel, the California Supreme Court has expressed a strong policy judgment that issues of guilt and innocence be determined in the context of a criminal justice proceeding, regardless of prior or subsequent proceedings addressing the same facts. *Lucido*, 51 Cal. 3d at 349 ("It is true, of course, that we have at times applied collateral estoppel principles to preclude criminal trials. . . . We have done so, however, only when compelling public policy considerations outweighed the need for determinations of guilt and innocence to be made in the usual criminal trial setting." (citation omitted)); *see also Miller*, 168 Cal. App. 3d at 386 (precluding relitigation of issues underlying criminal adjudication and stating that "the area of most of our concern lies in the necessity for stability of adjudications in prior criminal actions"). The same strong policy favors the application of collateral estoppel in this case.

The issues relevant to Plaintiff's guilt or innocence were fully litigated during the State habeas proceeding. When attempting to overturn their criminal convictions, habeas petitioners face an exceedingly high burden, both with regard to production of evidence and the applicable legal standard. The Plaintiff in this case met his burden. It would be entirely contrary to *Lucido*'s statement of public policy to allow relitigation of the same facts in a subsequent non-criminal proceeding. *Lucido*, 51 Cal. 3d at 351 (holding that other policy considerations favoring application of collateral estoppel in that case "pale[ed]" vis a vis "the importance of preserving the criminal trial process as the exclusive forum for determining guilt or innocence."); *Cf Ashe v. Swenson*, 397 U.S. 436, 445-46 (1970) ("For whatever else [the double jeopardy] constitutional guarantee may embrace, . . . it surely [embodies the doctrine of collateral estoppel to] protect[] a man who has been acquitted from having to 'run the gauntlet' a second time." (citations omitted)). Indeed, because the state court did not make any findings regarding constitutional violations by Defendants, which were not necessary to its ruling, the *only* right Defendants will seek in their opposition to this motion is the right—at the expense of the court,

1   Plaintiff, and the integrity of the state and federal judicial systems—to undermine

2   the state court's findings with regard to Plaintiff's criminal liability.

3        Thus, in this case, there is no coherent public policy argument for why

4   Defendants should have another opportunity to contest the facts of Plaintiff's

5   erroneous conviction that were extensively litigated and definitively decided in the

6   habeas proceeding. Defendants' only interest in contesting those facts is to muddy

7   the waters of this case in their effort to avoid civil liability at all costs.

8   **B.   The Issues Presented by Plaintiff for Preclusive Effect Were Actually
     Litigated and Necessarily Decided by the Superior Court**

9

10       In this case, it is beyond meaningful dispute that the first three elements of

11  collateral estoppel have been met. "For purposes of collateral estoppel, an issue was

12  actually litigated in a prior proceeding if it was properly raised, submitted for

13  determination, and determined in that proceeding. . . . The 'identical issue'

14  requirement addresses whether 'identical factual allegations' are at stake in the two

15  proceedings, not whether the ultimate issues or dispositions are the same."

16  *Hernandez v. City of Pomona*, 46 Cal. 4th 501, 511-512 (2009). An issue is deemed

17  to be "necessarily decided" if it is not "entirely unnecessary" to the judgment.

18  *Lucido*, 51 Cal. 3d at 342, 354.

19       Here, the issues presented by Plaintiff are based on the Superior Court's

20  Findings of Fact and Conclusions of Law and are, therefore, *exactly* those which

21  were litigated in the evidentiary hearing on Plaintiff's Petition and thereafter

22  decided by the Superior Court. Unlike in cases involving a unarticulated ruling or

23  general verdict, the Superior Court's explicit Findings of Fact and Conclusions of

24  Law mean that there is no need to delve into the record to determine what issues

25  were decided in the earlier proceeding. *Cf., e.g.*, *Ashe*, 397 U.S. at 445-46.

26  Furthermore, the record shows that the Superior Court did not include findings or

27  conclusions on issues that were not necessary to its ruling, the primary example

28  being that the court did not make a finding with regard to whether Defendant Ditsch

1    improperly influenced Mr. Turner's identification of Mr. Carrillo on the night of the

2    shooting.

3    **C.    Under California Law, Defendants County of Los Angeles and Craig Ditsch Are in Privity with the Los Angeles County DA's Office**

4

5           Although the five elements of collateral estoppel, see *supra* at 12, are

     essentially the same in all jurisdictions, California law regarding the *application* of

6    the fifth element—privity—has diverged significantly from historical definitions of

7    privity and from privity definitions in other jurisdictions. Thus, in California, "[t]he

8    courts, in the interest of justice and to prevent expensive litigation, are striving to

9    give effect to judgments by extending 'privies' beyond the classical description. . . .

10   The emphasis is not on a concept of identity of parties, but on the practical

11   situation. The question is whether the non-party is sufficiently close to the original

12   case to afford application of the principle of preclusion." *People ex rel. State of Cal.*

13   *v. Drinkhouse*, 4 Cal. App. 3d 931, 937 (Cal. Ct. App. 1970) (citations omitted); *see*

14   *also Cal. Physicians' Serv.*, 163 Cal. App. 4th at 1521 (noting that in California,

15   "the word 'privy' has acquired an expanded meaning").

16           The touchstone of privity under California law is the existence of a

17   "sufficiently close" relationship between the parties to the two proceedings such

18   that the estopped party "should reasonably have expected to be bound by the prior

19   adjudication." *People v. Sims*, 32 Cal. 3d 468, 486-87 (1982); *Clemmer v. Hartford*

20   *Insurance Co.*, 22 Cal. 3d 865, 875 (1978). Where traditional notions of privity do

21   not apply, California courts look to the interconnectedness of the parties to the

22   successive litigation to determine whether a "sufficiently close" relationship exists.

23   *Id.*  "In the final analysis, the privity question, under current case law, simply

24   depends on a determination of whether, in light of competing policy considerations,

25   it is fair to saddle [the party to be bound] with the result obtained in a lawsuit in

26   which she did not personally participate throughout." *Aronow v. Lacroix*, 219 Cal.

27   App. 3d 1039, 1048-49 (Ct. App. 1990).

28

1   Applying this standard and relevant California precedent, the Court should

2   hold that Defendants County and Ditsch are in privity with the prosecution of the

3   habeas proceeding and thereby bound by the issues decided by the State court.  In

4   this case, as set forth in the fact section, *supra* at 4-10, there is ample evidence that

5   Defendants were full and active participants in the Habeas proceedings which

6   resulted in a final determination on the merits of Plaintiff's criminal liability. They

7   were well aware of the issues at stake in the habeas proceeding—including the issue

8   of liability of both Defendants (*see supra* at 4)—and forcefully litigated those

9   issues. Accordingly, Defendants should be bound by the result of that litigation.

10   As in *Sims*, a leading California Supreme Court case on the issue of privity,[3]

11   the record in this case supports holding Defendant County in privity with the DA's

12   Office. The LASD and the DA's Office are both county agencies which represent

13   the interests of the people of California. *See Sims*, 32 Cal. 3d at 487. The agents of

14   the County in the LASD and in the DA's Office, "operat[ed] jointly in

15   investigating" and prosecuting the people's case against Plaintiff from January 18,

16   1991 through and including the Habeas proceedings. *See id.* The evidence against

17   Plaintiff was collected by agents of the LASD and the DA's Office acting in

18   collaboration with one another and was shared between them. *See id.* In addition,

19   LASD agents assisted in the cross-examination of Petitioner's witness David Lynn,

20   independently issued discovery requests, independently investigated Petitioner's

21   allegations, and otherwise participated in the Habeas proceedings, thereby exerting

22   some measure of control over the presentation of evidence at those proceedings. *See*

23   *Stafford v. Russell*, 117 Cal. App. 2d 319, 320 (Cal. Ct. App. 1953); *Montana*, 440

24   

25   [3] Numerous cases mistakenly assert *Sims* was superceded by statute, *see, e.g.*, *White v. City of Pasadena*, 671 F.3d 918, 927 (9th Cir. 2012 (citing *Gikas v.*
26   *Zolin*, 6 Cal. 4th 841 (1993)) or disapproved by the California Supreme Court's subsequent holding in *Lucido*, 51 Cal. 3d 335. Both of these notions were recently
27   rejected by the California Supreme Court in *People v. Garcia*, 39 Cal. 4th 1070, 1081-87 (2006), which upheld the both the reasoning and holding of *Sims*. *See also*
28   *People v. Ochoa*, 191 Cal. App. 4th 664, 671-72 (Cal. Ct. App. 2011). Moreover, the *Sims* analysis of privity has never been called into question.

U.S. at 153-55 (holding that United States was bound by judgment in earlier action because, although it wasn't a party to the earlier action, it participated in decision-making and prosecution of earlier action by the taxpayer plaintiff). Accordingly, Defendant County was in privity with the prosecution of the Habeas proceedings such that it should be bound by the Superior Court's ruling.

Defendant Ditsch's relationship to the Habeas proceedings was also "sufficiently close" to warrant the application of collateral estoppel. Defendant Ditsch testified at both criminal trials and was the only LASD agent to testify during the evidentiary hearing for Plaintiff's Habeas Petition, even though he was not the primary investigator during the original investigation. Defendant Ditsch's unique relevance to the Habeas proceeding is explained by Plaintiff's Petition, which focused on the original identification made by Mr. Turner on the same night as the shooting, an identification that was overseen by Defendant Ditsch. Moreover, Defendant Ditsch's transparent motivation in testifying at the Habeas proceeding was not only to uphold Plaintiff's criminal conviction, but also, as demonstrated above, to defeat any future civil action by undermining Scott Turner's testimony that he was influenced by Defendant Ditsch.  Ultimately, the influence of Defendant Ditsch was irrelevant to the Superior Court's findings.

Under California law, Defendant Ditsch's participation in and relationship with the earlier criminal proceedings in this case put him on notice that he "should reasonably have expected to be bound by [the Habeas] adjudication." *Cal. Physicians' Serv.*, 163 Cal. App. 4th at 1523-24. "A nonparty should reasonably be expected to be bound if he had in reality contested the prior action even if he did not make a formal appearance." *Ceresino v. Fire Ins. Exchange*, 215 Cal. App. 3d 814, 820 (Cal. Ct. App. 1989). Here, Defendant Ditsch personally and vigorously contested the issues raised in the Habeas proceeding through his testimony, which was thereafter decided against his interests. As a longtime law enforcement officer, Defendant Ditsch was aware that the proceeding, and his testimony, would lead to a

final decision regarding Plaintiff's criminal liability and have a collateral impact on any future civil liability. He should, therefore, be bound by that determination. *Cf. Drinkhouse*, 4 Cal. App. 3d at 938 (binding non-party to outcome of earlier criminal case); *People v. One 1964 Chevrolet Corvette Convertible*, 274 Cal.App.2d 720, 730 (Cal. Ct. App. 1969) (same); *Teitelbaum Furs, Inc. v. Dominion Ins. Co.*, 58 Cal. 2d 601, 606 (1962) (same); *see also Miller*, 168 Cal. App. 3d at 382, 386 (same).

In this regard, California courts applying the California privity standard have noted the significance of a party's knowledge of and testimony in an earlier case, particularly where the party had an interest in the outcome of the earlier action or where the party's conduct was a subject of the earlier action. *See Cal. Physicians' Serv.*, 163 Cal. App. 4th at 1521; *Lewis v. County of Sacramento*, 218 Cal. App. 3d 214, 217-18 (Cal. Ct. App. 1990); *Dyson v. Cal. State Personnel Bd.*, 213 Cal. App. 3d 711 (Cal. Ct. App. 1989); *Ceresino*, 215 Cal. App. 3d at 820-21; *Drinkhouse*, 4 Cal. App. 3d at 936-37. For example, in *Ceresino*, the court held that an individual's "interest 'in the determination of a question of fact or law with reference to the same subject matter or transaction'" in the earlier suit, although he was a non-party to that suit, precluded him from relitigating the same issue as a party in a later suit, because he had knowledge of the earlier suit, testified in the earlier suit, and was interested in the outcome of the question before the court in the earlier suit. 215 Cal. App. 3d at 820-21.

Finally, California courts have, when presented with the prospect of giving preclusive effect to issues decided against the district attorney in criminal proceedings, held that government agencies and agents of the government are in privity with the district attorney such that collateral estoppel applies. *Dyson*, 213 Cal. App. 3d at 727 (California Youth Authority precluded from relitigating illegality of search decided against district attorney during a criminal proceeding); *Zapata v. Department of Motor Vehicles*, 2 Cal. App. 4th 108, 113-115 (Cal. Ct.

App. 1983) (DMV precluded from relitigating illegality of driver's arrest for drunk driving which was decided against the district attorney during a criminal proceeding); *Cf. Sims*, 32 Cal. 3d at 486-488 (rejecting "simplistic" argument that district attorney could not be in privity with other agents of the government because the district attorney represented the people of California).

The *Dyson* case is particularly instructive. The collateral estoppel issue arose in the context of a disciplinary hearing against Dyson, an employee of the California Youth Authority ("CYA"), for dismissal based on allegations that he stole CYA property. The earlier action was a criminal prosecution of the same employee for the same theft, which was dismissed when the court ruled that the evidence of theft was obtained during an illegal search of Dyson's home. The CYA used the same evidence in the disciplinary hearing over Dyson's objection that the exclusionary rule applied to the disciplinary hearing and that the CYA was bound by the district attorney's adverse ruling. The California Court of Appeal ruled in favor of the employee and held that collateral estoppel was proper because the circumstances of the case revealed "a 'close relationship' between the significant actors in both proceedings from the very inception of the search [at issue in the criminal case]." The close relationship was described as follows:

> The search was initiated by [a CYA agent] who called the sheriff's department for assistance. The sheriff's department serves as the investigative arm for the district attorney. . . From the very start, a convergence between the disciplinary interests and the penal interests was evident. . . . The criminal action was initiated on the complaint of the [the CYA]. [The CYA's agent] presumably testified at the criminal suppression motion, presenting evidence relating to the validity of the search. As a witness he had every incentive to accurately portray the sequence of events leading up to the search. Because a criminal conviction of theft would have constituted cause for the discipline of Dyson under the Civil Service Laws . . . , the agency's disciplinary interest in the criminal proceeding was direct. The district attorney had every incentive to vigorously litigate the issue of the legality of the search. The [CYA] (through its agents) was the chief 'accuser' at the criminal proceeding. Its role at the disciplinary hearing was the same. The litigation objectives of the district attorney and the Attorney General [on behalf of the CYA] in their respective proceedings were identical.

213 Cal. App. 3d at 727.

In this case, the relationship between Defendants in this case, who investigated, prepared for and litigated the habeas proceedings directly with the DA, is even closer than the relationship that was described in *Dyson*, in which the sheriff's department was an intermediary between the party to be estopped (the CYA) and the entity prosecuting the earlier proceeding (the DA). Like the circumstances described in *Dyson*, the agent in this case, Defendant Ditsch, was actively involved in the investigation and prosecution of the habeas proceeding. He was no "stranger to that case" and cannot, therefore, avoid being bound by the adverse judgment rendered in that action. *See Aranow*, 219 Cal. App. 3d at 1052.

**D.    Precluding Relitigation of Decided Issues in This Case Does Not Violate Defendants' Due Process Rights**

Where, as in this case, the "party to be estopped [has] an identity or community of interest with, and adequate representation by, the losing party in the first action [and] the circumstances [are] such that the party to be estopped should reasonably have expected to be bound by the prior adjudication," the application of collateral estoppel comports with due process. *Brown v. Rahman*, 231 Cal. App. 3d 1458 (Cal. Ct. App. 1991) (citing *Clemmer*, 22 Cal. 3d at 876).

Parties arguing lack of privity frequently attack the adequacy of representation by the losing party in the first action, asserting that they would have litigated the earlier proceeding differently, that they did not have their own counsel, or that the interests of the party to the earlier proceeding were different from their interests. In addressing these arguments, California courts do not engage in an examination of the specifics of the proceedings in the earlier case, but rather evaluate "whether the losing party in the suit which is asserted to have preclusive effect had *the same interest* as the party to be precluded, and whether that losing party had *a strong motive to assert that interest*. If the interests of the parties in question are likely to have been divergent, one does not infer adequate

1  representation." *Aronow*, 219 Cal. App. 3d at 1048-49 (emphasis added); *see also*

2  *Cal. Physicians' Serv.*, 163 Cal. App. 4th at 1523.

3      For example, in *Drinkhouse*, the court rejected the defendants' arguments

4  that they could not be bound by an earlier criminal proceeding because as non-

5  parties to that proceeding "[t]hey had no control of the criminal prosecution. They

6  could not produce witnesses, nor could they cross examine witnesses produced by

7  the People. They could not have their own counsel, nor could they appeal." 4 Cal.

8  App. 3d at 936. Instead, the court found there was adequate representation because

9  the defendants to the criminal case had the same interest as the parties to the second

10  action (proving that no crime occurred) and had a strong incentive to contest the

11  evidence presented by the opposing party. 4 Cal. App. 3d at 938.

12      Similarly, in *California Physicians Service*, the California Court of Appeal

13  again rejected the argument that the party to the first action—CalPERS, represented

14  by the California Attorney General—inadequately represented the party to the

15  second action—Blue Shield. The court found that the issue in both proceedings was

16  the same and that Blue Shield and CalPERs were on the same side of that issue, *i.e.*,

17  both were trying to prove that a particular treatment was experimental such that it

18  would not be covered by health insurance. Blue Shield agents were involved in the

19  first action and testified in the first action; nevertheless, Blue Shield asserted that it

20  would have litigated the issue differently and more vigorously than CalPERs did in

21  the earlier proceeding. The court ruled that CalPERs had an equally strong interest

22  in proving the fact at issue and further noted that Blue Shield's arguments "r[ang]

23  hollow anyway, as CalPERs was represented by the California Attorney General,

24  who is commonly considered to zealously and competently litigate cases." *Id.* at

25  1523.

26      Finally, the same reasoning was applied in *Dyson v. Cal. State Personnel Bd.*,

27  213 Cal. App. 3d 711, 727 (Cal. Ct. App. 1989), discussed *supra* at 21-22, where

28  the court recognized that the district attorney had "every incentive to vigorously

litigate the issue of the legality of the search," that the agents had "every incentive to accurately portray the sequence of events leading up to the search," and that the "litigation objectives [with respect to establishing the legitimacy of the search] . . . in the[] respective proceedings were identical."

In the instant case, with respect to the issues decided by the Superior Court, the DA and the Defendants have the exact same interest—proving that the evidence supporting Mr. Carrillo's criminal conviction was valid and that his conviction was lawful. The DA had an exceedingly strong motive to uphold Mr. Carrillo's conviction, and there is no basis for arguing that the Defendants in this case have a stronger incentive to assert evidence establishing Plaintiff's guilt than the DA had in the habeas proceedings. Even if Defendants were to argue that prospect of civil liability gives rise to a stronger interest in upholding Plaintiff's conviction, that interest was manifested by the LASD prior to the habeas hearing when LASD representatives questioned Mr. Carrillo regarding his intentions to file a civil suit and was represented by the DAs in the habeas proceedings when they argued emphatically that there was no misconduct by the LASD, including Defendant Ditsch. In fact, Defendants interest in proving the facts supporting Plaintiff's guilt was even stronger *prior to the Habeas ruling* when success on the merits would have entirely precluded this litigation under *Heck v. Humphrey*, 512 U.S. 477 (1994), as evidenced by the LASD's decision to intervene in the investigation and litigation of the habeas proceeding.

Lastly, as a practical matter, the financial and professional relationship between the County, the DA's Office, the LASD, and Defendant Ditsch, demonstrate the "glaring interconnectedness of the[ir] rights and interests," justifying a privity finding. *See Mooney v. Caspari*, 138 Cal. App. 4th 704, 719 (Cal. Ct. App. 2006). With regard to their official duties, employees of the LASD and the DA's Office operate in tandem to pursue the same goal—the investigation and prosecution of criminal activity in violation of the laws of the State of

California. *Cf. Garcia*, 39 Cal. 4th at 1078. Their interests in this regard are entirely aligned by virtue of their respective, but intertwined duties. *See Dyson*, 213 Cal. App. 3d at 727 ("The Sheriff's department serves as the investigative arm for the district attorney.") Both the LASD and the DA's Office are county agencies. *Sims*, 32 Cal. 3d at 487. By law, the County sets the budget for the LASD and the DA's Office. Cal. Gov't Code §§ 25300, 25303; *County of Butte v. Superior Court*, 176 Cal. App. 3d 693 (Cal. Ct. App. 1985). The County is legally responsible for indemnifying all public employees carrying out their official duties and paying all civil judgments against such employees. Cal. Gov't Code §§ 995, 825(a). And with respect to any § 1983 or State law action against a law enforcement officer, such as Defendant Ditsch, the County's liability is derivative of the officer's liability. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that absence of § 1983 liability against the individual officer precluded *Monell* liability against the municipality); Cal. Gov't Code § 815.2(a). Confirming the uniformity of their interests, Defendants Ditsch and County have filed a single Answer and are represented by the same counsel.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Plaintiff's Motion.


Respectfully submitted,

DATED: May 15, 2012          KAYE, McLANE & BEDNARSKI, LLP

By_____/S/_____
          RONALD O. KAYE
          Attorneys For Plaintiff
          Francisco Carrillo, Jr.