1  DAVID D. LAWRENCE, State Bar No. 123039
   dlawrence@lbaclaw.com
2  JIN S. CHOI, State Bar No. 180270
   jchoi@lbaclaw.com
3  LAWRENCE BEACH ALLEN & CHOI, PC
   100 West Broadway, Suite 1200
4  Glendale, California 91210-1219
   Telephone No. (818) 545-1925
5  Facsimile No. (818) 545-1937

6  Attorneys for Defendants
   COUNTY OF LOS ANGELES
7  and CRAIG DITSCH

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

12 FRANCISCO CARRILLO, JR.,          )  Case No. CV 11-10310 SVW (AGRx)
                                     )
13            Plaintiff,             )  Honorable Stephen V. Wilson
                                     )
14       vs.                         )
                                     )  **DEFENDANT CRAIG DITSCH'S**
15 COUNTY OF LOS ANGELES;            )  **NOTICE OF MOTION AND**
   CRAIG DITSCH; AND DOES 1-10,      )  **MOTION FOR SUMMARY**
16 INCLUSIVE;                        )  **JUDGMENT, OR**
                                     )  **ALTERNATIVELY SUMMARY**
17            Defendants.            )  **ADJUDICATION;**
                                     )  **MEMORANDUM OF POINTS**
18 _____  )  **AND AUTHORITIES**

19                                      *[Separate Statement of*
                                        *Uncontroverted Facts; Declarations*
20                                      *and Exhibits and [Proposed]*
                                        *Judgment filed concurrently herewith]*
21
                                        Date:  September 10, 2012
22                                      Time: 1:30 p.m.
                                        Courtroom: 6
23

24 TO THE COURT, ALL INTERESTED PARTIES, AND TO THEIR COUNSEL

25 OF RECORD:

26       PLEASE TAKE NOTICE that on September 10, 2012 at 1:30 p.m. in

27 Courtroom 6, or as soon thereafter as counsel may be heard, by the above-

28 captioned Court located at 312 North Spring Street, Los Angeles, California,

                                   1

Defendant CRAIG DITSCH ("Defendant") will, and hereby do, move for summary judgment on the grounds that there is no triable issue of fact as to any of Plaintiff's claims, and Defendant is entitled to judgment as a matter of law.[1]

PLEASE TAKE FURTHER NOTICE THAT, if for any reason summary judgment cannot be had, Defendant will, and hereby do, further move the Court for summary adjudication as to each of the following issues:

1.     Defendant is entitled to qualified immunity against Plaintiff's Six Claims for Relief brought under 42 U.S.C. § 1983;

2.     Plaintiff's claims are barred because no rational trier of fact can find in his favor with respect to the alleged misconduct by Defendant during his interaction with witness Scott Turner due to Turner's sworn testimony — which cannot be rationally reconciled with his accusations against Defendant;

3.     Plaintiff's *Brady v. Maryland* – based claims are barred by the absence of the required showing of prejudice and suppression of material and exculpatory evidence;

4.     Plaintiff's vaguely framed due process claims constitute malicious prosecution and/or fabrication of evidence-type claims which have not been properly pled, and the elements for which cannot be met; and

5.     Plaintiff's three conspiracy claims for relief are not ripe for adjudication and are barred by the absence of any admissible evidence of conspiratorial conduct.

This Motion is based upon this Notice, the attached Memorandum of Points and Authorities, the concurrently filed Declarations of Commander Kevin Goran, Lieutenant Craig Ditsch, and Jin S. Choi and accompanying

---

[1]  At the March 12, 2012 scheduling conference, the Court bifurcated Plaintiff's claims against Defendant Ditsch from the § 1983 *Monell* claim against the County of Los Angeles.  (Docket No. 9.)

2

Exhibits, the Separate Statement of Uncontroverted Facts and Conclusions of Law, and the Court's file in this matter, and upon such other and further matters as may properly come before the Court.

This motion is made following the unsuccessful meet and confer efforts pursuant to Local Rule 7-3. (*See*, Declaration of Jin S. Choi, ¶ 3,)

Dated:  August 8, 2012                    LAWRENCE BEACH ALLEN & CHOI, PC

By _____/s/ Jin S. Choi_____
    Jin S. Choi
    Attorneys for Defendants
    COUNTY OF LOS ANGELES
    and CRAIG DITSCH

3

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES..........................................1

I.     INTRODUCTION ...........................................................................1

II.    STATEMENT OF FACTS .............................................................2

       A.    The January 18, 1991 Drive-By-Shooting.................................2

       B.    Scott Turner's Unequivocal Identification Of Plaintiff On January 19, 1991 ....................................................................3

       C.    Plaintiff's Preliminary Hearing................................................3

       D.    The First Murder Trial.............................................................4

       E.    The Second Murder Trial.........................................................4

       F.    The 2011 Habeas Corpus Proceeding .....................................5

III.   PLAINTIFF'S CLAIMS ...............................................................6

IV.   STANDARD OF REVIEW ..........................................................8

V.    DEFENDANT DITSCH IS ENTITLED TO QUALIFIED IMMUNITY BECAUSE HIS ALLEGED FAILURE TO DISCLOSE EXCULPATORY EVIDENCE DID NOT VIOLATE CLEARLY ESTABLISHED LAW ..............................................9

VI.   THE RECORD "TAKEN AS A WHOLE" CLEARLY ESTABLISHES THAT TURNER IDENTIFIED PLAINTIFF ON HIS OWN VOLITION, WITHOUT ANY UNDUE INFLUENCE ..........13

       A.    Plaintiff's *Brady* Claim Cannot Be Reconciled With Turner's Explanation For The Change In His Identification Testimony ........13

       B.    Similarly, The Third And Fifth Claims Cannot Be Reconciled With Turner's Sworn Testimony ........................................16

VII.  THE REQUISITE REQUIREMENTS FOR SECTION 1983 RELIEF UNDER *BRADY v. MARYLAND* CANNOT BE SATISFIED ................................................................................16

       A.    There Was No "Suppression" Of Material Evidence .......................17

       B.    No Actionable Prejudice Occurred .................................................19

VIII. PLAINTIFF'S CLAIMS AMOUNT TO EITHER A MALICIOUS PROSECUTION OR FABRICATION OF EVIDENCE CLAIM WHICH HAS NOT BEEN PROPERLY PLED AND IS BARRED BY THE FINDING OF PROBABLE CAUSE AND THE PRESUMPTION OF PROSECUTORIAL INDEPENDENCE..................19

IX.   PLAINTIFF'S § 1983 CONSPIRACY CAUSES OF ACTION ARE NOT RIPE FOR ADJUDICATION AND CANNOT BE SUPPORTED WITH ANY ADMISSIBLE EVIDENCE...........................23

X.   CONCLUSION ...........................................................................24

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Albright v. Oliver*,
   510 U.S. 266 (1994) ....................................................................21

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ......................................................................8

*Awabdy v. City of Adelanto*,
   368 F.3d 1062 (9th Cir. 2004) ....................................................21

*Ayala v. KC Environmental Health*,
   426 F. Supp. 2d 1070 (E.D. Cal. 2006) ......................................21

*Bastidas v. City of Los Angeles*,
   2006 WL 4749706 (C.D. Cal. 2006) ..........................................12

*Beck v. City of Upland*,
   527 F.3d 853 (9th Cir. 2008) ......................................................22

*Brady v. Maryland*,
   373 U.S. 86 (1963) ...............................................................passim

*Bretz v. Kelman*,
   773 F.2d 1026 (9th Cir.1985) (en banc) ....................................20

*Brooks v. City of Chicago*,
   564 F.3d 830 (7th Cir. 2009) ......................................................21

*Burns v. County of King*,
   883 F.2d 819 (9th Cir. 1989) ......................................................24

*Caine v. Burge*,
   2012 WL 2458640 (N.D. Ill. 2012) ............................................21

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ......................................................................8

*Claar v. Burlington N. R.R.*,
   29 F.3d 499 (9th Cir. 1994) ..........................................................8

*County of Sacramento v. Lewis*,
   523 U.S. 833 (1998) ....................................................................10

*Devereaux v. Abbey*,
   263 F.3d 1070 (9th Cir. 2001) ....................................................20

*Domenech v. City of Philadelphia*,
   2009 WL 1109316 (E.D. Pa. 2009)......................................10, 11

*Elder v. Holloway*,
   510 U.S. 510 (1994) ......................................................................9

iii

*Fox v. Hayes,*
    600 F.3d 819 (7th Cir.2010) ................................................................. 21

*Freeman v. City of Santa Ana,*
    68 F.3d 1180 (9th Cir. 1995) ................................................................. 20

*Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety,*
    411 F.3d 427 (3d Cir. 2005) ................................................................. 10

*Guatay Christian Fellowship v. County of San Diego,*
    670 F.3d 957 (9th Cir. 2011) ................................................................. 8

*Harper v. City of Los Angeles,*
    533 F.3d 1010 (9th Cir.2008) ................................................................. 22

*Harris v. Kuba,*
    486 F.3d 1010 (7th Cir. 2007) ................................................................. 21

*Hunter v. Bryant,*
    502 U.S. 224 (1991) ................................................................. 9

*Ivey v. Board of Regents of University of Alaska,*
    673 F.2d 266 (9th Cir. 1982) ................................................................. 24

*Jean v. Collins,*
    221 F.3d 656 (4th Cir. 2000) ................................................................. 11, 22

*Jernigan v. Richard,*
    WL 79262 (D. Ariz. 2012) ................................................................. 10

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ................................................................. 17

*Lacey v. Maricopa County,*
    649 F.3d 1118 (9th Cir. 2011) ................................................................. 20

*Malley v. Briggs,*
    475 U.S. 335 (1986) ................................................................. 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ................................................................. 8

*McMillian v. Johnson,*
    88 F.3d 1554 (11th Cir. 1996) ................................................................. 11

*Mowbray v. Cameron County,*
    274 F.3d 269 (5th Cir. 2001) ................................................................. 11

*Pattiz v. Minye,*
    61 Cal.App.4th 822 (1998) ................................................................. 21

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ................................................................. 9

*Salehpoor v. Shahinpoor,*
    358 F.3d 782 (10th Cir. 2004) ................................................................. 23

iv

*Saucier v. Katz,*
    533 U.S. 194 (2001) ...................................................................................9

*Schucker v. Rockwood,*
    846 F.2d 1202 (9th Cir. 1988)...............................................................24

*Scott v. Harris,*
    550 U.S. 372 (2007) ...................................................................................8

*Smiddy v. Varney (Smiddy I),*
    665 F.2d 261 (9th Cir.1981), *cert. denied,* 459 U.S. 829 (1982) ...................22

*Smith v. Almada,*
    640 F.3d 931 (9th Cir. 2011) ...................................................................17

*Smith v. Cain,*
    ___ U.S. ___, 132 S.Ct. 627 (2012) ........................................................17

*Sommer v. United States,*
    2011 WL 4592788 (S.D. Cal. 2011) .......................................................17

*Strickler v. Greene,*
    527 U.S. 263 (1999) .................................................................................17

*Tennison v. City & County of San Francisco,*
    570 F.3d 1078 (9th Cir. 2009).................................................................10

*Thomas v. Roach,*
    165 F.3d 137 (2nd Cir. 1999) .................................................................23

*Uboh v. Reno,*
    141 F.3d 1000 (11th Cir.1998) ...............................................................19

*United States v. Bagley,*
    473 U.S. 667 (1985) .................................................................................17

*United States v. Dupuy,*
    760 F.2d 1492 (9th Cir. 1985).................................................................17

*United States v. Griggs,*
    713 F.2d 672 (11th Cir. 1983).................................................................17

*United States v. Various Slot Machines on Guam,*
    658 F.2d 697 (9th Cir. 1981) ....................................................................8

*United Steelworkers v. Phelps Dodge Corp.,*
    865 F.2d 1539 (9th Cir. 1989) (en banc)................................................24

*Usher v. City of Los Angeles,*
    828 F.2d 556 (1981) .................................................................................20

*Wilkinson v. Torres,*
    610 F.3d 546 (9th Cir. 2010) ....................................................................8

v

**Statutes**

42 U.S.C. § 1983....................................................................................1, 10, 20, 24

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION.

Plaintiff Francisco Carrillo, Jr. ("Plaintiff") was convicted for murder on June 29, 1992 for the January 18, 1991 shooting death of Donald Sarpy.  In reaching their verdict, the jury weighed the testimony of the five witnesses who identified Plaintiff as the drive-by shooter against his alibi testimony and the testimony of a sixth witness who testified that someone else had to have been the shooter.  Nineteen years later, a state court granted Plaintiff's habeas petition, based on the recantations of four witnesses, and new evidence about the lighting conditions at the time of the shooting.  Although Plaintiff also accused Defendant Craig Ditsch ("Defendant" or "Defendant Ditsch") with various acts of misconduct, the state court did not issue any findings on these allegations.[2]

The 42 U.S.C. § 1983 claims alleged in this action arise from Defendant's involvement with an eyewitness's review of a gang photo book and photo "six-pack" within hours of the Sarpy shooting.  Plaintiff alleges that Defendant manipulated this eyewitness, Scott Turner ("Turner"), into selecting Plaintiff's photograph from the gang photo book and photo "six-pack".  Plaintiff further contends that Defendant then violated Plaintiff's rights under *Brady v. Maryland* by failing to disclose this alleged misconduct to the prosecutor, and by failing to disclose his purported membership in a "white supremacist internal gang", referred to as the "Vikings".  (*See* Complaint, ¶¶ 81-82.)  While couched in superficially different ways, all of Plaintiff's claims against Defendant allege violations of due process inextricably tied to Defendant's contact with Turner after the Sarpy shooting.

Defendant Ditsch is entitled to summary judgment against Plaintiff's

---

[2] In 1991, Defendant Ditsch was an Operation Safe Streets ("O.S.S.") deputy investigator.  He is currently a lieutenant with the Major Crimes Bureau of the Los Angeles County Sheriff's Department.  (Ditsch Declaration, ¶ 2.)

1

claims because not only is he entitled to qualified immunity due to the absence of any violation of any clearly established constitutional obligation, the record as a whole precludes any finding that Turner was coerced or manipulated into identifying Plaintiff as the shooter.  Plaintiff also cannot satisfy the requisite elements for a *Brady* violation due to Plaintiff having not been prejudiced by the alleged misconduct, and the absence of the necessary suppression.  Plaintiff's due process claims are also not cognizable because they are poorly disguised claims for malicious prosecution and fabrication of evidence, the elements of which have not been alleged nor satisfied.  Finally, Plaintiff's three conspiracy-based claims are barred as a matter of law and by the absence of evidence of any such conspiracy.

## II.   STATEMENT OF FACTS.[3]

### A.   The January 18, 1991 Drive-By-Shooting.

On January 18, 1991, Donald Sarpy was shot and killed by a drive-by shooter.  The shooting took place on Lugo Avenue in the city of Lynwood at approximately 7:00 p.m.  Standing within the vicinity of Mr. Sarpy at the time of the shooting were Mr. Sarpy's son, Dameon Sarpy, Scott Turner, Jeff Coleman, Montree Mitchell, James Munnerlyn, and Marcus Stewart.  Mr. Sarpy was provided with emergency medical treatment, and died a few hours later.  (SUMF 10-14.)

Scott Turner, a member of a Crips gang known as the "N-Hood", immediately believed that the shooter was a member of a Hispanic gang known as the "Young Crowd".  Turner and four other witnesses were interviewed by LASD homicide detectives after midnight at the Lynwood sheriff's station.  (SUMF 15, 17-18.)

---

[3] The uncontroverted facts which demonstrate the absence of a genuine issue for trial are set forth in the Defendant's Separate Statement of Uncontroverted Facts ("SUMF").

2

**B.**     **Scott Turner's Unequivocal Identification Of Plaintiff On January 19, 1991.**

At the Lynwood station, Turner indicated that he could recognize the shooter, and was shown the "Young Crowd" gang photo book by Defendant Ditsch.  Turner looked through the photo book and eventually picked out a photograph of an individual who he identified as the shooter.  This individual was Plaintiff, and shortly thereafter, Turner was shown a six-pack photo array, with Plaintiff in the number 1 position.  Turner selected Plaintiff from the six-pack.[4] (SUMF 57-68.)

This six-pack had been prepared in conjunction with a different shooting investigation by a different O.S.S. deputy investigator (Kevin Goran) on December 28, 1990 — about three weeks before the Sarpy shooting.  The six-pack had been shown to two witnesses who identified Plaintiff as the shooter in that incident as well.[5]  Because this six-pack had already been prepared, a second six-pack was not prepared after Turner picked out Plaintiff's photograph from the gang photo book.  (SUMF 66-67, 81-85.)

Plaintiff was arrested on January 24, 1991.  (SUMF 8.)

**C.**     **Plaintiff's Preliminary Hearing.**

On July 9, 1991, the probable cause hearing in the Sarpy prosecution was conducted, at which Scott Turner was the only witness.  Turner testified about the

---

[4] Plaintiff's claims in this action rest entirely on Turner's 2010 and 2011 assertions about the manner in which these identification procedures were conducted.  As discussed in Section VI, *infra*, Turner's assertions cannot be reconciled with his own sworn testimony, at Plaintiff's criminal proceedings and at the 2011 habeas proceeding. Thus, the fact that Defendant Ditsch and Turner may present conflicting accounts of the events in 1991 do not preclude the dismissal of the claims alleged against Defendant.

[5] Plaintiff was held to answer on the charges arising from this incident (the "Sarabia" incident); however, the charges were subsequently dismissed.

details of the shooting, his subsequent identification of Plaintiff as the shooter from the gang photo book and the six-pack, and his prior observations of Plaintiff prior to the shooting.  (SUMF 20-22.)

Based on Turner's testimony, the criminal court ruled that there was sufficient evidence to have Plaintiff answer the charges filed against him.  (SUMF 23.)

### D.   The First Murder Trial.

Scott Turner testified at the first murder trial, and again identified Plaintiff as the shooter.  Five additional witnesses to the shooting, Dameon Sarpy, Jeff Coleman, Montree Mitchell, James Munnerlyn, and Marcus Stewart, also testified at the trial, each of them identifying Plaintiff as the shooter.[6]  (SUMF 31.)

Defendant Ditsch testified as well, providing facts regarding Turner's viewing of the gang photo book and the six-pack on January 19, 1991.

The jury could not reach a unanimous verdict.  (SUMF 33.)

### E.   The Second Murder Trial.

The second trial commenced on June 18, 1992.  Five of the six eyewitnesses testified consistently with the first trial, identifying Plaintiff as the shooter; Turner did not.  (SUMF 34-35.)

On June 22, 1992, Turner indicated to the prosecutor and Plaintiff's defense counsel that he no longer believed that Plaintiff was the shooter.  This change in belief was based on his having had a physical altercation with an individual whom he now believed was the shooter — an encounter that occurred at a Jack-in-the-Box sometime after the conclusion of the first trial.  At the time he changed his mind, Turner was in custody as well facing felony charges, and he had a conversation with Plaintiff the prior day when they were housed in the same

---

[6] On July 9, 1991, prior to the preliminary hearing, these five witnesses were shown the same six-pack that was shown to Turner.  (SUMF 24-29.)

4

area of the county jail.[7]  Yet, Turner denied that the recantation of his identification had anything to do with his changed circumstances and impending imprisonment. (SUMF 35-38.)

The prosecutor did not believe Turner's account, and decided to proceed with the case.  Turner testified to his changed belief about the identity of the shooter, and he explained that **this change was based on his having encountered the "actual" shooter at the Jack-in-the-Box.**  He also did not attribute his change to any inappropriate conduct by any law enforcement personnel. (SUMF 39-42, 44-47.)  Thus, had the Jack-in-the-Box incident never occurred, Turner would have had no reason to change his testimony about the identity of the shooter.

Defendant Ditsch testified again, providing testimony about Turner's review of the gang photo book and selecting Plaintiff's photograph from the six-pack.  (Exhibit "M".)

**F.     The 2011 Habeas Corpus Proceeding.**

In support of his habeas petition, Plaintiff submitted the declarations of Scott Turner, Dameon Sarpy, Jeff Coleman, Montree Mitchell, James Munnerlyn, and Marcus Stewart, as well as expert evidence regarding the lighting conditions at the location of the drive-by shooting.  The fundamental thrust of Plaintiff's petition was that the witnesses who had identified Plaintiff at the second criminal trial had recanted their testimony, and that these recantations were corroborated by the expert evidence about lighting conditions.  The habeas court judge visited the location as well to determine the probative value of the lighting evidence. (Exhibit "F".)

For the first time, in conjunction with his petition, Plaintiff also alleged —

---

[7] At the second trial, Mr. Turner denied having had any conversation with Plaintiff but at the 2011 habeas proceeding, he testified that he in fact had a conversation with Plaintiff.

based on Scott Turner's declaration and testimony — that Defendant Ditsch had unduly influenced Turner's identification on January 19, 1991.  In his declaration, Turner accused Defendant Ditsch of selecting Plaintiff's photograph for him; in his subsequent habeas testimony, however, Turner essentially alleges that he was steered into identifying Plaintiff from the gang photo book.  This allegation mostly parallels the allegations set forth in the instant Complaint.  (SUMF 49-51.)

At the same time, Turner testified (as he did previously) that the Jack-in-the-Box incident played a role in his having changed his mind about the identity of the shooter.  (SUMF 52.)  Thus, **Turner has remained steadfast in testifying that had he not encountered the "actual" shooter at the Jack-in-the-Box after the first trial, he would not have changed his mind about Plaintiff's role in the shooting.**[8]

The habeas court's ruling was based on the fact that four witnesses had recanted their testimony since the second trial, and the court's finding that the new lighting evidence validated the recantations.  No finding was made with respect to Turner's accusations against Ditsch. (Exhibit "F".)

III.  **PLAINTIFF'S CLAIMS.**

Plaintiff's claims against Defendant Ditsch arise directly from the January 19, 1991 interaction between Defendant Ditsch and Scott Turner.  Plaintiff alleges in his First Claim for Relief that Ditsch violated Plaintiff's rights under *Brady v. Maryland* by failing to disclose to the prosecutor the following "facts":

1)      that Turner chose several other photographs before selecting Plaintiff's

---

[8] As discussed below, this is a crucial material fact that cannot be reconciled with Turner's accusation (made 19 years after the fact) that his initial identification of Plaintiff was somehow tainted.  The Jack-in-the-Box incident could and should have had no impact on Turner if Defendant Ditsch had in fact unduly influenced his selection of Plaintiff's photographs.  Because this allegation — fundamental to Plaintiff's claims— simply cannot withstand rational scrutiny, Plaintiff's claims cannot survive summary judgment.

photograph from the gang book;

2)   that Ditsch told Turner that persons he initially selected could not have been the shooter;

3)   that Ditsch told Turner he made the right choice after he selected Plaintiff;

4)   that the six-pack shown to Turner had been previously used in the Sarabia investigation;

5)   that another investigator had influenced witnesses in the Sarabia investigation to select Carrillo's photograph from the Sarabia six-pack;

6)   before the second trial, Ditsch threatened Turner that he would face negative consequences when he left custody; this "threat" was made to him after Turner indicated that he will be changing his testimony; and

7)   Ditsch was a member of a racist group of deputies known as the "Vikings" (Exhibit "B", ¶¶ 79-83).

Plaintiff's Third Claim for Relief alleges that his procedural or substantive due process rights, under the Fifth and Fourteenth Amendments, were violated because Turner's identification of him was not "free from suggestion or influence". (Exhibit "B", ¶¶ 91-92.)  Plaintiff's Fifth Claim for Relief alleges that his procedural and substantive due process rights were violated by the use of false evidence — that Defendant Ditsch "knew or should have known that Turner's selection of [Plaintiff] did not provide any evidence pointing to Mr. Carrillo's guilt, and that he was providing false evidence." (Exhibit "B", ¶ 105.)

Plaintiff's Second, Fourth, and Sixth Claims for Relief allege conspiracies to violate the rights alleged in the First, Third, and Fifth Claims for Relief.[9]

---

[9] The Seventh Claim for Relief alleges a *Monell* cause of action against the County of Los Angeles.  This claim (and associated discovery) has been bifurcated from Plaintiff's claims against Defendant Ditsch.  (Docket No. 9.)

## IV.  **STANDARD OF REVIEW.**

The court views the record in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  However, the nonmoving party has the "burden of [pointing] to 'specific facts showing that there is a genuine issue for trial....' [I]t is not the district court's job to sift through the record to find admissible evidence in support of a non-moving party's case." *Claar v. Burlington N. R.R.,* 29 F.3d 499, 504 (9th Cir. 1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986)).

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"); *Guatay Christian Fellowship v. County of San Diego,* 670 F.3d 957, 972 (9th Cir. 2011). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007) (no "genuine issue for trial" under the *Matsushita* standard where opposing parties submitted two different accounts of the facts, but the record (a videotape) so utterly discredited the respondent's version that no reasonable jury could have believed respondent); *Wilkinson v. Torres*, 610 F.3d 546, 549 (9th Cir. 2010).

The court may disregard "visible fiction" in cases where the responding party's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380-81 (emphasis added); *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 701 (9th Cir. 1981) ("Even on a motion for summary judgment, a court is not compelled to give weight to an allegation that is incontrovertibly demonstrated to be false.").

# V.   **DEFENDANT DITSCH IS ENTITLED TO QUALIFIED IMMUNITY BECAUSE HIS ALLEGED FAILURE TO DISCLOSE EXCULPATORY EVIDENCE DID NOT VIOLATE CLEARLY ESTABLISHED LAW.**

Qualified immunity is designed to shield from liability "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "The central purpose of affording public officials qualified immunity from suit is to protect them from undue interference with their duties and from potentially disabling threats of liability."  *Elder v. Holloway*, 510 U.S. 510, 514 (1994).  The United States Supreme Court has stated, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  "[T]he entitlement is an *immunity from suit* rather than a mere defense to liability."  *Id.* (emphasis in original); *see also*, *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'").

A determination that a defendant is entitled to qualified immunity involves a two part analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson*, 555 U.S. at 232.  A public employee is entitled to qualified immunity if the defendant did not violate the plaintiff's constitutional rights.  *Pearson*, 555 U.S. at 232.  Even assuming evidence of a constitutional violation is presented, the public employee is still entitled to qualified immunity if the constitutional right at issued was not "clearly established".  *Id.*  These steps are not cumulative; a defendant is entitled to qualified immunity if either test is satisfied.  The Supreme Court has held that a qualified immunity analysis should be conducted as expeditiously as possible.  *Id.* at 237.

In the instant case, the critical inquiry with respect to Plaintiff's § 1983

9

claims against Defendant Ditsch is the extent to which, if any, the constitutional parameters under *Brady v. Maryland,* 373 U.S. 86 (1963) had been established in January 1991 vis-à-vis police officers (as opposed to prosecutors).  Indeed, although a prosecutor's unintentional failure to disclose exculpatory evidence could result in a *Brady* violation, it was not until 2009 that the Ninth Circuit held that "a § 1983 plaintiff must show that police officers acted **with deliberate indifference to or reckless disregard for an accused's rights or for the truth** in withholding evidence from prosecutors." *Tennison v. City & County of San Francisco,* 570 F.3d 1078, 1089 (9th Cir. 2009).

In essence, the police officer's failure to disclose must have been "conscience-shocking", and this evaluation parallels the evaluation required for substantive due process violations by *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998).  *Id.* at 1089.  Thus, the controlling standard for *Brady*-based § 1983 claims brought against police officers was first clearly defined in the Ninth Circuit, over 18 years **after** the Defendant Ditsch's involvement in Plaintiff's criminal investigation.

While *Tennison* clearly marks the date on which the controlling standard for § 1983 *Brady* claims against police officers was established, the timeline for applying constitutional *Brady* obligations on police officers is anything but clear. For example, in *Jernigan v. Richard*, WL 79262, *15-16 (D. Ariz. 2012), the court explained that the application of *Brady* to police officers dates to 1995 "at the very latest."  Similarly, in *Domenech v. City of Philadelphia*, 2009 WL 1109316 (E.D. Pa. 2009), the court held that the defendant police officer was entitled to qualified immunity because "there was no clearly established constitutional requirement that police officers take affirmative steps to disclose potentially exculpatory evidence to prosecutors until 1995, at the earliest."  *Id.* at * 13 (citing *Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, 411 F.3d 427 (3d Cir. 2005) (in 1995, the Supreme Court held that prosecutors "have

a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police").  Accordingly, the *Domenech* court held that if the officer had failed "to affirmatively disclose any potentially exculpatory evidence in 1987, he could have reasonably believed that he was acting in accordance with constitutional dictates."  *Domenech*, 2009 WL 1109316, * 13.

In *Jean v. Collins*, 221 F.3d 656, 659 (4th Cir. 2000), the Fourth Circuit explained that the "Supreme Court decisions establishing the *Brady* duty on the part of prosecutors do not address whether a police officer independently violates the Constitution by withholding from the prosecutor evidence acquired during the course of an investigation."  The Fourth Circuit explained further that "[t]hese cases have **left unclear the exact nature of any duty that the law imposes on police with regard to exculpatory evidence**."  *Id.* (emphasis added); *Mowbray v. Cameron County*, 274 F.3d 269, 278 (5th Cir. 2001) ("no case extending *Brady* to police officers"); *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996) ("The Supreme Court has not explicitly addressed the disclosure duties of the police and other investigators under *Brady*.").

Here, assuming *arguendo* that Plaintiff's allegations regarding Defendant Ditsch's actions on January 19, 1991 are true, such allegations do not give rise to section 1983 liability because the failure to disclose such actions to a prosecutor did not violate clearly established law relating to *Brady v. Maryland*.  In other words, as the cases identified above unquestionably demonstrate, a reasonable officer in 1991 could have believed that he or she was not constitutionally required, under *Brady v. Maryland*, to disclose to a prosecutor the nature of his or her own misconduct during the course of a photograph viewing by an eyewitness.

Defendant Ditsch's entitlement to qualified immunity becomes even more evident upon scrutiny of Plaintiff's allegations.  Plaintiff accuses Defendant not only with gross misconduct during his interaction with Turner but with being a

member of a white supremacist deputy gang, and that Defendant violated *Brady* by not disclosing these "facts" to the prosecution.  The net effect of Plaintiff's contention is that Defendant was constitutionally required to subject himself to both criminal prosecution and civil liability.

In *Bastidas v. City of Los Angeles*, 2006 WL 4749706 (C.D. Cal. 2006), the court explained that there are no cases that require "a police officer's duty to report to a plaintiff the officer's own—or another officer's—misconduct in an unrelated proceeding. *Id.* at *7.  "Moreover …  there is no indication in the case law that a police officer, by virtue of his law enforcement status, forfeits his privilege against self-incrimination in any circumstances. …  If police officers were required to disclose their alleged misconduct or subject themselves to civil liability for not doing so, their Fifth Amendment protection would be seriously compromised …." *Id.* at *8 (emphasis added).  The court also held that the defendant officers were entitled to qualified immunity because a reasonable officer would have believed that he was not constitutionally obligated to disclose his misconduct to a criminal defendant's counsel.  *Id.* at *9.

For the same reasons, Defendant Ditsch is entitled to qualified immunity. In 1991, a reasonable officer certainly could have believed that *Brady v. Maryland* did not impose a constitutional obligation on his part to disclose official misconduct in an unrelated case to a criminal defendant.  *Bastidas* also demonstrates that the interplay between Defendant Ditsch's Fifth Amendment rights and Plaintiff's rights under *Brady* or broader due process protections was hardly clear, further cementing Defendant Ditsch's entitlement to qualified immunity.

//

//

//

//

## VI. THE RECORD "TAKEN AS A WHOLE" CLEARLY ESTABLISHES THAT TURNER IDENTIFIED PLAINTIFF ON HIS OWN VOLITION, WITHOUT ANY UNDUE INFLUENCE.

### A. Plaintiff's *Brady* Claim Cannot Be Reconciled With Turner's Explanation For The Change In His Identification Testimony.

In 1991 and 1992, Turner testified under penalty of perjury on three separate occasions:  the first two times, Turner testified that Plaintiff was the shooter, and the third time, he testified that Plaintiff was not the shooter.  This third occasion occurred during the second criminal trial, and his explanation for the dramatic change in his testimony was that he had an encounter with the actual shooter at a Jack-in-the-Box, sometime after the first trial.  Turner did not attribute his new testimony to any misconduct by any law enforcement personnel, and also denied that his being in custody (facing felony criminal charges) had any effect on his decision to change his testimony.  Turner also denied having had any communication with Plaintiff the prior day, when they happened to have been housed in the same area of the county jail.  In essence, Turner's testimony was that having personally encountered an individual who he believed was the actual shooter, he became convinced that Plaintiff was not the shooter.

Specifically, on June 23, 1992, Turner testified that:  (1) at the station, he told LASD personnel that he recognized the shooter, having seen him around Lynwood High School and from Plaintiff's involvement in a fight; (2) he was asked to look through a gang photo book and looked through about 200 photographs; (3) he pointed out a photograph of someone who looked like the shooter; (4) he was then shown a six-pack, from which he identified the shooter as the person in position no. 1; (5) at the time, he was "**positive**" about the identification; (6) he does not remember telling any of his friends who he had picked out; (7) he was told not to tell anyone who he had identified; (8) he never told any of his friends on which position of the six-pack the identified person was

located; (9) he had recognized the shooter from having seen him on numerous prior occasions.[10]  (SUMF 41.)

Turner proceeded to testify that the prior day, June 22, 1992, he had indicated for the first time that he was no longer positive about his identification. Turner also acknowledged seeing Plaintiff at the county jail the prior week but denied having had any conversation with him.  (SUMF 42-43.)  On cross-examination by Plaintiff's attorney, Turner reiterated that his prior in-court and out-of-court identifications of Plaintiff as the shooter was based on his **genuine belief** of this fact.  Then, Turner was asked, "what happened that caused you to change your mind?" Turner explained that sometime after the first trial, he went to a Jack-in-the-Box, and encountered a Young Crowd gang member who said "Fool, that's why I shot your homeboy father."  Turner punched him, and when that person's associate appeared with a gun, Turner ran away.  Turner testified that he was able to "get a good look" at the gang member and at that point, he realized that he was "the person who done this." Turner explained that this person resembled Plaintiff, and he became "surely positive" that this person was the actual shooter.  And "as a result" of this encounter, Turner told the prosecutor about his changed belief about the identity of the shooter.  (SUMF 44-46.)

Thus, at the second trial **Turner unambiguously testified that he truly believed that he immediately recognized the shooter from prior encounters, identified Plaintiff's photograph based on this recognition, and only after the Jack-in-the-Box incident did he come to believe that someone else was the shooter.**

Yet, in 2010, however, Turner provided a very different account through a declaration provided to Plaintiff's habeas attorneys.  Turner declared that

---

[10] Turner's testimony at the second trial thus provided no inkling of any police misconduct, and reaffirmed his earlier testimony that as of January 19, 1991, he was "positive" that Plaintiff was the shooter.

Defendant all but selected Plaintiff's photograph from the gang book for him, and Defendant then told him which photograph to select from the six-pack. (SUMF 49-50.) This was the first time Turner ever made this accusation; at the habeas proceeding, Turner's testimony did not go that far, instead testifying that while he selected Plaintiff's photograph from the gang book and six-pack, his selections had been dictated by Defendant's comments.

However, at the same habeas proceeding, Turner testified that he changed his testimony at the second trial due to his encounter at the Jack-in-the-Box. (SUMF 51-52.) This testimony is highly significant because it is consistent with his testimony at the second trial, and cannot be reconciled with his belated allegations against Defendant.

Simply put, if Turner's selection of Plaintiff's photograph was the result of Defendant's manipulation or undue influence (as he has belatedly alleged), the purported Jack-in-the-Box incident could have had no meaningful effect on Plaintiff's decision to change his testimony. In other words, if Turner's allegations are true, he never would or could have believed that Plaintiff was the shooter, and therefore, there could have been no reason for the Jack-in-the-Box incident to suddenly cause Turner to believe that Plaintiff now could not have been the shooter. Yet, Turner testified at both the second trial and at the habeas proceeding that the Jack-in-the-Box incident did have this effect, which necessarily means that before that incident, Turner had to have believed that Plaintiff was the shooter. And in order for Turner to have had this belief, Defendant Ditsch could not have manipulated him into selecting Plaintiff's photograph.

Thus, the only rational and logical interpretation of Turner's multiple sessions of sworn testimony cannot be reconciled with the contention that Turner identified Plaintiff to appease Defendant Ditsch. Indeed, based on the entirety of the record, no rational trier of fact can find in favor of Plaintiff on the dispositive

issue of whether Turner's identification of Plaintiff was tainted from the outset —
his testimony unquestionably established that it could not have been so tainted.
Turner's sworn testimony, even at the habeas proceeding, proves that he would
not have changed his identification but for the Jack-in-the-Box incident.

### B.  Similarly, The Third And Fifth Claims Cannot Be Reconciled With Turner's Sworn Testimony.

Plaintiff's Third and Fifth Claims for Relief allege that Turner's
identification of Plaintiff was unconstitutionally suggestive and that Defendant
Ditsch should have known the identification was false.  These Claims cannot
survive summary judgment based on the same evidence that demonstrates the
invalidity of Plaintiff's *Brady* claim.

Indeed, these two Claims hinge on the notion that Turner's identification of
Plaintiff on January 19, 1991 was improperly manufactured or manipulated.
(Complaint, ¶¶ 91-93, 105.) This contention, however, cannot be reconciled with
Turner's repeated sworn testimony, including his testimony at the 2011 habeas
proceeding, that until sometime after the first trial, he was "positive" that Plaintiff
was the shooter.  In other words, until the Jack-in-the-Box incident, Turner
sincerely believed that Plaintiff was the shooter, which necessarily means that his
initial identification of Plaintiff was genuine.  Furthermore, Defendant Ditsch
would have had no reason to question the veracity of Turner's statements.

Accordingly, no rational trier of fact could find that Defendant Ditsch
manipulated the identification procedure, and without this finding, Plaintiff's
claims against Defendant Ditsch cannot survive summary judgment.

## VII.  THE REQUISITE REQUIREMENTS FOR SECTION 1983 RELIEF UNDER *BRADY v. MARYLAND* CANNOT BE SATISFIED.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), a criminal defendant is
denied his due process right to a fair trial, and the government violates its
constitutional duty to disclose material evidence where (1) the evidence in

question is favorable to the accused in that it is exculpatory or impeachment evidence, (2) the government willfully or inadvertently suppresses this evidence, and (3) prejudice ensues from the suppression (i.e., the evidence is "material"). *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999); *Kyles v. Whitley,* 514 U.S. 419, 433 (1995).

The evidence which was "suppressed" must have been "material". The Ninth Circuit explained that in *Strickler v. Greene*, the Supreme Court stated that "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a **reasonable probability that the suppressed evidence would have produced a different verdict**." *Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011); *see also*, *United States v. Bagley*, 473 U.S. 667, 682 (1985) ("The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."); *Kyles v. Whitley,* 514 U.S. 419, 433 (1995) (the failure to disclose is prejudicial if "there [was] a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."); *Smith v. Cain*, ___ U.S. ___, 132 S.Ct. 627, 630 (2012) (a reasonable probability exists if the likelihood of a different result is great enough to undermine confidence in the outcome of the trial).

### A.   There Was No "Suppression" Of Material Evidence.

There is no meaningful "suppression" within the meaning of *Brady* "if the means of obtaining the exculpatory evidence has been provided to the defense". *United States v. Dupuy*, 760 F.2d 1492, 1502 (9th Cir. 1985); *United States v. Griggs,* 713 F.2d 672, 674 (11th Cir. 1983) ("Where defendants ... had within their knowledge the information by which they could have ascertained the supposed *Brady* material, there is no suppression by the government."); *Sommer v. United States*, 2011 WL 4592788, *7 (S.D. Cal. 2011) ("*Brady* violation does not occur if the defendant knew or should have know[n] the **essential facts**

17

permitting him to take advantage of any exculpatory information.") (emphasis added).

Here, at the second trial when Turner suspiciously and suddenly changed his testimony in a dramatic fashion, Turner could certainly have been questioned about the circumstances of his initial identification of Plaintiff from the gang photo book and the six-pack. The fact that this topic was not inquired into further at the second trial does not retroactively allow Plaintiff to allege that he was convicted due to his having been denied key exculpatory evidence. Indeed, Turner's 180-degree turnaround just months after the first trial signaled the need for additional questioning regarding Turner's change in testimony, with questioning that could have been focused on the circumstances surrounding Turner's initial identification. This issue was therefore not suppressed in a manner that validates § 1983 relief under *Brady*. (As discussed above, even if Turner had been questioned, he would have denied any misconduct by Defendant Ditsch, as evidenced by his continued insistence to this day that he changed his mind about the identity of the shooter because of the Jack-in-the-Box encounter.)

To the extent that Plaintiff's *Brady* claim against Defendant Ditsch is based on his having not disclosed to the prosecutor that he was a member of a "white supremacist gang", as discussed above, there was no constitutional obligation to disclose misconduct in an unrelated matter (assuming *arguendo* that Defendant was a member of a white supremacist gang of deputies — which he certainly was not). (SUMF 80.) Furthermore, issues related to the Lynwood station associated "Vikings" had already been covered by the mass media well before Plaintiff's second criminal trial. (Choi Decl., ¶ 27; Exhibit "EE".) Thus, by not disclosing Defendant's purported membership in an alleged white supremacist deputy gang cannot be treated as a *Brady* violation giving rise to § 1983 relief.

Finally, to the extent that Plaintiff's *Brady* claim is based on the failure to disclose alleged misconduct by "Deputy Loy Luna" with respect to the six-pack

1    identification conducted during the Sarabia investigation, there is no evidence that

2    Defendant Ditsch had any knowledge about any such purported misconduct.

3    (SUMF 93; *see* Complaint, ¶ 81-A(e).)

4         **B.    No Actionable Prejudice Occurred.**

5         Here, the showing of prejudice cannot be made because Turner, in fact,

6    testified adamantly at the second trial that Plaintiff was **not** the shooter.  Turner

7    went so far as testifying that he encountered the actual shooter after the first trial,

8    at which time that person admitted to the shooting.  Turner's undisputed

9    testimony, **in favor** of Plaintiff at the second trial cannot be reconciled with

10   Plaintiff's contention that he was prejudiced as required by *Brady*.

11        Just as importantly, Plaintiff cannot show that a different result would have

12   ensued because five other witnesses testified that Plaintiff was the shooter, and

13   the jury weighed their testimony against Turner's new factual account.  Because

14   these five witnesses never had any contact with Defendant Ditsch, their collective

15   testimony prevents Plaintiff from satisfying the prejudice prerequisite.

16   **VIII.  PLAINTIFF'S CLAIMS AMOUNT TO EITHER A MALICIOUS**

17   **PROSECUTION OR FABRICATION OF EVIDENCE CLAIM**

18   **WHICH HAS NOT BEEN PROPERLY PLED AND IS BARRED BY**

19   **THE FINDING OF PROBABLE CAUSE AND THE PRESUMPTION**

20   **OF PROSECUTORIAL INDEPENDENCE.**

21        Plaintiff's Complaint appears to be carefully worded to avoid phrases such

22   as "fabrication of evidence" or "malicious prosecution".  Despite the break-up of

23   Plaintiff's claims, the fundamental crux of Plaintiff's claims is that Defendant

24   Ditsch allegedly steered Turner into identifying Plaintiff from the gang photo

25   book and six-pack, and hid this purported misconduct from the prosecution —

26   thereby leading to the filing of the murder charge against Plaintiff.  *See Uboh v.*

27   *Reno,* 141 F.3d 1000, 1001, 1003 (11th Cir.1998) (holding that allegations that

28   officials have falsified affidavits and sought an indictment on fabricated charges

1   must be construed as a malicious prosecution claim under the Fourth

2   Amendment).

3       As discussed above, this theory cannot be reconciled with the record as a

4   whole.  Furthermore, to the extent that the First, Third, and Fifth Claims for

5   Relief are treated as a poorly stated malicious prosecution claim, they cannot

6   survive summary judgment for several reasons.

7       First, a malicious prosecution claim is not cognizable under 42 U.S.C. §

8   1983 if process is available within the state judicial system to provide a remedy.

9   *Bretz v. Kelman,* 773 F.2d 1026, 1031 (9th Cir.1985) (en banc).  The Ninth

10  Circuit has "enunciated an important exception to this rule: malicious prosecution

11  constitutes a deprivation of liberty without due process of law—and is thus a

12  federal constitutional tort—when it is "conducted with the intent to deprive a

13  person of equal protection of the laws or is otherwise intended to subject a person

14  to a denial of constitutional rights."  *Lacey v. Maricopa County*, 649 F.3d 1118,

15  1133 (9th Cir. 2011) (citing *Bretz,* 773 F.2d at 1031); *Usher v. City of Los*

16  *Angeles*, 828 F.2d 556, 562 (1981).  In *Lacey*, the Ninth Circuit explained further

17  that to prevail on a § 1983 malicious prosecution cause of action, the plaintiff

18  must show that he was prosecuted with malice, **without probable cause**, and for

19  purpose of denying him equal protection or another specific constitutional right.

20  *Id.* (citing *Freeman v. City of Santa Ana,* 68 F.3d 1180, 1189 (9th Cir. 1995)).

21  Thus, Plaintiff's allegations necessarily require him to allege and prove that he

22  was prosecuted without probable cause — regardless of whether these allegations

23  are treated as a malicious prosecution or fabrication of evidence claim.

24  *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (a due process

25  "violation cannot in itself support a deliberate-fabrication-of-evidence claim.").

26      Here, there is no dispute that Plaintiff was held to answer after a

27  preliminary hearing, and six eyewitnesses identified him as the shooter at his first

28  trial.  Under these circumstances, where an unquestioned finding of probable

20

1    cause was made, Plaintiff cannot prevail on what is effectively a malicious

2    prosecution cause of action.  *See*, *Albright v. Oliver*, 510 U.S. 266, 271 (1994)

3    (there is no substantive right under the Fourteenth Amendment Due Process

4    Clause to be free from criminal prosecution except upon probable cause).

5        Indeed, Plaintiff should not be permitted to pursue a malicious prosecution

6    claim poorly disguised as a non-descript due process claim.  In *Brooks v. City of*

7    *Chicago*, 564 F.3d 830 (7th Cir. 2009), the plaintiff alleged that police officers

8    had violated his rights to due process by not disclosing known exculpatory

9    evidence, committing perjury, and otherwise depriving the plaintiff a fair trial.

10   The court held that the plaintiff's allegations were in essence a malicious

11   prosecution claim, and not a due process violation.  *See also*, *Fox v. Hayes,* 600

12   F.3d 819, 841 (7th Cir.2010) (plaintiff's due process claim consisted of "nothing

13   more than a hybrid" of his false arrest and malicious prosecution claims and was

14   barred); *Caine v. Burge*, 2012 WL 2458640, *6 (N.D. Ill. 2012) ("Allegations that

15   police officers failed to provide favorable or exculpatory information by

16   disclosing or admitting that fabrications occurred does not give rise to a due

17   process violation."); *Harris v. Kuba,* 486 F.3d 1010, 1017 (7th Cir. 2007) (*Brady*

18   cannot be extended to "provide relief if a police officer makes a false statement to

19   a prosecutor by arguing that an officer is 'suppressing' evidence of the truth by

20   making the false statement.").

21       Secondly, a malicious prosecution claim "must generally establish that the

22   prior proceedings terminated in such a manner as to indicate his innocence."

23   *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004); *see also, Pattiz*

24   *v. Minye,* 61 Cal.App.4th 822, 827 (1998) ("[T]he plaintiff must establish more

25   than that he prevailed in the underlying action.  He must prove a termination that

26   reflects on his innocence.") (internal citations omitted); *Ayala v. KC*

27   *Environmental Health*, 426 F. Supp. 2d 1070, 1085, 1088 (E.D. Cal. 2006) ("To

28   recover compensatory damages, the malicious prosecution plaintiff bears the

21

burden to prove that the defendant did not have reasonable grounds to believe that the facts alleged in the complaint were true."). No such finding was made in Plaintiff's habeas proceeding in which the court found that Plaintiff had presented sufficient evidence that had the jury heard the changed testimony of witnesses Sarpy, Turner, Coleman, and Mitchell, and the testimony of the lighting expert, the outcome of the trial could have been affected.[11]

Finally, this claim is also barred by the presumption of prosecutorial independence. *Harper v. City of Los Angeles,* 533 F.3d 1010, 1027 (9th Cir.2008) (filing of criminal complaint immunizes investigating officers from damages suffered thereafter because it is presumed that prosecutor filing complaint exercised independent judgment in determining that probable cause for accused's arrest exists at that time) (citation omitted); *Smiddy v. Varney (Smiddy I),* 665 F.2d 261, 266-68 (9th Cir.1981), *cert. denied,* 459 U.S. 829 (1982); *Beck v. City of Upland,* 527 F.3d 853, 862 (9th Cir. 2008) (a presumption exists "that the prosecutor filing [a criminal] complaint exercised independent judgment in determining that probable cause for an accused's arrest[/prosecution] exist[ed], thereby breaking the chain of causation between an arrest and prosecution and immunizing investigating officers ... from damages suffered after the complaint was filed.") (internal quotations marks and citations omitted). Simply put, the prosecutor's presumed exercise of her independent judgment bars Plaintiff's claims which are bound together by a common theory of malicious prosecution.

---

[11] The Fourth Circuit has held that a *Brady* violation that resulted in the overturning of the plaintiff's conviction is a necessary condition for § 1983 liability on the part of the police. *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000).

IX. **PLAINTIFF'S § 1983 CONSPIRACY CAUSES OF ACTION ARE**
    **NOT RIPE FOR ADJUDICATION AND CANNOT BE SUPPORTED**
    **WITH ANY ADMISSIBLE EVIDENCE.**

Plaintiff's three conspiracy-based claims are not cognizable as a matter of law, where Plaintiff does not allege the identity of any purported conspirator, other than Defendant Ditsch, and any such claims are not ripe for adjudication as a matter of law. *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 625 (9th Cir. 1988) (an alleged cover-up of constitutional violations states a federally cognizable claim only if the purported "actions can be causally connected to a failure to succeed in the present lawsuit."). The *Karim-Panahi* court explained further that since "the ultimate resolution of the present suit remains in doubt," the plaintiff's "cover-up claim is not ripe for judicial consideration" and should be dismissed. *Id.* at 625.

Moreover, to withstand summary judgment, a plaintiff's section 1983 conspiracy claim must be supported by concrete evidence of the alleged conspiracy; conclusory allegations that defendants acted in agreement or concert to violate a plaintiff's constitutional rights are insufficient as a matter of law. These principles are well-established, and their application here mandates summary dismissal of Plaintiff's conspiracy-based claims. *See United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989) (en banc) (to make out a civil rights conspiracy claim, a plaintiff must at a minimum establish "an agreement or meeting of the minds" between the alleged conspirators); *Thomas v. Roach*, 165 F.3d 137, 147 (2nd Cir. 1999) (summary judgment was appropriate where the plaintiff's conspiracy "assertions were conclusory and vague, and did not establish the existence of an agreement among the defendants to deprive [the plaintiff] of his constitutional rights."); *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004) ("That individual [defendants] failed to take action against other [defendants] does not evidence agreement and

23

concerted action. Parallel action--or inaction in our case--does not necessarily indicate an agreement to act in concert.").

In fact, the conclusory allegations in the instant case are not even sufficient to withstand a motion to dismiss, let alone a motion for summary judgment. *Burns v. County of King*, 883 F.2d 819, 821 (9th Cir. 1989) (in order to state a conspiracy claim under section 1983, "the plaintiff must state specific facts to support the existence of the claimed conspiracy"); *Schucker v. Rockwood*, 846 F.2d 1202, 1205 (9th Cir. 1988) (conclusory allegations of conspiracy "are insufficient to support [plaintiff's] section 1983 claim."); *see also Ivey v. Board of Regents of University of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982) ("Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss.").

Finally, Plaintiff's conspiracy causes of action fail because there is no evidence that Defendant Ditsch conspired, or sought to conspire, to violate any of Plaintiff's constitutional rights. *See, United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989) (en banc) (to make out a civil rights conspiracy claim, a plaintiff must at a minimum establish "an agreement or meeting of the minds" between the alleged conspirators); *see* SUMF 78-79.

## X.   CONCLUSION.

For the foregoing reasons, Defendant Craig Ditsch is entitled to summary judgment, and the claims alleged against him should be dismissed with prejudice.

Dated:  August 8, 2012                    LAWRENCE BEACH ALLEN & CHOI, PC


By _____/s/ Jin S. Choi_____
          Jin S. Choi
     Attorneys for Defendants
     COUNTY OF LOS ANGELES
     and CRAIG DITSCH

24