1 DAVID D. LAWRENCE, State Bar No. 123039
  dlawrence@lbaclaw.com
2 JIN S. CHOI, State Bar No. 180270
  jchoi@lbaclaw.com
3 LAWRENCE BEACH ALLEN & CHOI, PC
  100 West Broadway, Suite 1200
4 Glendale, California 91210-1219
  Telephone No. (818) 545-1925
5 Facsimile No. (818) 545-1937

6 Attorneys for Defendants
  COUNTY OF LOS ANGELES
7 and CRAIG DITSCH

8

9 UNITED STATES DISTRICT COURT

10 CENTRAL DISTRICT OF CALIFORNIA

11

| 12 | FRANCISCO CARRILLO, JR., | ) | Case No. CV 11-10310 SVW (AGRx) |
|---|---|---|---|
| 13 | Plaintiff, | ) | Honorable Stephen V. Wilson |
| 14 | vs. | ) | |
| 15 | COUNTY OF LOS ANGELES; | ) | **DECLARATIONS OF JIN S. CHOI, CRAIG DITSCH, AND KEVIN GORAN AND EXHIBITS IN SUPPORT OF DEFENDANT CRAIG DITSCH'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, SUMMARY ADJUDICATION** |
| 16 | CRAIG DITSCH; AND DOES 1-10, INCLUSIVE; | ) | |
| 17 | Defendants. | ) | |
| 18 | | ) | |

19 *[Notice of Motion and Motion for Summary Judgment, Separate*
20 *Statement of Uncontroverted Material Facts, and [Proposed] Judgment filed*
21 *concurrently herewith]*

22 Date: September 10, 2012
   Time: 1:30 p.m.
23 Courtroom: 6

24 TO THE HONORABLE COURT, ALL INTERESTED PARTIES, AND TO

25 THEIR COUNSEL OF RECORD:

26 //

27 //

28 //

1

Defendant CRAIG DITSCH hereby submits the attached Declarations of Craig Ditsch, Kevin Goran, and Jin. S. Choi, and Exhibits in support of his Motion for Summary Judgment.

Dated: August 8, 2012    LAWRENCE BEACH ALLEN & CHOI, PC


By _____/s/ Jin S. Choi_____
   Jin S. Choi
   Attorneys for Defendants
   COUNTY OF LOS ANGELES
   and CRAIG DITSCH

## DECLARATION OF JIN S. CHOI

I, Jin S. Choi, declare as follows:

1. I have personal knowledge of the facts stated herein, except those stated upon information and belief and, as to those matters, I believe them to be true. If called upon to testify to the matters herein, I could and would competently do so.

2. I am an attorney at law duly licensed to practice before this Court and all the courts of the State of California. I am a shareholder with the law firm of Lawrence Beach Allen & Choi, P.C., attorneys for Defendants County of Los Angeles and Sheriff Baca in the above-referenced matter.

3. This motion is made following the unsuccessful meet and confer efforts pursuant to Local Rule 7-3. Attached hereto as Exhibits "A" are true and correct copies of my letters dated July 23, 2012 and July 30, 2012 sent to Plaintiff's counsel pursuant to Local Rule 7-3.

5. Attached hereto as Exhibit "B" is a true and correct copy of the operative Complaint in this action.

6. Attached hereto as Exhibit "C" is a true and correct copy of Plaintiff's Verified Petition for Writ of Habeas Corpus (without exhibits) filed in the County of Los Angeles Superior Court on or about September 22, 2010, in the matter of *In re Francisco Carrillo, Jr.*, Case No. TA011653.

7. Attached hereto as Exhibit "D" is a true and correct copy of the Return to Plaintiff's Petition for Writ of Habeas Corpus filed by the County of Los Angeles District Attorney's Office, Case No. TA011653, filed on or about February 14, 2011, in the matter of *In re Francisco Carrillo, Jr.*, Case No. TA011653.

8. Attached hereto as Exhibit "E" are true and correct copies of the declarations of Scott Turner, Dameon Sarpy, James Munnerlyn, Jeffrey Coleman, and Montree Mitchell, filed by Plaintiff in support of his petition for habeas

1

corpus, in the matter of *In re Francisco Carrillo, Jr.*, Case No. TA011653.

9. Attached hereto as Exhibit "F" is a true and correct copy of the County of Los Angeles Superior Court's Findings of Fact and Conclusions of Law on Petition for Writ of Habeas Corpus, in the matter of *In re Francisco Carrillo, Jr.*, Case No. TA011653, dated July 26, 2011.

10. Attached hereto as Exhibit "G" is a true and correct copy of the reporter's transcript from the May 21, 1991 preliminary hearing in the matter of *The People of the State of California v. Francisco Carrillo, aka Spider*, Case No. TA011972 (relating to the Frank Sarabia shooting).

11. Attached hereto as Exhibit "H" is a true and correct copy of the reporter's transcript from the July 9, 1991 preliminary hearing in the matter of *The People of the State of California v. Francisco Carrillo, aka Spider*, Case No. TA011653 (relating to the Donald Sarpy shooting).

12. Attached hereto as Exhibit "I" is a true and correct copy of the reporter's transcript of Scott Turner's testimony from the first trial in the matter of in the matter of *The People of the State of California v. Francisco Carrillo, aka Spider*, Case No. TA011653.

13. Attached hereto as Exhibit "J" is a true and correct copy of the reporter's transcript of Scott Turner's testimony from the second trial in the matter of in the matter of *The People of the State of California v. Francisco Carrillo, aka Spider*, Case No. TA011653.

14. Attached hereto as Exhibit "K" is a true and correct copy of the reporter's transcript of Scott Turner's testimony from the matter of *In re Francisco Carrillo, Jr.*, Case No. TA011653.

15. Attached hereto as Exhibit "L" is a true and correct copy of the reporter's transcript of Craig Ditsch's testimony from the first trial in the matter of in the matter of *The People of the State of California v. Francisco Carrillo, aka Spider*, Case No. TA011653.

16. Attached hereto as Exhibit "M" is a true and correct copy of the reporter's transcript of Craig Ditsch's testimony from the second trial in the matter of in the matter of *The People of the State of California v. Francisco Carrillo, aka Spider*, Case No. TA011653.

17. Attached hereto as Exhibit "N" is a true and correct copy of the reporter's transcript of Craig Ditsch's testimony from the matter of *In re Francisco Carrillo, Jr.*, Case No. TA011653.

18. Attached hereto as Exhibit "O" is a true and correct copy of the reporter's transcript of Plaintiff Carrillo's testimony from the first trial in the matter of in the matter of *The People of the State of California v. Francisco Carrillo, aka Spider*, Case No. TA011653.

19. Attached hereto as Exhibit "P" is a true and correct copy of the reporter's transcript of Plaintiff Carrillo's testimony from the second trial in the matter of in the matter of *The People of the State of California v. Francisco Carrillo, aka Spider*, Case No. TA011653.

20. Attached hereto as Exhibit "Q" is a true and correct copy of the reporter's transcript of Plaintiff Carrillo's testimony from the matter of *In re Francisco Carrillo, Jr.*, Case No. TA011653.

21. Attached hereto as Exhibit "R" is a true and correct copy of the reporter's transcript of the testimony of Dameon Sarpy, Marcus Stewart, Montrai Mitchell, James Munnerlin, and Jeffrey Coleman (relating to their identification of Plaintiff Carrillo as the person who shot Donald Sarpy), from the first trial in the matter of in the matter of *The People of the State of California v. Francisco Carrillo, aka Spider*, Case No. TA011653.

22. Attached hereto as Exhibit "S" is a true and correct copy of the reporter's transcript of the testimony of Dameon Sarpy, Marcus Stewart, Montrai Mitchell, James Munnerlin, and Jeffrey Coleman (relating to their identification of Plaintiff Carrillo as the person who shot Donald Sarpy), from the second trial

3

1 | in the matter of in the matter of *The People of the State of California v. Francisco*
2 | *Carrillo, aka Spider*, Case No. TA011653.
3 |          23.   Attached hereto as Exhibit "T" is a true and correct copy of the
4 | reporter's transcript of Detective Birl Adams' testimony from the first and second
5 | trials in the matter of in the matter of *The People of the State of California v.*
6 | *Francisco Carrillo, aka Spider*, Case No. TA011653.
7 |          24.   Attached hereto as Exhibit "U" is a true and correct copy of the
8 | reporter's transcript of Deputy District Attorney Mary Ann Escalante's March 14,
9 | 2011 testimony from the matter of *In re Francisco Carrillo, Jr.*, Case No.
10 | TA011653.
11 |          25.   Attached hereto as Exhibit "V" are true and correct copies of the
12 | referenced portions of Sergeant Tim Duerr's reporter's transcript from his June
13 | 13, 2012 deposition taken in this action.
14 |          26.   Attached hereto as Exhibit "W" are true and correct copies of the
15 | January 18, 1991 Complaint Report and Supplementary Report which were
16 | marked as Exhibit "1" during Sergeant Duerr's June 13, 2012 deposition.
17 |          27.   Attached hereto as Exhibit "EE" is a true and correct copy of an
18 | October 12, 1991 Los Angeles Times article regarding District Court Judge
19 | Hatter's findings in the matter of *Thomas v. County of Los Angeles*, Case No. 90-
20 | 5217.
21 |          I declare under penalty of perjury under the laws of the State of California
22 | and the United States of America that the foregoing is true and correct.
23 |          Executed on August 8, 2012 at Glendale, California.
24 |
25 |
26 |                                              /s/ Jin S. Choi
                                                 JIN S. CHOI
27 |
28 |

4

## DECLARATION OF CRAIG DITSCH

I, Craig Ditsch, declare as follows:

1. I have personal knowledge of the facts stated herein, except those stated upon information and belief and, as to those matters, I believe them to be true. If called upon to testify to the matters herein, I could and would competently do so.

2. I am a Lieutenant with the Los Angeles County Sheriff's Department ("LASD") assigned to the Major Crimes Bureau of the Detective Division. I have been continuously employed with the LASD since 1985. In 1988, I began my assignment with the Juvenile Operations Bureau Gang Enforcement Team. In 1989, I began my assignment as a deputy investigator with the Juvenile Operations Bureau Operation Safe Streets ("OSS"), and I had this assignment until 1997. The jurisdiction for OSS encompassed Lynwood, East Compton, and Willowbrook, and until 1994, OSS staff and personnel worked primarily out of a detached trailer located at the Lynwood Station.

3. As an OSS investigator, I became very familiar with gang activity and gang culture in the Lynwood area, and my duties focused on investigating gang-related criminal activity and arresting perpetrators of such criminal acts. In conjunction with my investigative activities, I often interacted with known gang members and their associates "in the field", often for the purpose of gathering gang-related intelligence that could prove useful in both ongoing or future investigations.

4. As part of our intelligence gathering activities, photographs of known gang members were taken by OSS investigators, and maintained in an album-like "gang book", with each "gang book" containing photographs of known members of the same gang. Included in the front of each "gang book" was a continuously updated list of identifying numbers, names, known gang monikers, and dates of birth, which corresponded to the photographs contained in the "gang book". These "gang books" were maintained for the many gangs which operated in the Lynwood area in 1991, many of which were "targeted" for investigation by the OSS due to their heightened criminal activities. These gangs had defined geographical territories; it certainly was not uncommon for one gang to develop violent rivalries with one or more other gangs. Such rivalries often led to violent acts being committed against gang members, their associates, and bystanders.

5. In January 1991, ten deputy investigators were assigned to OSS, and each investigator was assigned to certain known gangs in the Lynwood area. For example, one of the gangs to which I was assigned was the "N-Hood" gang, an African-American Crips gang, and therefore, I became familiar with many present and past members of the N-Hood gang.

6. In the evening of January 18, 1991, I responded to a report of a drive-by shooting on Lugo Avenue in Lynwood. The shooting occurred within the known territory of the N-Hood gang, and upon arriving at the scene, I observed paramedics attending to the victim of the drive-by shooting, and multiple LASD patrol deputies had responded to the scene as well. I do not recall the specifics of any conversations I may have had with any LASD personnel or eyewitnesses of the shooting. I recall leaving the scene alone to search for the vehicle that matched the description of the suspect vehicle. I was not able to locate the suspect vehicle during my search.

7.     I returned to the Lynwood Station later that night.  I became aware that several eyewitnesses from the drive-by shooting, including Scott Turner (a known N-Hood gang member), were at the station, for the purpose of being interviewed by the homicide detectives assigned to this incident.  Although I was not a homicide detective, OSS deputy investigators often assisted homicide detectives working on cases involving gang members, whether the gang members were victims or suspects.

8.     I ultimately contacted Mr. Turner at the station at approximately 2:00 a.m. at which time Mr. Turner indicated to me that he had recognized the shooter as a Young Crowd gang member who he had observed on prior occasions around Lynwood High School.  Based on Mr. Turner's statements, I asked Mr. Turner to look through the Young Crowd gang book.  This gang book contained over 140 photographs.

9.     Mr. Turner looked through this gang book, page by page, and he eventually selected photograph no. 126.  When he made this selection, I did not know the name of the individual, in part because I had never been assigned to the Young Crowd gang.  Mr. Turner expressed no hesitation about his identification.  This photograph was the first and only photograph that Mr. Turner picked out of the gang book.  At no time did I pressure or try to influence Mr. Turner into selecting any particular individual from the gang book.

10.    After Mr. Turner made his selection, I was able to determine his name by reviewing the list of names at the beginning of the gang book, which indicated that the photograph was that of Francisco Carrillo — the Plaintiff in this action ("Plaintiff").  (Attached hereto as Exhibit "X" is a true and correct copy of the list of names contained in the Young Crowd gang book.)

11.    I then left Mr. Turner and went to the area of the OSS trailer where photographs used to assemble photograph arrays ("six-packs") were kept.  My intent was to assemble a six-pack, using a different photograph of Plaintiff, and

five other photographs of similar-looking individuals.

12. At Plaintiff's two criminal trials in 1991 and 1992, I testified that I assembled the six-pack which was shown to Mr. Turner. However, at the March 2011 habeas corpus proceeding, I was presented with information that made me realize that a six-pack with Plaintiff (in the number 1 position of the six-pack) may have previously been assembled and used in a separate investigation. It is my recollection now that I did not have to complete the process of preparing a six-pack to show Mr. Turner because one had already been prepared (for a separate investigation by another investigator). It is this six-pack that I showed Mr. Turner shortly after he made his selection from the gang book.

13. I do not believe that using a previously assembled six-pack for a particular suspect, in connection with a separate investigation, would undermine in any meaningful way the integrity or accuracy of a six-pack identification procedure. In other words, if the previously assembled six-pack is made up of photographs of similar looking individuals, and has never been shown to the subject eyewitness (in this case, Mr. Turner), there would be no reason to question the validity of the identification procedure.

14. When I showed Mr. Turner this six-pack, he selected Plaintiff's photograph without hesitation or ambiguity. (Attached hereto as Exhibit "Y" is a true and correct copy of the admonition form signed by Mr. Turner after identifying Plaintiff from the six-pack.) I then advised one of the homicide detectives about Mr. Turner's identification, and I prepared a supplemental report regarding the identification. After Mr. Turner identified Plaintiff as the shooter, I did not interview any other witnesses who may have been present at the Lynwood station, either on that date or any subsequent date. (Attached hereto as Exhibit "Z" is a true and correct copy of my supplemental report.)

15. On January 24, 1991, I was one of a number of LASD personnel involved in the execution of search warrants in connection to the other shooting

8

1  incident in which Plaintiff had been identified as the suspect. I do not have a
2  specific recollection of my actions on this date, but I am informed and believe that
3  Plaintiff was arrested on this date.
4      16.    Due to my personal knowledge regarding Mr. Turner's identification
5  of Plaintiff on January 19, 1991, I testified at Plaintiff's two criminal trials. At no
6  point during the two trials was I questioned by either the prosecutor or Plaintiff's
7  counsel about whether I had attempted to influence Mr. Turner's identification of
8  the shooter, or somehow manipulate Mr. Turner into identifying Plaintiff. At
9  some point during Plaintiff's second criminal trial, I learned that Mr. Turner had
10 indicated that he will be changing his testimony about the identity of the shooter.
11 Given Mr. Turner's testimony at the first trial, during which he identified Plaintiff
12 as the shooter, and his unambiguous selection of Plaintiff's photographs, I was
13 surprised by his intent to change his testimony.
14     17.    However, by the time of the second trial, Mr. Turner was in County
15 custody, facing felony charges and state imprisonment. I also learned that Mr.
16 Turner may have had some kind of contact with Plaintiff at the County Jail shortly
17 before he communicated his intent to change his earlier testimony. I was present
18 when the prosecutor, Mary Escalante, and Plaintiff's counsel, Robin Yanes, met
19 with Mr. Turner in the courthouse lock-up area. During this meeting, Mr. Turner
20 stated that he had recently had an encounter with the shooter at a Jack-in-the-Box.
21 Mr. Turner did not in any way suggest that I had somehow manipulated him into
22 identifying Plaintiff on January 19, 1991.
23     18.    Subsequently, I showed the Young Crowd gang book to Mr. Turner a
24 second time in the courthouse lock-up area. This time, Mr. Turner picked out
25 photographs of two individuals that he said looked like the individual he had
26 encountered at Jack-in-the-Box. These photographs were labeled with lower
27 numbers than Plaintiff's photograph, meaning that Mr. Turner would have had to
28 looked at and pass over these photographs before he selected Plaintiff's

1 photograph at the Lynwood station.

2     19.   I am aware that the second criminal trial proceeded, with Mr. Turner testifying that Plaintiff was not the shooter, and other eyewitnesses testifying that Plaintiff was the shooter (as they did during the first criminal trial). From the time I testified at the second criminal trial in 1992, and until sometime in the latter part of 2010, I had no communications or discussions about Plaintiff's conviction or the underlying investigation.

    20.   I am informed and believe that in this action, Plaintiff alleges that I (or some other un-named defendant) failed to disclose to the prosecutor that OSS investigator Loy Luna had improperly influenced a six-pack identification which took place during the "Sarabia" investigation (wherein Plaintiff was initially identified as the perpetrator). I played no part in the "Sarabia" investigation, and I have never had any knowledge, direct or otherwise, of any facts regarding investigator Luna's actions with respect to the six-pack identification in that investigation.

    21.   I never conspired with anyone, or attempted to conspire with anyone, to violate Plaintiff's rights under the federal and state constitutions, including his rights to due process, and nor did I ever engage in any actions that would or could have deprived Plaintiff of his right to a fair trial.

    22.   Finally, I am informed and believe that Plaintiff accuses me of having been a member of a "white supremacist" deputy gang. This accusation is patently false, and I am personally offended by this vicious personal attack. To the extent that Plaintiff alleges that I should have disclosed my membership in a "white supremacist" deputy gang to the prosecutor at any time after the Donald Sarpy murder, obviously I could not have done so because such a representation about myself would have had no basis in truth whatsoever.

1  I declare under penalty of perjury under the laws of the State of California
2  and the United States of America that the foregoing is true and correct.
3  Executed on August 2, 2012, at Glendale, California.

_____
CRAIG DITSCH

11

## DECLARATION OF KEVIN GORAN

I, Kevin Goran, declare as follows:

1. I have personal knowledge of the facts stated herein, except those stated upon information and belief and, as to those matters, I believe them to be true. If called upon to testify to the matters herein, I could and would competently do so.

2. I am a Commander with the Los Angeles County Sheriff's Department ("LASD"). I have been continuously employed with the LASD since December 1983. In April 1988, I began my assignment with the Juvenile Operations Bureau Gang Enforcement Team. In May 1990, I began my assignment as a deputy investigator with the Juvenile Operations Bureau Operation Safe Streets ("OSS"), and I had this assignment until August 1993. The jurisdiction for OSS encompassed Lynwood, East Compton, and Willowbrook, and until 1994, OSS staff and personnel worked primarily out of a detached trailer located at the Lynwood Station.

3. As an OSS investigator, I became very familiar with gang activity and gang culture in the Lynwood area, and my duties focused on investigating gang-related criminal activity and arresting perpetrators of such criminal acts. In conjunction with my investigative activities, I often interacted with known gang members and their associates "in the field", often for the purpose of gathering gang-related intelligence that could prove useful in both ongoing or future investigations.

4. As part of our intelligence gathering activities, photographs of known gang members were taken by OSS investigators, and maintained in an album-like "gang book", with each "gang book" containing photographs of known members of the same gang. Included in the front of each "gang book" was a periodically updated list of identifying numbers, names, known gang monikers, and dates of birth, which corresponded to the photographs contained in the "gang book".

1  These "gang books" were maintained for the many gangs which operated in the
2  Lynwood area, many of which were "targeted" for investigation by the OSS due
3  to their heightened criminal activities. These gangs had defined geographical
4  territories; it certainly was not uncommon for one gang to develop violent
5  rivalries with one or more other gangs. Such rivalries often led to violent acts
6  being committed against gang members, their associates, and bystanders.

7     5.   In December 1990, ten deputy investigators were assigned to OSS,
8  and each investigator was assigned to certain known gangs in the Lynwood area.
9  For example, one of the gangs to which I was assigned was the "Young Crowd"
10 gang, and therefore, I became familiar with many present and past members of the
11 Young Crowd gang.

12    6.   On December 28, 1990, I was assigned to investigate a shooting
13 incident which occurred at 3568 Louise Avenue, in Lynwood, California. I went
14 to the subject location and spoke with the victims, Katrina Salway and Frank
15 Sarabia, who provided details about the shooter and his actions. Based on the
16 information gathered from the victims, my partner, Loy Luna, and I concluded
17 that the perpetrator could have been Francisco Carrillo, a member of the Young
18 Crowd gang. My observations and the victims' statements were summarized in
19 my supplementary report, dated December 29, 1990 (a true and correct copy of
20 which is attached hereto as Exhibit "AA").

21    7.   I returned to the Lynwood station and prepared a six-photograph
22 array ("six-pack"), using photographs of Mr. Carrillo and five other similar-
23 looking individuals; Mr. Carrillo's photograph was in the # 1 position. I then took
24 the six-pack to the victims' home, at which time I learned that another witness
25 (who was at the home when I arrived), Angel Fanshaw, may also be able to
26 identify the shooter.

27    8.   Ms. Salway and Ms. Fanshaw then separately looked at the six-pack,
28 and each identified Mr. Carrillo as the shooter. Mr. Sarabia refused to look at the

six-pack. Attached hereto as Exhibit "BB" is a true and correct copy of the witness admonition forms signed by Ms. Salway and Ms. Fanshaw on December 29, 1990. The words written in the "comments" section of both forms was written by me, and related the comments made by these witnesses during the identification procedures. Additional details regarding their identification of Mr. Carrillo were set forth in my supplementary report.

9. Subsequently, I prepared a search warrant affidavit which was signed by Judge John Hopson on January 23, 1991. (A true and correct copy of this affidavit and the "Observations of Affiant" are attached hereto as Exhibit "CC".) I, along with other LASD personnel, participated in the execution of this search warrant on January 24, 1991, and during the execution of the warrant, Mr. Carrillo was placed under arrest.

10. On May 15, 1991, I was present during the live line-up conducted in conjunction with the criminal charges filed against Mr. Carrillo, as a result of the December 28, 1990 incident. Witnesses Frank Sarabia and Katrina Salway viewed the line-up, and neither witness was able to make a positive identification. (Attached hereto as Exhibit "DD" are documents signed by Mr. Sarabia and Ms. Salway, in conjunction with this live line-up.)

11. On May 21, 1991, I was present during the preliminary hearing in this criminal proceeding, and I testified during the hearing, as did Ms. Salway. Ms. Salway did not identify Mr. Carrillo as the shooter at the hearing. I testified about how I had learned that the shooter was referred to as "Spider" during the incident, and about how the six-pack identification procedures were carried out. Ms. Fanshaw did not testify at the preliminary hearing. At the conclusion of the hearing, the court held Mr. Carrillo to answer on the charges filed against him.

12. Fellow OSS deputy investigator Craig Ditsch was not involved in the Sarabia investigation, and he did not assist me with my investigative efforts during that investigation.

14

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on August 2, 2012, at Monterrey Park, California.

_____
KEVIN GORAN

15