RONALD O. KAYE (No.145051)
MARILYN E, BEDNARSKI (No. 105322)
CAITLIN S. WEISBERG (No. 262779)
KAYE, McLANE & BEDNARSKI
234 E. Colorado Blvd. Suite 230
Pasadena CA 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
E-mail: rok@kmbllp.com
E-mail: mbednarski@kmbllp.com
E-mail: cweisberg@kmbllp.com

Attorneys for Plaintiff,
FRANCISCO CARRILLO, JR.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| FRANCISCO CARRILLO, JR., | CASE NO. CV 11-10310 SVW (AGRx) |
| Plaintiff, | **PLAINTIFF FRANCISCO CARRILLO JR.'S SEPARATE STATEMENT OF GENUINE ISSUES AND ADDITIONAL MATERIAL FACTS** |
| v. | |
| COUNTY OF LOS ANGELES, CRAIG DITSCH AND DOES 1 THROUGH 10, inclusive, | [*Filed concurrently with Plaintiff's Opposition to Defendant Craig Ditsch's Motion for Summary Judgment or Adjudication, Declarations of Counsel and Exhibits*] |
| Defendants. | DATE:          September 10, 2012 |
| | TIME:           1:30 p.m. |
| | COURT:       Hon. Stephen V. Wilson |
| | Action Filed: December 14, 2011 |
| | Pretrial Conference: October 1, 2012 |
| | Trial: October 16, 2012 |

1    Pursuant to Local Rule 56-1, Plaintiff Francisco Carrillo, Jr., by and through

2  his counsel of record, respectfully submits this Separate Statement of Genuine

3  Issues and Additional Material Facts in support of his Opposition to Defendant's

4  Craig Ditsch's Motion for Summary Judgment or Adjudication.

5    In this Separate Statement of Genuine Issues and Additional Material Facts,

6  Plaintiff cites to the exhibits submitted with Defendant's Motion for Summary

7  Judgment (Dkt. No. 35) and to additional exhibits which are submitted herewith. For

8  the convenience of the Court and the parties, Plaintiff has continued the exhibit

9  lettering and the page numbering begun by Defendant. Thus, Plaintiff's first exhibit

10  is Exhibit FF which starts at page 1054. The page numbers used for the citations

11  herein refer to the continuous page number of Defendant's and Plaintiff's exhibits,

12  which are located at the bottom-center of each page.

13    Further, in Defendant's counsel's declaration authenticating the exhibits filed

14  in support of Defendant's motion, Defendant's counsel failed to authenticate

15  Defendant's Exhibits "X" through "DD," although Exhibits "X" through "DD" were

16  filed as an attachment to Defendant's motion. Therefore, Plaintiff has authenticated

17  Exhibits "X" through "DD" in Plaintiff's counsel's declaration filed herewith, along

18  with his authentication of Exhibits "FF" through "EEE."

19  \\

20  \\

21  \\

22  \\

23  \\

24  \\

25  \\

26  \\

27  \\

28  \\

1    In this Separate Statement of Genuine Issues and Additional Material Facts,

2  Plaintiff agrees to certain facts as "undisputed" or "partially disputed" for purposes

3  of the present motion only. In not disputing those facts herein, Plaintiff does not

4  stipulate to the facts, Defendant's articulation of the facts, the completeness of the

5  facts, or the relevance of the facts for purposes of trial in this matter.

6

7

8    Respectfully submitted,

9    KAYE, McLANE & BEDNARSKI, LLP

10

11  DATED: August 20, 2012        By    _____/S/_____

12                                       RONALD O. KAYE
                                         Attorney for Plaintiff Francisco Carrillo, Jr.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES[1]

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| **Operation Safe Streets** | |
| 1.      In 1990 and 1991, the jurisdiction for the Los Angeles County Sheriff's Department's Juvenile Operations Bureau Operation Safe Streets ("O.S.S.") encompassed Lynwood, East Compton, and Willowbrook.  Until 1994, O.S.S. staff and personnel worked primarily out of a detached trailer located at the Lynwood Station. | *Undisputed.* |
| 2.      O.S.S. investigators became very familiar with gang activity and gang culture in the Lynwood area, and their duties focused on investigating gang-related criminal activity and arresting perpetrators of such criminal acts. | *Undisputed.* |
| 3.      In conjunction with their investigative activities, O.S.S. investigators often interacted with known gang members and their associates "in the field", often for the purpose of gathering gang-related intelligence that could prove useful in both ongoing or future investigations. | *Undisputed.* |
| 4.      As part of their intelligence gathering activities, photographs of known gang members were taken by O.S.S. investigators, and maintained in an album-like "gang book", with each "gang book" containing | *Undisputed.* |

_____

[1] All cross-references to paragraphs within this Statement of Facts—whether disputed, undisputed, or additional—will be referred to herein as "SF."

| | DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|---|
| | photographs of known members of the same gang. | |
| | 5.      Included in the front of each "gang book" was a continuously updated list of identifying numbers, names, known gang monikers, and dates of birth, which corresponded to the photographs contained in the "gang book".   These "gang books" were maintained for the many gangs which operated in the Lynwood area in 1991, many of which were "targeted" for investigation by the O.S.S. due to their heightened criminal activities. | *Undisputed.* |
| | 6.      These gangs had defined geographical territories; it certainly was not uncommon for one gang to develop violent rivalries with one or more other gangs.  Such rivalries often led to violent acts being committed against gang members, their associates, and bystanders. | *Undisputed.* |
| | 7.      In December 1990 and January 1991, ten deputy investigators were assigned to O.S.S., and each investigator was assigned to certain known gangs in the Lynwood area. | *Undisputed.* |
| | 8.      One of the gangs that Defendant Craig Ditsch was assigned to was the "N-Hood" gang, an African-American Crips gang, and he became familiar with many present and past members of the N-Hood gang. | *Undisputed.* |
| | 9.      One of the gangs that O.S.S. investigator Kevin Goran was assigned to was the "Young Crowd" gang, and he became familiar with | *Undisputed.* |

| **DEF'S UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE; EVIDENCE** |
|---|---|
| many present and past members of the Young Crowd gang. | |
| **The Shooting of Donald Sarpy and the Ensuing Investigation:** | |
| 10.    On January 18, 1991, Donald Sarpy, an African-American adult male, was shot by a drive-by shooter. | *Undisputed.* |
| 11.    The shooting took place on Lugo Avenue in the city of Lynwood at approximately 7:00 p.m. | *Undisputed.* |
| 12.    Mr. Sarpy was provided with emergency medical treatment at the scene, and died a few hours later at the hospital. | *Undisputed.* |
| 13.    The shooter occupied the front passenger seat in the involved vehicle. | *Undisputed.* |
| 14.    Standing in the vicinity of Mr. Sarpy at the time of the shooting were various witnesses, including Mr. Sarpy's son, Dameon Sarpy, Scott Turner, Jeff Coleman, Montree Mitchell, James Munnerlyn, and Marcus Stewart. | *Undisputed.* |
| 15.    The witnesses immediately believed that the shooter, a young Hispanic male, was a member of the "Young Crowd" gang. | *Undisputed.* |
| 16.    Several of these witnesses spoke with Deputy Tim Duerr, either in person or telephonically, regarding their observations after Mr. Sarpy was transported to the hospital. | *Partially disputed.* Plaintiff disputes the wording of this statement to the extent it implies that the witnesses spoke with Deputy Duerr about observations they made "after Mr. Sarpy was transported to the hospital." Rather, their observations took place before Mr. Sarpy was taken to the hospital. Deputy Duerr interviewed only two witnesses at the scene: the victim's son, Dameon Sarpy, and James Munnerlyn. The telephone conversations, |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | however, did take place after Mr. Sarpy was taken to the hospital.<br><br>*Pltf's Evid*: Exhibit "FF" at 1060:14-1061:6.<br><br>*Def's Evid*.: Exhibit "V" at 1010:12-1011:19; Exhibit "W" at 1026-1027. |
| 17.     Homicide Detectives Birl Adams and Joe Olmedo spoke with these eyewitnesses at the Lynwood Sheriff's station after midnight on January 19, 1991. | *Undisputed.* |
| 18.     At approximately 2:00 a.m. on January 19, 1991, Scott Turner identified Plaintiff as the shooter — first picking out Plaintiff's photograph from a gang photo book, and then picking out Plaintiff's photograph from a "six-pack" photo array.  These photographs were shown to Turner by Defendant Ditsch. | *Partially Disputed.*<br>Defendant Ditsch presented Mr. Turner with the Young Crowd gang book to review, encouraging Mr. Turner to choose someone. Turner testified that Defendant Ditsch advised him: "Whoever this guy was [ ], he murdered your friend's [ ] father [ ]. Take this guy down [ ]. It shouldn't be hard [ ]. Just look in there and find out who did it."  Having been unable to see who did the shooting, as demonstrated by Mr. Turner's statements to Deputy Duerr, Turner randomly chose multiple photographs of Young Crowd Gang members. When Mr. Turner randomly chose two photographs, Defendant Ditsch advised him that those individuals could not be the shooter, explaining that at least one was in custody. In response, Defendant Ditsch pressured Mr. Turner further: "Focus, man. [ ] Get this shit together. [ ] Look at the pictures and this – you're not going to let this guy get away with this. It's your friend's dad there. He's in the hospital. You going to let that ride? . . . Find the guy who did this to your friend's dad. Don't let him get away with this. You're enemies. I know you want to take him down." Ultimately, Defendant Ditsch influenced Turner's selection of Mr. Carrillo's |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | photograph in the gang book. After influencing Turner's selection, Defendant Ditsch confirmed Turner's selection by describing Mr. Carrillo: "He's a new member, [ ]. He's trying to get his bones, [ ]. He's fresh on, so he's got to get his respects, so it could be him. He's a young guy, [ ], he's coming up. Yeah. Yeah. You know, could be him. Matter of fact, it is him."<br><br>After Defendant Ditsch affirmed and approved Mr. Turner's selection of Mr. Carrillo's photograph from the gang book, Defendant Ditsch influenced Mr. Turner's selection of Mr. Carrillo in a photo six-pack. Turner testified, consistent with his 2010 declaration in support of the habeas petition, that when Mr. Carrillo's photo was placed in a six-pack, Turner had initially not chosen correctly and Ditsch had to tell him, "No, No, this guy right here.  That's the one you picked."<br><br>*Plf's Evid.*: Exhibit "K" at 368:2-24, 389:2-391:14, 434:25-435:7; Exhibit "W" 1016, 1018, 1026.<br><br>*Defs' Evid.*: Exhibit "J" at 296:15-297:16; Exhibit "K" at 361:16-363:21; Ditsch Decl., ¶¶ 8-11. |
| 19.    Plaintiff was arrested on January 24, 1991, pursuant to an investigation of a separate shooting incident, in which Plaintiff was the suspect.  *See* Fact Nos. 92-94. | *Undisputed.* |
| 20.    On July 9, 1991, the probable cause hearing in the Sarpy prosecution was conducted, at which Scott Turner testified. | *Undisputed.* |
| 21.    Turner testified to the details of the involved vehicle, the actions | *Undisputed.* |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| of the shooter, his identification of Plaintiff from a gang photo book and a six-pack photo array on January 19, 1991. | |
| 22.   Turner also testified that he had recognized Plaintiff from having "seen him around Lynwood High School." | *Undisputed* It should also be noted that in addition to this cited testimony, Turner also testified that he recognized Plaintiff because he "[saw] him in the school," and it was his impression that Plaintiff "was a student there [at Lynwood High School]" like himself. Mr. Carrillo never attended Lynwood High School and never "hung around" Lynwood High School. *Plf's Evid.*: Exhibit "H" at 224:10-11; 224: 21-23; Exhibit "Q" at 728:15-23. *Defs' Evid.*: Exhibit "H" at 223:23-26. |
| 23.   The court held Plaintiff to answer on the charges filed against him. | *Undisputed.* |
| 24.   Prior to the preliminary hearing on July 9, 1991, witnesses Dameon Sarpy, Jeff Coleman, Montree Mitchell, James Munnerlyn, and Marcus Stewart were shown the same six-pack photo array by homicide detective Birl Adams. | *Undisputed.* |
| 25.   Jeff Coleman was shown a "mug show up folder" and asked if he could identify someone in the folder as the shooter.  He identified Carrillo's picture, picture number 1, because "he is the one who did it." | *Partially Disputed.* Jeff Coleman did not identify Mr. Carrillo because he was actually unable to see the shooter on the night of the crime.  Rather, Scott Turner told Coleman that he himself had chosen "No. 1" from the six-pack, and Coleman relied on that as being correct. Coleman testified, "I really didn't see [Carrillo], to be honest. . . .I couldn't really get a visual on the face."  This is consistent with Coleman's failure to tell investigators on |

| **DEF'S UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE; EVIDENCE** |
|---|---|
| | the night of the crime that he could identify the shooter and giving only a general description of Hispanic, male. |
| | *Plf's Evid.*: Exhibit "E" at 145, ¶¶ 3-5; Exhibit "GG" at 1072:27-1073:4; Exhibit "W" at 1016-1019. |
| | *Defs' Evid.*: Exhibit "S" at 831:23-832:28; Exhibit "T" at 922:13-22. |
| 26.    When presented with a six-pack from Detective Adams, Sarpy identified the individuals in photograph number 1 or number 6 as the shooter.  After looking at the photographs more closely, he identified the individual in photograph number 1 as the shooter. | *Partially Disputed.*<br>Dameon Sarpy's selection of Mr. Carrillo from the six-pack was not based on being able to identify the shooter on the night of the crime. Sarpy was "not able to get a good look at the faces of anyone inside the car."  Prior to choosing photograph number 1 and 6, Sarpy had been told by Scott Turner that Turner had chosen the number 1 photograph and that Turner was certain that the shooter was No. 1.<br><br>*Plf's Evid.*:  Exhibit "E" at 150, ¶ 1, 151, ¶¶ 4-5; Exhibit "GG" at 1064:7-1066:14.<br><br>*Defs' Evid.*: Exhibit "S" at 834:12-835:11; Exhibit "T" at 923:27-924:6. |
| 27.    When Marcus Stewart was shown the six-pack by Detective Adams, he identified the individual in photograph number 1 as the shooter. | *Partially Disputed.*<br>Marcus Stewart's selection of Mr. Carrillo from the six-pack was not based on being able to identify the shooter on the night of the crime.  Stewart saw someone reach out of the car and shoot, but he could not see the shooter's face well enough to identify anyone. In choosing someone from the six-pack, he chose someone he was not sure about.<br><br>*Plf's Evid.*: Exhibit "GG" at 1068:10-1069:4; 1070:17-19.<br><br>*Defs' Evid.*: Exhibit "R" at  800:16-801:9; |

| | **DEF'S UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE; EVIDENCE** |
|---|---|---|
| | | Exhibit "T" at 921:5-922:12. |
| | 28.    Montrai Mitchell also identified the individual in photograph number 1 as the shooter, informing Detective Adams that he had seen the individual around Lynwood. | *Partially Disputed.* Montrai Mitchell's selection of photograph number 1 was not based on being able to actually identify the shooter from the night of the crime.  Rather, Mitchell was never able to get a good look at anyone inside the car; he did not see the shooter's face and could not make a positive identification.  He felt pressured by the sheriffs to make an identification and believes others suggested who he should choose from the six-pack.<br><br>*Plf's Evid.*: Exhibit "E" at 146-147, ¶¶ 2, 6, 9; Exhibit "GG" at 1075:12-19; 1076:7-27; 1077: 24-27.<br><br>*Defs' Evid.*: Exhibit "S" at 850:9-851:10; Exhibit "T" at 922:27-923:15. |
| | 29.    When he was shown the six-pack by Detective Adams, James Munnerlynn told him that either the individual that the individuals in photograph 1 and in photograph 3 looked like the shooter.  However, he ultimately made it "clear" that the individual in photograph number 1 was the shooter. | *Partially Disputed.* James Munnerlyn's selection of photograph number 1 was not based on his being able to see and identify the shooter on the night of the crime.  Rather, Munnerlyn heard that Scott Turner had identified the shooter and so Munnerlyn "went along with what all of the others were saying."<br><br>*Plf's Evid.*:  Exhibit "E" at 149, ¶ 3.<br><br>*Defs' Evid.*: Exhibit "S" at 850:27- 851:21; Exhibit "T" at 922:23-923:5. |
| | 30.    Plaintiff's first criminal trial commenced on January 2, 1992. | *Undisputed.* Although Plaintiff notes, as a matter of accuracy not materiality, that the jury was selected on December 23, 1991 after which trial was continued to January 2, 1992 for opening statements and testimony. |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| 31.    At the first criminal trial, witnesses Scott Turner, Dameon Sarpy, Jeff Coleman, Montree Mitchell, James Munnerlyn, and Marcus Stewart testified, and they each identified Plaintiff as the shooter. | *Undisputed.* |
| 32.    Plaintiff testified at the first trial that he was not at the scene of the shooting when it occurred. | *Undisputed.* |
| 33.    The first criminal trial ended with a hung jury. | *Undisputed.*<br>Plaintiff notes that the split for the jury was 7 for "not guilty" and 5 for "guilty."<br><br>*Plf's Evid.*:  Exhibit "HH" at 1083:14-15; 1084:8-13. |
| **Scott Turner Identifies Another Person As The Shooter At The Second Trial** | |
| 34.    The second trial commenced on June 18, 1992, and witnesses Dameon Sarpy, Jeff Coleman, Montree Mitchell, James Munnerlyn, and Marcus Stewart again testified that Plaintiff was the shooter. | *Undisputed.* |
| 35.    Scott Turner, however, changed his testimony from the first trial and the preliminary hearing, testifying that Plaintiff could not have been the shooter. | *Undisputed.* |
| 36.    On June 22, 1992 (before he testified), Turner told the prosecutor and Plaintiff's counsel that he no longer believed that Plaintiff was the shooter. | *Undisputed.* |
| 37.    This change in belief was based on his having had a physical confrontation with an individual whom he now believed was the shooter. | *Disputed.*<br>Scott Turner's change in belief stems from his recognition that he never could identify any person in the car, other than the fact that they were from the Young Crowd Gang. Along |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | with his recantation at the second trial, Scott Turner explained that he could identify the shooter because of an altercation he had at a Jack-In-The-Box Restaurant. But during the Habeas hearing, Scott Turner explained why he advised the jury at the second trial that the boy at the Jack-In-the-Box was the shooter – because the boy had admitted to being the shooter. Turner did not recognize the person in the Jack-In-The-Box as the person who was in the passenger seat of car that performed the drive-by, because he could not see into the car. Because Turner based his accusation of the boy in the Jack-In-The-Box exclusively on the boy's admission, Turner was never sure that the boy was the shooter of Donald Sarpy.<br><br>*Plf's Evid.*:<br>Exhibit "E" at 142, ¶4; Exhibit "K" at 407:11-12, 409:19-23, 410:1-2, 411:21-23, 416:8-13, 417:22-26, 424:1-5.<br><br>*Defs' Evid.*: Exhibit "J" at 302:20-305:24; Exhibit "K" at 406:3-14. |
| 38.    At this time, Turner was in custody facing felony charges, and he had a conversation with Plaintiff the prior day when they were housed in the same area of the county jail. | *Partially disputed.*<br>Plaintiff does not dispute that a conversation occurred between Plaintiff and Scott Turner prior to his testimony at the second trial. Upon information and belief, as a matter of accuracy, the two were not housed in the same area of the county jail.<br><br>*Defs' Evid.*: Exhibit "K" at 365:12-28; 393:6-9. |
| 39.    The prosecutor, Mary Escalante, did not believe Turner's new account, and decided to proceed with the case. | *Undisputed.*<br>Plaintiff notes, however, that Deputy District Attorney Escalante's 1992 view of the evidence changed according to her later testimony at Plaintiff's 2011 habeas hearing. |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | Once she learned that the victim's son, Dameon Sarpy, had admitted he had not seen the shooter or made a valid identification, and was recanting his testimony, she viewed all of the witnesses' testimony in a new light and then strongly believed that the evidence against Mr. Carrillo was no longer reliable.<br><br>*Plf's Evid.*:  Exhibit "GG" (Habeas hearing, Escalante) at 1079:25-1080:24.<br><br>*Defs' Evid.*: Exhibit "U" at 966:14-37:2. |
| 40.    Turner testified to his changed belief about the identity of the shooter, and he explained that this change was based on his having encountered the "actual" shooter at a Jack-in-the-Box restaurant sometime after the first trial. | *Undisputed.*<br>*See* Plaintiff's SF No. 37.<br><br><br>*Defs' Evid.*: Exhibit "J" at 302:20-305:24. |
| 41.    Specifically, on June 23, 1992, Turner testified to the details surrounding his original identification:  (1) on January 19, 1991, at the Lynwood station, he told LASD personnel that he recognized the shooter, having seen him around Lynwood High School and from Plaintiff's involvement in a fight; (2) he was asked to look through a gang photo book and looked through about 200 photographs; (3) he pointed out a photograph of someone who looked like the shooter; (4) he was then shown a six-pack, from which he identified the shooter as the person in position no. 1; (5) at that time, he had been "positive" about the identification; (6) he did not remember telling any of his friends | *Undisputed.* |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| who he had picked out; (7) he had been told not to tell anyone who he had identified; (8) he never told any of his friends which position of the six-pack the identified person was located; (9) he had recognized the shooter from having seen him on various prior occasions. | |
| 42.    Turner also testified that the prior day, June 22, 1992, he had indicated for the first time that he was no longer positive about his identification. | *Undisputed.* |
| 43.    Turner also acknowledged seeing Plaintiff at the county jail the prior week but denied having had any conversation with him.<br><br>FN: At the 2011 habeas proceeding, however, Turner testified that he had indeed had a conversation with Plaintiff at the county jail before he notified the prosecutor of his intent to change his testimony. (Exhibit "K" at 365:12-28.) | *Undisputed.* |
| 44.    On cross-examination by Plaintiff's attorney, Turner reiterated that his prior in-court and out-of-court identifications of Plaintiff as the shooter was based on his genuine belief of this fact. | *Undisputed.* |
| 45.    Then, Turner was asked, "what happened that caused you to change your mind?" Turner then explained that sometime after the first trial, he went to a Jack-in-the-Box, and encountered a Young Crowd gang member who said "Fool, that's why I shot your homeboy father." Turner then | *Undisputed.* |

| **DEF'S UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE; EVIDENCE** |
|---|---|
| punched him, and when that person's associate appeared with a gun, Turner ran away. | |
| 46. Turner then testified that he was able to "get a good look" at the gang member, and at that point, he realized that he was "the person who done this." Turner explained that this person resembled Plaintiff, and he became "surely positive" that this person was the actual shooter. And "as a result" of this encounter, Turner told the prosecutor about his changed belief about the identity of the shooter. | *Undisputed.* *See* SF 37. |
| 47. In addition to Turner's testimony that Plaintiff was not the shooter, the jury was presented with testimony from Plaintiff that he was not the shooter. | *Undisputed.* |
| 48. The jury returned a guilty verdict at the second trial. | *Undisputed.* |
| 49. On March 23, 2010, Turner signed a declaration which was submitted in support of Plaintiff's petition for habeas corpus. Declarations of Jeffrey Coleman, Montrai Mitchell, James Munnerlynn, and Dameon Sarpy were also submitted. | *Undisputed.* All five of the declarants admitted that on the night of the murder they had been unable to see the face of the shooter well enough to make an identification. Turner stated he had been led by Defendant Ditsch to choose Plaintiff's photo out of the gang book, as well as from the six-pack display. The other four declarants admitted they had relied on Turner's selection of Carrillo and had not independently chosen Carrillo's photograph. All recanted their testimony that Carrillo was the shooter.<br><br>*Plf's Evid.*: Exhibit "E" at 142-154. |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| 50.    In his 2010 declaration, Turner accused Defendant Ditsch of having selected Plaintiff's photographs from the gang book and six-pack.  Turner also stated in the declaration that he simply "went along" with Defendant Ditsch's identifications. | *Undisputed.* |
| 51.    At the 2011 habeas proceeding, however, Turner testified that he selected the photographs from the gang book and six-pack, after Defendant Ditsch's alleged comments regarding the incorrectness of his initial selections. | *Partially Disputed.* <br> *See* SF No.18. <br> Turner testified that although he eventually selected a photograph that Defendant Ditsch agreed was the shooter, Turner had picked several other photographs before that.  It was Ditsch who selected the shooter in the gang book, since Ditsch approved of the selection after several random attempts by Turner, and in the photo six-pack, after Turner selected a photograph which was not Mr. Carrillo, Ditsch corrected Turner by Mr. Carrillo's photograph in slot number 1. <br><br> *Defs' Evid.*: Exhibit "K" at 389:9-391:7; 432:15-22. |
| 52.    Also at the 2011 habeas proceeding, Turner testified again that the Jack-in-the-Box incident caused him to believe that Plaintiff was not the shooter. | *Disputed.* <br> Scott Turner's change in belief stems from his recognition that he never could identify any person in the car, other than the fact that they were from the Young Crowd gang. Along with his recantation at the second trial, Scott Turner explained that he could identify the shooter because of an altercation he had at a Jack-In-The-Box Restaurant. But during the Habeas hearing, Scott Turner explained why he advised the jury at the second trial that the boy at the Jack-In-the-Box was the shooter – because the boy had admitted to being the shooter. Turner did not recognize the person in the Jack-In-The-Box as the person who was in the passenger seat of car that performed the |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | drive-by, because he could not see into the car. Because Turner based his accusation of the boy in the Jack-In-The-Box exclusively on the boy's admission, Turner was never sure that the boy was the shooter of Donald Sarpy.<br><br>*Plf's Evid.*: Exhibit "E" at 142, ¶4; Exhibit "K" at 407:11-12, 409:19-23, 410:1-2, 411:21-23, 416:8-13, 417:22-26, 424:1-5.<br><br>*Defs' Evid.*: Exhibit "K" at 409:19-410:2; 417:22-418:1. |
| 53.     On March 14, 2011, Plaintiff's state petition for habeas corpus was granted, and he was released from state prison on March 16, 2011. | *Undisputed.* |
| **Defendant Ditsch's Involvement In The "Sarpy" Murder Investigation:** | |
| 54.     In the evening of January 18, 1991, Defendant Ditsch responded to a report of a drive-by shooting on Lugo Avenue in Lynwood.  The shooting occurred within the known territory of the N-Hood gang. | *Disputed.* Although the shooting did occur within the known territory of the N-Hood gang, Plaintiff disputes that Defendant Ditsch "responded to a report of a drive-by shooting on Lugo Avenue" if that implies that Defendant Ditsch was present at the scene.  Other than the testimony of Defendant Ditsch, there is no evidence supporting his presence at the scene. The original police reports make no reference to his presence, although the drafter, Deputy Duerr, testified that if a patrol deputy had responded to the scene and was "performing some function of investigation," he would have "definitely put them in the report." Further, there is no report of Defendant Ditsch to document that he was present at the scene.<br><br>*Plf's Evid.*: Exhibit "W" at 1016-1029; Exhibit "V" at 1005:17-1006:19; Decl. Ronald Kaye at ¶ 35. |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | *Defs' Evid.*: Ditsch Decl., ¶ 6; Exhibit "M" at 484:9-14. |
| 55.  When he arrived at the scene, he observed paramedics attending to the victim of the drive-by shooting, and multiple LASD patrol deputies had responded to the scene as well. | *Disputed.* According to Defendant Ditsch's testimony at the habeas hearing, when he arrived at the scene the ambulance had already gone. Further, based on the failure to make any reference to Defendant Ditsch's presence at the scene in the police report, it is disputed whether he arrived when other patrol deputies were present. *See* SF 54.<br><br>*Plf's Evid.*: Exhibit "N" at 583:24-584:3.<br><br>*Defs' Evid.*: Ditsch Decl., ¶ 6; Exhibit "M" at 487:28-488:9. |
| 56.  Defendant Ditsch left the scene alone to search for the vehicle that matched the description of the suspect vehicle.  He was not able to locate the suspect vehicle during his search. | *Disputed.* *See* SF No. 54<br><br>*Defs' Evid.*: Ditsch Decl., ¶ 6; Exhibit "M" at 489:20-490:3. |
| 57.  Defendant Ditsch returned to the Lynwood Station later that night. He became aware that several eyewitnesses from the drive-by shooting, including Scott Turner (a known N-Hood gang member), were at the station, for the purpose of being interviewed by the homicide detectives assigned to the Sarpy incident. | *Undisputed.* |
| 58.  Although he was not a homicide detective, O.S.S. deputy investigators often assisted homicide detectives working on cases involving gang members, whether the gang members were victims or suspects. | *Undisputed.* |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| 59. Defendant Ditsch contacted Turner at the station at approximately 2:00 a.m. at which time Turner indicated to him that he had recognized the shooter as a Young Crowd gang member whom he had observed on prior occasions around Lynwood High School. | *Disputed.* Mr. Turner could not identify anyone in the car, but was confident it was a Young Crowd member who did the shooting. Only after Mr. Turner was pressured by Defendant Ditsch did he make any further statements identifying the suspect. Further, Mr. Turner's purported "observation" of Mr. Carrillo at Lynwood High School was incorrect. <br><br> *Plf's Evid.*: Exhibit "E" at 142, ¶4; *See also* SF 18; SF 22. <br><br> *Defs' Evid.*: Ditsch Decl., ¶ 8. |
| 60. Based on Turner's statements, Defendant Ditsch asked Turner to look through the Young Crowd gang book. This gang book contained over 140 photographs. | *Disputed.* *See* SF18 Defendant Ditsch pressured Turner to make a selection from the gang book, despite Turner's previous statement that he was unable to give any further description of the suspects other than Hispanic male. <br><br> *Plf's Evid.*: Exhibit "W" at 1026. <br><br> *Defs' Evid.*: Ditsch Decl., ¶ 8; Exhibit "M" at 491:7-15. |
| 61. Turner looked through this gang book, page by page, and he eventually selected photograph no. 126. When he made this selection, Defendant Ditsch did not know the name of the individual, in part because he had never been assigned to the Young Crowd gang. | *Disputed.* Mr. Turner randomly "selected" Mr. Carrillo from the Young Crowd gang book after being pressured by Defendant Ditsch to pick out the shooter, and after he randomly selected two other Young Crowd gang members who Defendant Ditsch stated could not be the suspect. *See* SF 18. <br><br> Plaintiff disputes Defendant Ditsch's claim that he did not know Mr. Carrillo or his name because he had never been assigned to the Young Crowd gang. Despite his assignment, Defendant Ditsch twice testified that he was |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | in fact familiar with the Young Crowd gang, familiar with certain of its members and that he specifically knew Mr. Carrillo.  At the first trial Defendant Ditsch stated he knew Mr. Carrillo "from prior contacts," from "talking with him out in the field," and "other arrests." At the second trial, Defendant Ditsch testified that he knew Mr. Carrillo's moniker to be "Spider," (which was incorrect – *see* SF 66), that he had had a "half a dozen contacts" with Mr. Carrillo, and knew the location of his former residence when he had lived on Duncan Avenue in Lynwood. Further, in his deposition, former O.S.S. Luna testified that information regarding a suspect, particularly a charged suspect, in a rival gang shooting (such as Mr. Carrillo in the Sarabia shooting which occurred approximately three weeks earlier on December 28, 1990) would likely have been shared with the O.S.S. investigators at the Lynwood Station. |
| | *Plf's Evid.*: Exhibit "L" at 460:11-26; Exhibit "M" at 499:12-500:1; Decl. of Marilyn Bednarski at ¶ 4. |
| | *Defs' Evid.*: Ditsch Decl., ¶ 9; Exhibit "M" at 493:23-494:3; Exhibit "N" at 564:8-13. |
| 62.     Turner expressed no hesitation about his identification. | *Disputed.* See SF 18.<br><br>*Defs' Evid.*: Ditsch Decl., ¶ 9; Exhibit "M" at 532:26-533:3; Exhibit "N" at 564:20-25. |
| 63.     This photograph was the first and only photograph that Turner picked out of the gang book. | *Disputed.* See SF 18.<br><br>*Defs' Evid.*: Ditsch Decl., ¶ 9; Exhibit "M" at 493:23-494:3; Exhibit "N" at 563:25-564:7. |
| 64.     At no time did Defendant Ditsch pressure or try to influence Turner into selecting any particular | *Disputed.* See SF 18. |

| | DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|---|
| 1 | | |
| 2 | individual from the gang book. | *Defs' Evid.*: Ditsch Decl., ¶ 9; Exhibit "N" at 564:8-13. |
| 3 | 65.    After Turner made his selection, Defendant Ditsch was able to determine his name by reviewing the list of names at the beginning of the gang book, which indicated that the photograph was that of Francisco Carrillo. | *Partially disputed.* Plaintiff disputes the assertion that "Turner made his selection." *See* SF 18.  Plaintiff does not dispute that at some time after Turner was pressured to pick Mr. Carrillo, Ditsch looked at the list of names at the beginning of the gang book. However, Defendant Ditsch knew of Mr. Carrillo, and Mr. Carrillo's name, based on the Sarabia shooting three weeks earlier, and the sharing of the Sarabia investigation information between Investigators Luna and Goran with Defendant Ditsch. |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | *Plf's Evid.*: *See* SF18, 61, SF 111, 114, 115, 116, 117. |
| 13 | | |
| 14 | | *Defs' Evid.*: Ditsch Decl., ¶ 10; Exhibit "X" at 1030-1032; Exhibit "N" at 563:18-22. |
| 15 | | |
| 16 | 66.    Defendant Ditsch then left Turner and went to the area of the O.S.S. trailer where photographs used to assemble photograph arrays ("six-packs") were kept.  Defendant Ditsch's intent was to assemble a six-pack, using a different photograph of Plaintiff, and five other photographs of similar-looking individuals. | *Disputed.* Defendant Ditsch had no intention of assembling his own six-pack because he had previously obtained information about Mr. Carrillo from either Deputy Goran or Deputy Luna from the Sarabia case in which the O.S.S. deputies targeted Mr. Carrillo. That is why, when Turner randomly chose Mr. Carrillo, Defendant Ditsch confirmed Turner's selection by saying about Mr. Carrillo: "he's trying to get his bones, you know, trying to get his reputation up. So he's a new member. It could be him, you know, most likely it probably is him." What reveals Deputy Goran, Deputy Luna and Defendant Ditsch's intent to arrest Mr. Carrillo, regardless of Mr. Turner's inability to make an identification, was their identical misidentification of "Spider" as Mr. Carrillo's |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| Def's Uncontroverted Facts | Plaintiff's Response; Evidence |
|---|---|
| | moniker – contrary to all the Young Crowd documentation of the O.S.S. group, including the Young Crowd gang list and the gang data base, showing that his moniker was "lil spider" and also showing that a different Young Crowd gang member – Juan Luis -- EE 37, was "Spider." |
| | The Sarabia case stemmed from a shooting which occurred on December 28, 1990, approximately three weeks before, the Sarpy shooting. In that investigation, eyewitness Katrina Salway heard a Young Crowd member yell to a suspect of at the Sarabia shooting: "Hey Spider you don't have to shoot them." In response, the shooter stated: "Fuck it, I'm gonna shoot 'em."Deputy Goran wrote in his Report that he consulted with Deputy Luna, and they "both agreed that Spider from 'Young Crowd' was Francisco Carrillo." Deputy Goran then created a photo identification "six pack" and presented it to Katrina Salway. |
| | Contrary to Deputy Goran's and Deputy Luna's characterization, the Young Crowd gang book index – which has Deputy Goran's hand written additions and has been authenticated by Deputy Luna – and the Lynwood gang data base system revealed Mr. Carrillo's street, name, in photo slot number 127, as "lil spider." The Young Crowd gang book index did, however, reveal that photo slot number EE 037, Juan Rafael Luis, was referred to as "Spider" of the Young Crowd. On January 19, 1991, the date when Defendant Ditsch influenced Mr. Turner's selection of Mr. Carrillo from the gang book at the Lynwood Station, Defendant Ditsch has stated in his August, 2012 declaration that he reviewed the list of names at the beginning of the gang book, which linked Mr. Carrillo to |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | the street name "lil spider." But, in contradiction to the gang list, and in contradiction to the Data base system which he reviewed that night, Defendant Ditsch noted in his January 19, 191 Supplementary Report that Mr. Carrillo's street name was "Spider."<br><br>Thus, Deputy Goran and/or Deputy Luna provided this incorrect information to Defendant Ditsch that Mr. Carrillo's street name is "Spider." Defendant Ditsch planned on using the photo six-pack of the Sarabia case, because he was acting in collusion with Investigators Goran and Luna.<br><br>At his deposition, Defendant Ditsch testified that both Deputy Goran and Luna were the Young Crowd specialists in the O.S.S., and he would turn to them for information about Young Crowd. *Also see* SF 111, 114, 115, 116, 117.<br><br>Plaintiff's Eyewitness Identification Expert Gary L. Wells, and Police Practices Expert Thomas R. Parker, both with over 30 years in their respective fields, have never seen nor heard of the use of the same photo six-pack in two different cases. Similarly, Defendant Ditsch testified at his deposition that, other than this case, he had no recollection of ever using the same six-pack in two different investigations.<br><br>*Plf's Evid.*: Exhibit "AA" at 1036-1037; Exhibit "X" at 1030,1032; Exhibit "II" at 1094:2-1095:24; Exhibit "Z" at 1035; Exhibit "JJ" at 1100; Ditsch Decl. filed by Defendants at ¶10; Exhibit "KK" at 1107:24-1109:13,1119:9-25, 1123:5-1124:1; Exhibit "LL" at 1130-1131, ¶¶ 2,3; Exhibit "MM" at 1133-1135, ¶¶ 2-5. |

| **DEF'S UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE; EVIDENCE** |
|---|---|
| | *Defs' Evid.*: Ditsch Decl., ¶ 11; Exhibit "M" at 496:21-28. |
| 67.     Defendant Ditsch did not have to complete the process of preparing a six-pack to show Turner because one had already been prepared (for a separate investigation by another investigator).  It is this six-pack that that Defendant Ditsch showed Turner shortly after he made his selection from the gang book. | *Partially Disputed.* Plaintiff agrees that the six-pack presented to Mr. Turner was the one created in the Sarabia case.  Plaintiff disputes the timing, however, and upon information and belief, Defendant Ditsch already had the Sarabia six pack available before the presentation of the gang book to Mr. Turner. Further, Plaintiff disputes that Turner made an independent selection from the gang book.<br><br>*See* SF 18; SF 66.<br><br>*Defs' Evid.*: Ditsch Decl., ¶ 12. |
| 68.     When Defendant Ditsch showed Turner this six-pack, he selected Plaintiff's photograph without hesitation or ambiguity. | *Disputed.* *See* SF 18.<br><br>*Defs' Evid.*: Ditsch Decl., ¶ 14; Exhibit "M" at 497:7-15; Exhibit "Y" at 1033. |
| 69.     Defendant Ditsch then advised one of the homicide detectives about Turner's identification, and Defendant Ditsch prepared a supplemental report regarding the identification. | *Undisputed.* Plaintiff notes that in that supplemental report, Defendant Ditsch, similar to Investigators Goran and Luna, misidentified Mr. Carrillo's gang moniker as "Spider" contrary to the Young Crowd gang book index and the data base. The report misrepresented and omitted material facts. *See* SF 18.<br><br>*Pltf's Evid*: Exhibit "Z" at 1035. |
| 70.     After Turner identified Plaintiff as the shooter, Defendant Ditsch did not interview any other witnesses who may have been present at the Lynwood station, either on that date or any subsequent date. | *Undisputed.* Plaintiff notes that Defendant Ditsch did interview Turner again at the time of the second trial.<br><br>*Plf's Evid.*: Exhibit "M" at 511:11-27. |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | *Defs' Evid.*: Ditsch Decl., ¶ 14; Exhibit "M" at 523:24-26, 545:22-27. |
| 71.   Defendant Ditsch testified at Plaintiff's two criminal trials, in 1991 and 1992. | *Undisputed.* |
| 72.   At some point during Plaintiff's second criminal trial, Defendant Ditsch learned that Turner had indicated that he will be changing his testimony about the identity of the shooter.  Given Turner's testimony at the first trial, during which he identified Plaintiff as the shooter, and his unambiguous selection of Plaintiff's photographs, Defendant Ditsch was surprised by his intent to change his testimony. | *Partially Disputed* While Plaintiff does not dispute that Defendant Ditsch may have been surprised by Mr. Turner's decision to change his testimony, this surprise could not have been caused by Defendant Ditsch's belief that Mr. Turner had unambiguously selected Mr. Carrillo's photographs.  Defendant Ditsch knowingly influenced Turner's selection, and Mr. Turner had no identifying information of the shooter – other than male Hispanic from the Young Crowd gang – prior to this influence.

*Plf's Evid.*: *See* SF 18.

*Defs' Evid.*: Ditsch Decl., ¶ 16; Exhibit "N" at 584:6-17. |
| 73.   However, by the time of the second trial, Turner was in County custody, facing felony charges and state imprisonment.  Defendant Ditsch also learned that Turner may have had some kind of contact with Plaintiff at the County Jail shortly before he communicated his intent to change his earlier testimony. | *Partially Disputed.* On information and belief, Mr. Turner was in California State custody in the California Department of Corrections.

*Defs' Evid.*: Ditsch Decl., ¶ 17. |
| 74.   Defendant Ditsch was present when the prosecutor, Mary Escalante, and Plaintiff's counsel, Robin Yanes, met with Turner in the courthouse lock-up area. | *Disputed.* Defendant Ditsch testified that he was present for one meeting with Scott Turner in lock-up. If there was only one meeting in lock-up between Defendant Ditsch and Mr. Turner, that meeting was with Defendant Ditsch, Mr. Turner and defense investigator, David Lynn. |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | Therefore, there may never had been a meeting between Defendant Ditsch and Turner with the prosecutor, Mary Escalante and Plaintiff's counsel present. |
| | During the second trial, prior to Defendant Ditsch's testimony, the Court asked Defendant Ditsch whether he met with Mr. Turner in lock-up, for the purpose of selecting a photograph out of the Young Crowd gang book and the following exchange occurred: |
| | - The Court: If I order you to bring with the the 2 or 3 photographs that Turner looked at in the book and picked out, do you know what I am talking about? |
| | - Deputy Ditsch: I believe so, yes. |
| | - The Court: Was there a defense investigator with you at this time." |
| | - Deputy Ditsch: Yes. |
| | - The Court: So there is some way you marked those. |
| | - Deputy Ditsch: I believe there were notes taken by his investigator . . . |
| | When confronted at his deposition with this excerpt from the record whether the defense investigator was present and was taking notes of Ditsch's meeting with Turner, Ditsch admitted that he probably was back in lock-up with the defense investigator who was taking notes. |
| | Further, the record of the second trial repeatedly reveals discussions between the trial judge and both defense attorney Yanes and the prosecutor, DDA Escalante, that Defendant Ditsch had not arrived to show the photographs to Mr. Turner, and that defense attorney Yanes and the prosecutor, DDA Escalante, met with Mr. Turner without Defendant Ditsch. |
| | *Plf's Evid.*: Exhibit "N" at 581:15-18; Exhibit |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | "HH" at 1085:14-20, 1086:21-25, 1087:8-19, 1088:19-22, 1089:9-20; Exhibit "KK" at 1125:22-1127:10.<br><br>*Defs' Evid.*: Ditsch Decl., ¶ 17; Exhibit "N" at 568:17-25. |
| 75. During this meeting, Turner stated that he had recently had an encounter with the shooter at a Jack-in-the-Box. Turner did not in any way suggest that Defendant Ditsch had somehow manipulated him into identifying Plaintiff on January 19, 1991. | *Partially disputed.*<br>Plaintiff disputes that the meeting was with prosecutor Escalante and Plaintiff's defense counsel. *See* SF 74.<br><br>*Defs' Evid.*: Ditsch Decl., ¶ 17; Exhibit "N" at 584:6-17. |
| 76. Subsequently, Defendant Ditsch showed the Young Crowd gang book to Turner a second time in the courthouse lock-up area. This time, Turner picked out photographs of two individuals that he said looked like the individual he had encountered at Jack-in-the-Box. These photographs were labeled with lower numbers than Plaintiff's photograph, meaning that Turner would have had to looked at and pass over these photographs before he selected Plaintiff's photograph at the Lynwood station. | *Partially Disputed*<br>The showing of the gang book by Defendant Ditsch to Mr. Turner occurred in the presence of defense investigator David Lynn. Defense investigator Lynn wrote notes reflecting the selection of two individuals from the Young Crowd gang book, photo slots EE98 and EE53.<br><br>*Plf's Evid.*: Exhibit "HH" at 1089:9-20; Exhibit "NN" at 1137; Exhibit "OO" at 1140:8-11, 1142:4-18; Exhibit "PP" at 1151, ¶ 5.<br><br>*Defs' Evid.*: Ditsch Decl., ¶ 18; Exhibit "M" at 552:7-553:27. |
| 77. From the time he testified at the second criminal trial in 1992, and until sometime in the latter part of 2010, Defendant Ditsch had no communications or discussions about Plaintiff's conviction or the underlying investigation. | *Undisputed* |
| 78. Defendant Ditsch never conspired with anyone, or attempted to conspire with anyone, to violate | *Disputed.*<br>This is a conclusory factual allegation lacking any meaningful evidentiary support and does |

| **Def's Uncontroverted Facts** | **Plaintiff's Response; Evidence** |
|---|---|
| Plaintiff's rights under the federal and state constitutions, including his rights to due process. | not deserve any weight. |
| | In this action, Plaintiff has demonstrated that Defendant Ditsch conspired with Deputies Luna, Goran and / or an unnamed co-conspirator, to influence Scott Turner's photo identification of Mr. Carrillo as the shooter of Donald Sarpy: (1) The use of the same photo six-pack in the Sarabia case; (2) the insertion of Defendant Ditsch in the Sarpy case, a case he was not assigned to, to administer a photo identification procedure with Scott Turner, an 16 year old who Defendant Ditsch used previously as a cooperating witness, at minimum from an incident that happened on September 20, 1990 – three and one-half months earlier; (3) the familiarity of Goran and Luna with Scott Turner as an eyewitness against Young Crowd from a drive-by shooting on October 20, 1990, in which Luna testified at a preliminary hearing on November 20, 1990 – less than two months earlier, (4) the identical misidentification of Mr. Carrilo as "Spider" by Goran and Defendant Ditsch in the Sarabia and Sarpy cases, in direct contradiction to the internal O.S.S. documents of the Lynwood O.S.S. gang book index and the gang data base; and (5) evidence that Defendant Ditsch was a Lynwood Viking and Luna had a history of targeting, threatening and abusing members of the Young Crowd gang, amply reveals the conspiracy at issue; and (6) the sharing of gang intelligence between Investigators of O.S.S. on a regular basis, particularly the identity of a gang member who was the alleged shooter in a recent shooting.

*Plf's Evid.*: *See* SF 18, 66, 80, 111, 114, 115, 116, 117. |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | *Defs' Evid.*: Ditsch Decl., ¶ 21. |
| 79.    Defendant Ditsch also never engaged in any actions that would or could have deprived Plaintiff of his right to a fair trial. | *Disputed.* This is a conclusory factual allegation lacking any meaningful evidentiary support and does not deserve any weight. |
| 80.    Plaintiff's accusation that Defendant Ditsch was a member of a "white supremacist" deputy gang is patently false.  Defendant Ditsch could not have disclosed any such membership in a "white supremacist" deputy gang to the prosecutor because such a representation would have been entirely false. | *Disputed.* In addition to being a member of the O.S.S., Defendant Ditsch was a member of the Lynwood Vikings.  In December of 1991, eleven months after Mr. Carrillo's wrongful arrest, the Los Angeles County Board of Supervisors appointed retired Judge James G. Kolts as Special Counsel to conduct a review of the Los Angeles County Sheriff's Department.  As part of its review, the Kolts Commission's reviewed evidence reflecting the existence of racist deputy gangs within the Sheriff's Department; in particular, the Lynwood Vikings.  The Commission found that "some deputies at the Department's Lynwood Station associate with the 'Viking' symbol, and appear at least in times past to have engaged in behavior that is brutal and intolerable and is typically associated with street gangs."  The Commission quoted District Court Judge Terry Hatter from the class action lawsuit, *Thomas v. County of Los Angeles*, CV 90-5217-TJH, finding that "many incidents . . .  involved a group of Lynwood area deputies who are members of a neo-nazi, white supremacist gang – the Vikings – which exists with the knowledge of departmental policy makers." Defendant Ditsch had a duty to disclose this information (gang membership) to the prosecution, in light of Defendant Ditsch's testimony that Scott Turner independently chose Mr. Carrillo's photograph on January 19, 1991, because it was highly relevant |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | impeachment of Defendant Ditsch's testimony challenging Scott Turner's recantation in the second trial.<br><br>*Plf's Evid.*: Exhibit "N" at 570:15-19; Exhibit "QQ" at 1160-1161; Exhibit "RR" at 1166.<br><br>*Defs' Evid.*: Ditsch Decl., ¶ 22. |
| **Facts Regarding The "Sarabia" Shooting Investigation:** | |
| 81.     On December 28, 1990, O.S.S. investigator Goran was assigned to investigate a shooting incident which occurred at 3568 Louise Avenue, in Lynwood, California.  He went to the subject location and spoke with the victims, Katrina Salway and Frank Sarabia, who provided details about the shooter and his actions. | *Partially disputed.*<br>At his deposition, O.S.S. investigator Goran testified that he had no independent recollection of any aspect of the Sarabia investigation. Consequently, any evidence reflecting the events of the Sarabia investigation depicted by Investigator Goran should be disregarded.<br>Plaintiff agrees that Goran went to the scene of the shooting and spoke with the victims but failed to obtain a description of the shooter from the witnesses, other than the fact that the shooter's accomplice referred to the shooter as "Spider" and the shooter responded to the moniker "Spider."<br><br>*Plf's Evid.*: Exhibit "II" at 1096:6-15, 1097:6-9, 1098:22-24; Exhibit "AA" at 1036-1037.<br><br>*Defs' Evid.*: Goran Decl., ¶ 6. |
| 82.     Based on the information gathered from the victims, investigator Goran concluded that the perpetrator could have been Francisco Carrillo, a member of the Young Crowd gang. | *Disputed.*<br>As demonstrated in the crime report, investigator Goran failed to obtain any description of the shooter.  Instead, he relied on the witnesses' description that he heard the shooter respond to the moniker "Spider."<br>With just that one piece of information, Goran and Luna, mistakenly or intentionally, and wrongly, concluded that "Spider" was Mr. Carrillo.  Had these deputies consulted the |

| **Def's Uncontroverted Facts** | **Plaintiff's Response; Evidence** |
|---|---|
| | gang list or the gang data base at the Lynwood station they had developed for the purpose of identifying criminal suspects, they would have discovered that "Spider" was Juan Luis, EE-37, and not Francisco Carrillo, whose street name was listed as "Lil Spider" – EE – 127. Had Goran obtained a description of the shooter that night, instead of waiting until the preliminary hearing to find out that the shooter was 5'9" and "heavyset," Goran would have determined that this description did not fit Mr. Carrillo, whose height and weight were available on the Young Crowd data base at 5' 10", 140 pounds. (On information and belief, the 5'9" and "heavyset" description matches Juan Luis, the person listed as "Spider" on the gang list.)<br><br>*Plf's Evid.*: Exhibit "AA" at 1036-1037; Exhibit "X" at 1030,1032; Exhibit "II" Goran Depo 1094:2-1095:24; Exhibit "JJ" at 1100; Exhibit "G" at 176:11-23.<br><br>*Defs' Evid.*: Goran Decl., ¶ 6; Exhibit "AA" at 1037. |
| 83.    Investigator Goran returned to the Lynwood station and prepared a six-photograph array ("six-pack"), using photographs of Mr. Carrillo and five other similar-looking individuals; Mr. Carrillo's photograph was in the # 1 position. | *Partially Disputed.*<br>The other five persons in the six-pack were not similarly situated, as this scenery in the background of this photograph set him apart from the others in the six-pack. Mr. Carrillo's photograph had been obtained as the result of an unlawful stop by Investigator Luna, while he was obeying the law and riding his bicycle in Ham Park, a well-known Young Crowd gathering spot.<br><br>*Plf's Evid.*: Exhibit "Q" at 719:13-720:19, 721:3-723:10; Exhibit "SS" at 1171.<br><br>*Defs' Evid.*: Goran Decl., ¶ 7. |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| 84.   He then took the six-pack to the victims' home, at which time he learned that another witness (who was at the home when he arrived), Angel Fanshaw, may also be able to identify the shooter. | *Undisputed.* |
| 85.   Ms. Salway and Ms. Fanshaw then separately looked at the six-pack, and each identified Mr. Carrillo as the shooter.  Mr. Sarabia refused to look at the six-pack. | *Partially Disputed.* The two witnesses were not separated, but were shown the photo six-pack while in the same room. Ms. Salway did not make a positive identification of the shooter and stated that she was unsure. Ms. Fanshaw never testified at the preliminary hearing or was present at the live line-up where the witnesses failed to identify Mr. Carrillo. Therefore, on information and belief, Ms. Fanshaw did not identify Mr. Carrillo as the shooter. With regard to the photo presentation, similar to Defendant Ditsch's manipulation of Scott Turner's identification of Mr. Carrillo on January 19, 1991, Ms. Salway testified in the preliminary hearing:<br>- Salway: I had said 'I'm not sure if it's no. 1 or no. 6' and then Detective Luna said, 'is it no. 1?'<br>- Defense counsel: And after he said that, what did you say?<br>- Salway: I said, 'I'm pretty sure it is.'<br>- Defense counsel: Okay. But prior to that you weren't sure; is that right?<br>- Salway: No, I wasn't.<br>When asked in his deposition if the conduct described by Ms. Salway could have occurred, Investigator Luna testified that might have occurred. In addition, when Ms. Salway testified that when she advised Investigator Luna that she did not know if it was no. 1 or 6, Luna advised her that they were brothers. |

| **DEF'S UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE; EVIDENCE** |
|---|---|
| | Mr. Carrillo and his brother were in the six-pack, not in positions 1 and 6, but in positions 1 and 3, thereby providing further corroboration of the veracity of Ms. Salway's testimony. Investigator Luna's knowledge that two of the photographs from the photo six-pack were of two brothers further corroborates that Ms. Salway's depiction of how the photo six-pack identification was administered by Investigators Goran and Luna in the Sarabia case. *Plf's Evid.:* Exhibit "G" at 178:10-12; 187:10-188:11; 190:1-17; Exhibit "DD" at 1049-1051; Decl. of Marilyn Bednarski at ¶¶ 5, 6; Exhibit "TT" at 1173; Exhibit "SS" at 1171. *Defs' Evid.*: Goran Decl., ¶ 8; Exhibit "BB" at 1038-1039. |
| 86.     Subsequently, investigator Goran prepared a search warrant affidavit which was signed by Judge John Hopson on January 23, 1991. | *Undisputed.* |
| 87.     Investigator Goran, along with other LASD personnel, participated in the execution of this search warrant on January 24, 1991, and during the execution of the warrant, Mr. Carrillo was placed under arrest. | *Partially Disputed.* Investigator Goran did not participate in the execution of the search warrant – his name is absent from the report, reflecting that he was not part of the team who engaged in the search. Plf's Evid.: Exhibit "UU" at 1175-1176. *Defs' Evid.*: Goran Decl., ¶ 9. |
| 88.     On May 15, 1991, investigator Goran was present during the live line-up conducted in conjunction with the criminal charges filed against Mr. Carrillo, as a result of the December 28, 1990 | *Undisputed.* Specifically, at the Sarabia preliminary hearing, Investigator Goran testified that neither witness Frank Sarabia and Katrina Salway could pick out Mr. Carrillo at the live line-up. |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| incident.  Witnesses Frank Sarabia and Katrina Salway viewed the line-up, and neither witness was able to make a positive identification. | *Plf's Evid.*: Exhibit "G" at 203:13-26.<br><br>*Defs' Evid.*: Goran Decl., ¶ 10; Exhibit "DD" at 1049-1051. |
| 89.     On May 21, 1991, investigator Goran was present during the preliminary hearing in this criminal proceeding, and he testified during the hearing, as did Ms. Salway.  Ms. Salway did not identify Mr. Carrillo as the shooter at the hearing. | *Undisputed*<br>*See* SF 85.<br><br>*Defs' Evid.*: Goran Decl., ¶ 11. |
| 90.     Investigator Goran testified about how he had learned that the shooter was referred to as "Spider" during the incident, and about how the six-pack identification procedures were carried out.  Ms. Fanshaw did not testify at the preliminary hearing. | *Undisputed*<br>*See* SF 66.<br>Plaintifff notes that Investigator Goran testified contrary to the testimony of eyewitness Salway and contrary to the information contained in his own crime report.  Goran claimed that one witness described the shooter as tall and dark, however, those details are nowhere found in the crime report.  The crime reports only describe the shooter as a Young Crowd member. In addition, the shooter answered to the moniker, "Spider."  In fact, when Ms. Salway testified, she described the shooter as 5'9" and heavyset.  The crime report also states that when shown the six-pack, Ms. Salway "immediately pointed to Photo #1" and said he was the shooter.  However, at the hearing Goran testified that Ms. Salway studied the photo spread "for quite a long time," before choosing No. 1.   Ms. Salway also testified that when she was shown the six-pack she kept saying that she was "not sure," and that Deputy Luna suggested that she choose No. 1, by pointing to it and asking her if he was the shooter.  When Ms. Salway saw Mr. Carrillo in court, she positively stated |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | that he was not the shooter.  In fact, Mr. Carrillo did not fit the description and did not use the moniker "Spider" at that time. Goran's crime report also did not reflect that Ms. Salway chose two photos, No. 1 and No. 6, and that she was hesitant and not sure of either selection. *Plf's Evid.*: Exhibit "AA" at 1036-1037; Exhibit "G" at 176:11-23;178:10-12; 187:10-188:11; 190:1-17; 198:4-23; *Defs' Evid.*: Goran Decl., ¶ 11. |
| 91.     At the conclusion of the hearing, the court held Mr. Carrillo to answer on the charges filed against him. | *Undisputed.* |
| 92.     These charges were subsequently dismissed. | *Undisputed.* |
| 93.     Defendant Ditsch played no part in the "Sarabia" investigation, and he has no knowledge, direct or otherwise, of any facts regarding the manner in which the six-pack identification was conducted during that investigation. | *Disputed* Plaintiff disputes this position based on: (1) the use of the same photo six-pack by Defendant Ditsch in the Sarpy case, and Investigators Luna and Goren in the Sarabia case; (2) in both cases an eye witness testified that their selection of Mr. Carrillo was based on the influence of an O.S.S. Investigator – witness Katrina Salway with Investigator Luna in the Sarabia case, and witness Scott Turner in the Sarpy case; (3) Investigator Goran spoke to Defendant Ditsch at the O.S.S. Headquarters and gave him the Sarabia photo six-pack; and (4) Defendant Ditsch's sworn testimony for 20 years on multiple occasions at the first trial, the second trial, the habeas proceeding, as well as in his sworn declaration that he personally assembled the photo six-pack. At the first and second trial of Mr. Carrillo, Defendant Ditsch testified that after Mr. |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
| | Turner chose Mr. Carrillo out of the gang book, Ditsch assembled a photo six-pack to present to Mr. Turner. Approximately 20 years later, in opposition to Mr. Carrillo's Petition, in 2010-11, both in his declaration and in his habeas testimony, Defendant Ditsch maintained his position that he assembled the photo six-pack for Mr. Turner. After the habeas hearing, the Superior Court found that, in fact, Defendant Ditsch used the same photo six-pack used in another case charged against Mr. Carrillo – the "Sarabia" case –, which was dismissed based on faulty eyewitness identifications. Faced with this Finding by the Superior Court, at his deposition in July of 2012, and by declaration presented in support of Defendants' Motion, Defendant Ditsch admitted that he was "shocked" when he was shown the two six packs, that he "ran this through [his] head a thousand times," ultimately "recalling" the exact conversation with Investigator Goran, and agreeing with the Court that *he did not* assemble the photo six-pack, but rather, used an already existing six-pack from the Sarabia case, provided to him by another O.S.S. member, Deputy Goran. Defendant Ditsch had no recollection of ever using the same six-pack on any other case before or after this case, and Plaintiff's police practices and eyewitness identification experts, both with over 30 years experience, had never seen nor heard of such a practice. In addition, the interaction between the O.S.S. members in 1990-1991, including Investigators Ditsch, Goran and Luna, promoted the sharing of information, particularly in solving gang crimes. (*See* SF 111, 114, 115, 116, 117).  In January 1991, |

| DEF'S UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE; EVIDENCE |
|---|---|
|  | the O.S.S. had 10 investigators worked in a gang trailer outside the Lynwood Station. The trailer was 40 feet long and 10 feet wide, with 10 desks in total, five lined up along each side of the room. Gang investigations, in general, emphasized the sharing of gang intelligence among the investigators, and the Lynwood O.S.S. was a tight knit group.<br><br>*Plf's Evid.*: Exhibit "L" at 452:9-13; 467:15-16; 471:11-13; 475:12-14; Exhibit "M" at 497:4-6; 524:22-25; Ex. "VV" at 1178, ¶6; Exhibit "N" at 564-65:28-6; Exhibit F at 163, ¶ 24; Ex. "WW" at 1181-1182; Exhibit "KK" at 1103:19-1104:12, 1110:24-1111:17, 1111:18-22, 1112:16-18, 1113:10-13, 1118:13-21, 1120:2-1122:11, 1123:5-1124:1; Ditsch Decl. filed by Defendants at ¶13-14; Exhibit "LL" at 1131, ¶ 3; Ex. "MM" at 1134-1135, ¶¶ 4-5.<br><br>*Defs' Evid.*: Ditsch Decl., ¶ 20. |

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

| PLAINTIFF'S ADDITIONAL FACTS | PLAINTIFF'S EVIDENCE |
|---|---|
| 94.     The eyewitnesses of the shooting of Donald Sarpy could not identify any physical characteristic of a suspect, let alone recognize the identity of the suspect, on the night of January 18, 1991 particularly because it was too dark for any observer, including Scott Turner, to detect the facial features of the perpetrators, and because the car was too far away and it happened too fast. This was consistent with the Superior Court's observations of the re-enactment of the shooting using the same atmospheric conditions and illumination that were present at the time of the shooting. | Exhibit "F" at 159-161, 164, ¶¶ 8-18, 27, 33-40; Exhibit "XX" at 1198, ¶ 24. |
| 95.     Shortly after the shooting of Donald Sarpy, Deputy Timothy Duerr of the Lynwood Sheriff's Department interviewed two of the six eyewitnesses out at the scene at 4220 Lugo Avenue.  Duerr interviewed the other four eyewitnesses, including Scott Turner, by telephone shortly thereafter. | Exhibit "W" at 1016-1019, 1024-1027 . |
| 96.     After speaking with the witnesses, Duerr referenced in his Report the witnesses' description of three suspects who committed the drive-by: Sex: Male; Race: Hispanic; Hair: Unknown; Eyes: Unknown; Height: Unknown; Weight: Unknown; Date of Birth: Unknown; Age: 15-18; Observable Physical Oddities: None. | Exhibit "W" at 1016, 1018. |

| PLAINTIFF'S ADDITIONAL FACTS | PLAINTIFF'S EVIDENCE |
|---|---|
| 97.  When filling out the Screening Factors in the Report, Deputy Duerr checked "NO" for Suspect Named / Known. | Exhibit "W" at 1017; Exhibit "FF" (Excerpt of Duerr Depo) 48:1-11 |
| 98.  Duerr testified that when the report was ultimately presented to the Sergeant, if he had learned any other information from the suspects, he would have supplemented the Report. Consequently, by the time Deputy Duerr presented this information to Sergeant, he had not learned that any of the witnesses knew any of the suspects, nor that any of the witnesses had given him any unique suspect identifier. The Report and Supplemental Report constitutes the entirety of the descriptions Deputy Duerr received from the witnesses. | Exhibit "FF" at 1056:18-1057:12, 1058:12-25. |
| 99.  The initial Report was approved by the Sergeant at  2:37 a.m.; and the supplemental Report was approved by the Sergeant at 5:51 a.m. Deputy Duerr believes that he gave the Supplemental Report at a later time than the initial report, which would be likely after Defendant Ditsch began interviewing Scott Turner. | Exhibit "W" at 1016, 1022; Exhibit "FF" at 1059:7-19. |
| 100.   Scott Turner was 16 years old at the time of the shooting. | Exhibit "W" at 1018. |
| 101.   The entirety of Scott Turner's description to Deputy Duerr consisted of:  "[A]s the suspect vehicle drove past him, he only saw (2) male Hispanics (NFD) [No Further Details] in the vehicle. He also said that after the gunshots had been fired, he believes he heard | Exhibit "W" at 1018, 1026. |

| | PLAINTIFF'S ADDITIONAL FACTS | PLAINTIFF'S EVIDENCE |
|---|---|---|
| | someone in the suspect vehicle possibly yell "Young Crowd Locos." | |
| | 102.   Scott Turner was a Neighborhood Crips gang member – a rival gang to the Young Crowd gang in 1991. | Exhibit "K" at 370:3-4; Exhibit "L" at 461:11-13. |
| | 103.   Defendant Ditsch had approximately 20 prior contacts with Defendant Ditsch prior to the second trial in June of 1992 and knew him about a year prior to January 18, 1991. | Exhibit "M" at 533:23-26, 484:25-26. |
| | 104.   At the time of the incident, one of Defendant Ditsch's O.S.S. team's targeted groups was Lynwood Neighborhood Crips | Exhibit "M" at 500:5-8. |
| | 105.   As part of his relationship with Scott Turner, Turner cooperated with Defendant Ditsch as a witness on at least one other occasion pertaining to another shooting in Lynwood in September, 1990, where a toddler was injured. | Exhibit "KK" at 1114:8-1115:2, 1115:21-1117:5, 1117:15-20; Exhibit "YY" at 1200-1201. |
| | 106.   In that case, Scott Turner gave Defendant Ditsch information who the shooter was, which resulted in the shooter's arrest. | Exhibit "KK" at 1115:5-15. |
| | 107.   Ditsch described his relationship with Mr. Turner before the Sarpy case as "cooperative and seemed to be a good witness." | Exhibit "N" at 562:20-22. |
| | 108.   Of the six teenage eyewitnesses who were present at the shooting of Donald Sarpy, Defendant Ditsch only performed a photo identification with Scott Turner during the early morning hours of January 19, 1991. Ditsch was not part of the homicide team | Decl. of Craig Ditsch filed by Defendants at ¶¶ 7, 8. |

| **PLAINTIFF'S ADDITIONAL FACTS** | **PLAINTIFF'S EVIDENCE** |
|---|---|
| investigating the case. | |
| 109.   On October 20, 1990, Scott Turner was shot at in Lynwood during a drive-by shooting perpetrated by the Young Crowd gang. | Exhibit "ZZ" at 1206:24-1208:23. |
| 110.   As a result of this shooting, O.S.S. Investigator Loy Luna interviewed Mr. Turner, and Mr. Turner picked out three photographs of the perpetrators from the Young Crowd gang book at the Lynwood station. | Exhibit "ZZ" at 1209:17-1210:3. |
| 111.   At his deposition, Defendant Ditsch testified that if a member of one of his gang's was a victim of a crime, he would talk to a Lynwood O.S.S. investigator of the suspect / perpetrator's gang to share intelligence on the crime. | Exhibit "KK" at 1105:20-1106:2. |
| 112.   From 1988 to 1990, for 18 months, Luna and Goran were on patrol together for the Lynwood Gang Enforcement Team. | Exhibit "II" at 1092:23-25, 1093:12-15; Decl. of Marilyn Bednarski at ¶ 3. |
| 113.   Luna and Goran were then partnered as the primary O.S.S. investigators with the responsibility of investigating criminal activities perpetrated by the Young Crowd gang in November of 1990. | Decl. of Marilyn Bednarski at ¶ 3. |
| 114.   At his deposition, Luna testified that it was likely that he would have shared with Investigator Goran the fact that Scott Turner positively picked out three suspects from the Young Crowd gang book from the October 20, 1990 shooting. | Decl. of Marilyn Bednarski at ¶ 8. *See* SF 109, 110. |
| 115.   At his deposition, Luna testified that he likely would have shared with the other O.S.S. | Decl. of Marilyn Bednarski at ¶ 9. |

| PLAINTIFF'S ADDITIONAL FACTS | PLAINTIFF'S EVIDENCE |
|---|---|
| investigators in the Lynwood Station, including Defendant Ditsch, about the shooting incident where Scott Turner was a target of the Young Crowd gang because it was an incident involving two rival gangs. He would want that information shared with the group for general intelligence purposes. | |
| 116.   Investigators at O.S.S. in Lynwood would share intelligence in order to update each other on the status of gang activity in the Lynwood area. | Exhibit "KK" (Ditsch Depo) at 1103:19-1104: 12, 1111:15-17; Decl. of Marilyn Bednarski at ¶ 10. |
| 117.   Luna testified that the O.S.S. investigators would sit down together at Monday meetings after cases were brought in over the weekend, and discuss their cases, asking if other investigators were familiar with a particular shooting, a particular gang member, and gang trends. This type of sharing of intelligence happened constantly at Lynwood O.S.S. in an informal setting. | Decl. of Marilyn Bednarski at ¶ 10. |
| 118.   Luna testified that if a gang member was a suspected shooter and there was corroboration that the person utilized a firearm to commit a crime, that would be shared among the O.S.S. investigators. | Decl. of Marilyn Bednarski at ¶ 4. |
| 119.   Witnesses Estella Montoya, Joanna Rivera, Leopoldo Ortega, and Michael Sterling all were living in Lynwood at the time of Mr. Carrillo's arrest.  All four witness have all signed sworn declarations reflecting the targeting of Young Crowd Gang members by deputies | Exhibit "AAA" at 1212-1213; Exhibit "BBB" at 1215-1216; Exhibit "CCC" at 1218-1222; Exhibit "DDD" at 1224-1225. |

| | PLAINTIFF'S ADDITIONAL FACTS | PLAINTIFF'S EVIDENCE |
|---|---|---|
| 1 | | |
| 2 | assigned to the Lynwood Station in the early-mid 1990s.  They describe how the deputies would harass the Young Crowd gang members, regardless of the fact they were not engaged in any criminal activities, threatening to arrest them and to fabricate evidence. They describe how the Lynwood deputies would confront Young Crowd gang members, using gang-like taunts in their efforts to disrespect the gang and its members. They describe witnessing the Lynwood deputies during this time period often using excessive force against Young Crowd gang members without any provocation. | |
| 14 | 120.   Estella Montoya, a care giver for a paralyzed individual in Mesa, Arizona, states under oath that: "One deputy really seemed to hate Young Crowd and his name was Deputy Luna. He would harass Ernesto [her husband and a Young Crowd member] every time he saw him.  One time in the early 1990s my 5 year old daughter was brought down to the station because a Lynwood deputy was killed and the deputies thought she was a witness. I went down to the station to protect her. While I was at the station, Detective Luna cursed at me and specifically told me that he was going to bring down the Young Crowd gang." | Exhibit "AAA" at 1212-1213, ¶¶ 1, 5. |
| 27 | 121.   Joanna Rivera, a Custodian at Columbia Elementary School in Perris California, states under oath: | Exhibit "BBB" at 1215-1216 , ¶¶ 1, 3-5. |

| PLAINTIFF'S ADDITIONAL FACTS | PLAINTIFF'S EVIDENCE |
|---|---|
| "The deputy who picked on the boys the worst was Deputy Luna. On one occasion I was at my house talking with several friends and Deputy Luna drove up in a police car. There was a young boy, approximately 13 years old with us – I don't remember his name.  Luna pulled up, threw the boy against his car and then took him away. The boy was not doing anything wrong. About 15-20 minutes later, Luna drove back to my house with the boy.  The boy was very beat up with marks all over his face. There were several people hanging around my house when Luna and the boy returned, and Luna said something like "I am going to bring all the Young Crowd down." | |
| 122.   On June 22, 1992, prior to Mr. Turner's testimony at the second trial, defense investigator David Lynn accompanied Defendant Ditsch into lock-up to interview Mr. Turner. David Lynn wrote notes reflecting Defendant Ditsch's interaction with Mr. Turner, and specifically wrote the time 2:45 p.m. | Exhibit "NN" at 1137; Exhibit "OO" at 1141:2-1142:15; 1143:14-18; 1148:24-1149:11. |
| 123.   During Defendant Ditsch's interview of Mr. Turner, among other statements, Ditsch advised Turner: "No more breaks for you if you get arrested in Lynwood;"  "Do you realize that you have caused an innocent man to spend 1 ½ years in jail?" And "I'll tune him up." | Exhibit "NN" at 1137-1138; Exhibit "OO" at 1143:19-20, 1144:6-15, 1145:1-6, 1145:19-20, 1146:25-1147:5. |
| 124.   At the hearing on Mr. Carrillo's habeas petition, when | Exhibit "N" at 569:2-22; *See* SF 106. |

| PLAINTIFF'S ADDITIONAL FACTS | PLAINTIFF'S EVIDENCE |
|---|---|
| confronted with David Lynn's testimony about the statements made by Ditsch to Turner in lock-up, Defendant Ditsch testified that: (1) he did not believe he threatened Turner ; (2) he did not believe he ever said to Turner: "no more breaks for you if you get arrested in Lynwood;" (3) he did not believe he said "I'll have to talk to these fools" in a threatening manner to Mr. Turner;" and (4) he absolutely denied making a comment about Mr. Turner: "I'll tune him up." | |
| 125.   At his deposition, Defendant Ditsch testified that he has no idea if he said "I'll tune him up" to Scott Turner in lock-up. Defendant Ditsch added that he assumes that "tuning up" means "kick somebody's butt." | Exhibit "KK" at 1128:5-18. |
| 126.   In his effort to demonstrate to the Court at the Habeas Hearing that these statements with Mr. Turner did not occur, Defendant Ditsch further testified that he *only* went into lock-up to speak to Mr. Turner one time, with the Deputy District Attorney and with the defense attorney, and that no one else was present in the interview. Defendant Ditsch emphasized that the defense investigator, David Lynn, was "absolutely not" present in lock-up when Ditsch spoke to Turner, and that Ditsch only participated in one meeting with Mr. Turner prior to Mr. Carrillo's second trial.  Finally, Defendant Ditsch emphasized that the notes drafted by David Lynn could not reflect what Ditsch said in | Exhibit "N" at 568:21-25, 569:8-10, 570:4-11, 571:15-18, 580:14-16, 581:15-18. |

| PLAINTIFF'S ADDITIONAL FACTS | PLAINTIFF'S EVIDENCE |
|---|---|
| lock-up to Turner, because "nobody took notes" during the interview with Scott Turner. | |
| 127.   During the second trial, however, prior to Defendant Ditsch's testimony, the Court asked Defendant Ditsch whether he met with Mr. Turner in lock-up, for the purpose of selecting a photograph out of the Young Crowd gang Book. In response, Defendant Ditsch stated on the record that the defense investigator was present during his meeting with Turner and that he believed the investigator had taken notes of the meeting. When confronted at his deposition with this excerpt from the record of the second trial whether the investigator was present and was taking notes of Ditsch's meeting with Turner, Ditsch admitted that he probably was back in lock-up with the defense investigator who was taking notes during this meeting at the second trial. | Exhibit "HH" at 1089:9-20; Exhibit "KK" at 1125:22-1127:10. |
| 128.   When faced with Scott Turner's recantation, the following sequence of events transpired in the second trial: (1) Defendant Ditsch threatened Turner in lock-up (*see* SF 124, 125, 127); (2) Turner recanted from his prior testimony and testified that Mr. Carrillo was not the shooter, and (3) Defendant Ditsch testified to his opinion that Scott Turner was not telling the truth in his recanting testimony when Turner stated that he did not recognize Mr. Carrillo. | Exhibit "M" at 513:9-14. |

| PLAINTIFF'S ADDITIONAL FACTS | PLAINTIFF'S EVIDENCE |
|---|---|
| 129.   Defendant Ditsch also testified as a gang expert at the second trial.  In reference to Scott Turner's recantation, Defendant Ditsch offered his expert opinion that people in custody are reluctant to testify against another inmate because, in retaliation for their testimony, they can be the victim of an assault.  Defendant Ditsch further opined that if an inmate has a "snitch jacket," the Mexican Mafia prison gang can "put a hit" out on the person – ordering that the inmate be killed. | Exhibit "M" at 509:3-17, 510:23-511:6. |
| 130.   In closing argument at the second trial, Deputy District Attorney Escalante argued to the jury that Scott Turner told the truth in his prior identifications of Mr. Carrillo as the shooter of Donald Sarpy: (1) with Defendant Ditsch on January 19, 1991, (2) at the preliminary hearing, and (3) at the first trial, (referred to as a prior proceeding in closing argument). She further argued that the only reason Mr. Turner recanted, as described by Defendant Ditsch in his gang expert testimony, is because Turner is "scared to death" about retaliation while in custody. | Exhibit "EEE" at 1228:17-1229:22, 1230:24-1230:1, 1232:12-17. |
| 131.   At the time of the Sarabia and Sarpy investigations, Mr. Carrillo was 16 years old. He was a "member" of the Young Crowd gang, although he stopped spending time with the Young Crowd gang and moved away from Lynwood several months earlier to get away | Exhibit "O" at 602:5-6; 606:2-11; Exhibit "Q" at 715:6-17. |

| PLAINTIFF'S ADDITIONAL FACTS | PLAINTIFF'S EVIDENCE |
|---|---|
| from the gangs. The primary basis of his "membership" in the Young Crowd gang was based on his prior residence in the geographic area where he and the friends he had who were Young Crowd gang members | |
| 132.   During his time he was a Young Crowd member, Mr. Carrillo never engaged in acts of violence, and he had no criminal convictions – other than the Sarpy murder. | Exhibit "Q" at 724:19-725:7, 739:22-740:8. |
| 133.   During his entire custodial stay with the California Department of Corrections and Rehabilitation, Mr. Carrillo has had no "write-ups", or CDCR 115 form, for any disciplinary violations while in custody. | Exhibit "Q" at 758:5-15. |
| 134.   At the first and second trial, Mr. Carrillo testified that his street name was "Spider." | Exhibt "O" at 604:14-15; Exhibit "P" at 671:27-28. |
| 135.   Prior to being arrested on January 25, 1991 and put into custody for the Sarpy murder, Mr. Carrillo primarily was known as Franky, but he also was known as "lil spider." Mr. Carrillo was never known as or referred to as "Spider" prior to being placed into custody for the Sarpy murder. | Exhibit "X" at 1032 (EE-126); Exhibit "JJ"  at 1100; Exhibit "UU" at 1176; Exhibit "Q" at 771:11-772:2. |
| 136.   The reason Mr. Carrillo testified during the first and second trials that he was "Spider" was because when he was in custody, in juvenile hall for the first trial and Los Angeles County Jail for the second trial, he wanted to "appear larger than I was or not so afraid," so he dropped the "little" part. | Exhibit "Q" at 772:14-23. |
| 137.   While in custody before the | Exhibit "K" at 365:9-26. |

| PLAINTIFF'S ADDITIONAL FACTS | PLAINTIFF'S EVIDENCE |
|---|---|
| second trial, Mr. Turner spoke to Mr. Carrillo in the lock-up. During that conversation, Mr. Carrillo stated that he did not do the shooting, and Mr. Turner responded "I know."  Mr. Turn recanted his testimony because he knew Mr. Carrillo was innocent of the shooting of Donald Sarpy and Turner did not want Mr. Carrillo to spend the rest of his life in prison for a crime he did not commit.  Mr. Carrillo did not threaten Mr. Turner to cause the recantation of Mr. Turner's testimony. | |
| 138.   At his deposition, Sergeant Luna testified that in the gang culture, when a gang member is younger, smaller or has a youthful appearance, that gang member is often referred to as "little" or "lil" next to a gang name. The "little" / "lil" next to a gang name is a distinct person from a person with same gang name without the "little" descriptor.  In Sergeant Luna's experience, as the gang member who has "little" / "lil" before his name grows older, or develops some recognition of leadership, that gang member may drop the "little" / "lil" to show an increase in status. | Decl. of Marilyn Bednarski at ¶ 11. |
| 139.   Although Defendant Ditsch: (1) pressured Scott Turner to pick out a photograph from the Young Crowd gang book even though Mr. Turner did not say that he could identify the person who did the shooting of Donald Sarpy; (2) witnessed that Scott Turner picked | Decl. of Ronald Kaye at ¶ 36. |

| PLAINTIFF'S ADDITIONAL FACTS | PLAINTIFF'S EVIDENCE |
|---|---|
| several other photographs of persons other than Mr. Carrillo from the Young Crowd gang book as a possible shooter; (3) advised Scott Turner that the initial photographs he selected could not be the shooter; (4) advised Scott Turner that Turner made the right choice after randomly selecting Mr. Carrillo after two unsuccessful attempts; (5) spoke with Investigators Goran and Investigator Luna after the shooting on December 28, 1990 (Sarabia shooting) about Mr. Carrillo being a new shooter which O.S.S. should be concerned about as part of O.S.S. intelligence on gang trends; (6) used the same photo six-pack in the Sarpy case that Investigator Goran did in the Sarabia case; (7) threatened Scott Turner after he learned that Mr. Turner was recanting his identification of Mr. Carrillo during the second trial; and (8) was a member of the Lynwood Vikings at the time of the Sarpy murder – Defendant Ditsch never revealed this information to the prosecution or to Mr. Carrillo's defense attorney. | |
| 140.   The only evidence linking Mr. Carrillo for the murder of Donald Sarpy was the eyewitness identifications made on the night of January 18, 1991. After the recantations by the eyewitnesses at the habeas proceeding, the Superior Court found that the evidence against him was "false, tainted, or both." | Exhibit "F" at 168, ¶¶ 1, 2. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28