RONALD O. KAYE (No.145051)
MARILYN E, BEDNARSKI (No. 105322)
CAITLIN S. WEISBERG (No. 262779)
KAYE, McLANE & BEDNARSKI
234 E. Colorado Blvd. Suite 230
Pasadena CA 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
E-mail: rok@kmbllp.com
E-mail: mbednarski@kmbllp.com
E-mail: cweisberg@kmbllp.com

Attorneys for Plaintiff,
FRANCISCO CARRILLO, JR.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| FRANCISCO CARRILLO, JR.,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES, CRAIG DITSCH AND DOES 1 THROUGH 10, inclusive,<br><br>Defendants. | CASE NO. CV 11-10310 SVW (AGRx)<br><br>**PLAINTIFF FRANCISCO CARRILLO JR.'S OPPOSITION TO DEFENDANT CRAIG DITSCH'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY SUMMARY ADJUDICATION; MEMORANDUM OF POINTS & AUTHORITIES**<br><br>[*Filed concurrently with Plaintiff's Statement of Genuine Issues and Additional Material Facts, Declarations of Counsel and Exhibits*]<br><br>DATE:          September 10, 2012<br>TIME:          1:30 p.m.<br>COURT:      Hon. Stephen V. Wilson<br><br>Action Filed: December 14, 2011<br>Pretrial Conference: October 1, 2012<br>Trial: October 16, 2012 |

1    Plaintiff Francisco Carrillo, Jr., by and through his counsel of record

2 respectfully submits this Opposition to Defendant Craig Ditsch's Motion for

3 Summary Judgment, or Alternatively Summary Adjudication of Issues (Dkt. No.

4 34).

5    Plaintiff's Opposition is based on the attached Memorandum of Points and

6 Authorities, Plaintiff's Statement of Genuine Issues and Additional Material Facts,

7 the Declaration of Ronald O. Kaye and evidence attached thereto, all pleadings and

8 papers on file in this action, and such other evidence and argument as may be

9 presented on behalf of Plaintiff at the hearing on this motion.

10

11                              Respectfully submitted,

12                              KAYE, McLANE & BEDNARSKI, LLP

13

14 DATED: August 20, 2012        By _____/S/_____

15                              RONALD O. KAYE
                                MARILYN E. BEDNARSKI
16                              Attorney for Plaintiff Francisco Carrillo, Jr.

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES CITED .......................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES.............................................1

I.    INTRODUCTION...................................................................................1

II.   STATEMENT OF FACTS.....................................................................1

III.  STANDARD OF REVIEW.....................................................................3

IV.  ARGUMENT .........................................................................................3

     A.    Factual and Legal Basis for Plaintiff's Claims .........................3

     B.    Plaintiff Has Not Asserted a Malicious Prosecution Claim, Rendering Defendant's Arguments Seeking Summary Judgment on Claims 1,3 & 5 Based on Probable Cause and ProsecutorialIndependence Inapplicable ...................................4

          1.    The Use of Fabricated Evidence to Secure a Conviction Constitutes a Violation of Due Process and Must Be Analyzed Under Fourteenth Amendment Standards....................6

          2.    Fourth Amendment and Malicious Prosecution Principles Are Not Relevant to Plaintiff's Due Process Claims ...................7

     C.    Defendant's Argument Regarding the "Irreconcilable" Turner Testimony (A) Improperly Seeks to Give Defendant the Benefit of an Inference to Which He Is Not Entitled at the Summary Judgment Stage, (B) Does Not Destroy Plaintiff's Claims and (C) Is Not Supported by the Evidence ........................................8

     D.    Defendant's Brady Arguments Regarding Suppression and Prejudice Misstate the Law and Rely on Disputed Facts ......................11

          1.    Suppression Standard...................................................11

          2.    Prejudice Standard .......................................................13

     E.    Defendant Is Not Entitled to Qualified Immunity Because the Relevant Brady Standard Was Clearly Established, at Least, by 1990-91 ...................................................................................15

          1.    Legal Standard for Qualified Immunity ......................16

          2.    QI and Brady for Police (as Opposed to Prosecutors).................17

          3.    QI and Brady for "Misconduct" ...............................17

     F.    Disputed Issues of Material Fact Preclude Summary Judgment on Plaintiff's Conspiracy Claims (Claims 2, 4, 6)....................................21

V.   CONCLUSION ...................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970) ................................................................. 22

*Albright v. Oliver*,
510 U.S. 266 (1994) ................................................................. 5

*Anderson v. Creighton*,
483 U.S. 635, 640 (1987) ........................................................ 16

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................. 3

*Atkins v. County of Riverside*,
151 F. App'x 501 (9th Cir. 2005) ........................................... 6

*Awabdy v. City of Adelanto*,
368 F.3d 1062 (9th Cir. 2004) ........................................ 5, 7, 8

*Banks v. Dretke*,
540 U.S. 668 (2004) ............................................................... 11

*Bastidas v. City of Los Angeles*,
2006 WL 4749706 (C.D. Cal. 2006) ...................................... 19

*Beck v. City of Upland*,
527 F.3d 853 (9th Cir. 2008) ................................................... 8

*Belmontes v. Woodford*,
350 F.3d 861 (9th Cir. 2003) ................................................. 12

*Benn v. Lambert*,
283 F.3d 1040 (9th Cir. 2002) ............................................... 11

*Borunda v. Richmond*,
885 F.2d 1384 (9th Cir. 1988) ................................................. 8

*Brady v. Maryland*,
373 U.S. 83 (1963) ........................................................... 16, 18

*Brown v. Miller*,
519 F.3d 231 (5th Cir. 2008) ............................................. 6, 22

*Buber v. Township of Old Bridge*,
2007 WL 4557658 (D.N.J. Dec. 21, 2007) ............................ 13

*Castellano v. Fragozo*,
352 F.3d 939 (5th Cir. 2003) ............................................... 5, 7

*Creal v. City of Fairfiled*,
2007 WL 2019624 (E.D. Cal. 2007) ...................................... 10

*Davis v. Alaska,*
    415 U.S. 308 (1974) ................................................................. 18

*Devereaux v. Abbey,*
    263 F.3d 1070 (9th Cir. 2001) ........................................... 6, 15

*Dominguez v. Hendley,*
    545 F.3d 585 (7th Cir. 2008) .............................................. 6, 7

*Evans v. Lewis,*
    855 F.2d 631 (9th Cir. 1988) ................................................. 18

*Freeman v. State of Ga.,*
    599 F.2d 65 (5th Cir. 1979) ......................................... 15, 16, 17

*Galbraith v. County of Santa Clara,*
    307 F.3d 1119 (9th Cir. 2002) ................................................. 6

*Gantt v. Roe,*
    389 F.3d 908 (9th Cir. 2004) ................................................. 11

*Geter v. Fortenberry,*
    849 F.2d 1550 (5th Cir. 1988) .......................................... 6, 22

*Geter v. Fotenberry,*
    882 F.2d 167 (5th Cir. 1989) ................................................. 16

*Giglio v. United States,*
    405 U.S. 150 (1972) .......................................................... 16, 18

*Gregory v. City of Louisville,*
    444 F.3d 725 (6th Cir. 2006) ........................................... 5, 6, 7

*Hampton v. Hanrahan,*
    600 F.2d 600 (7th Cir. 1979), .............................................. 21

*Hayes v. Brown,*
    399 F.3d 972 (9th Cir. 2005) ............................................. 4, 5

*Headwaters Forest Defense v. County of Humbolt,*
    276 F.3d 1125 (9th Cir. 2002) ............................................. 16

*Hernandez v. City of Napa,*
    781 F. Supp. 2d 975 (N.D. Ca. 2011) .................................. 23

*Hope v. Pelzer,*
    536 U.S. 730 (2002) .............................................................. 16

*Hovey v. Ayers,*
    458 F.3d 892 ........................................................................... 4

*Karim-Panahi v. Los Angeles Police Dep't,*
    839 F.2d 621 (9th Cir. 1988) ................................................. 21

*Limone v. Condon,*
372 F.3d 39 (1st Cir. 2004) ...................................................... 7, 16

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871 (1990) ..................................................................... 3

*Manson v. Braithwaite,*
432 U.S. 98 (1977) ....................................................................... 4

*McMillian v. Johnson,*
88 F.3d 1554 (11th Cir.1996) ..................................................... 12

*Mendocino Enviro. Ctr. v. Mendocino County,*
192 F.3d 1283 (9th Cir.1999) ......................................... 4, 22, 23

*Miller v. Pate,*
386 U.S. 1 (1967) ......................................................................... 6

*Mills v. City of Harrisburg,*
589 F. Supp. 2d 544 n.5 (M.D. Pa. 2008) ................................. 10

*Mills v. Scully,*
826 F.2d 1192 (2d Cir. 1987) ..................................................... 15

*Moldowan v. City of Warren,*
578 F.3d 351 (6th Cir. 2009) ..................................................... 22

*Mooney v. Holohan,*
294 U.S. 103 (1935) ..................................................................... 6

*Napue v. Illinois,*
360 U.S. 264 (1959) ................................................................ 6, 18

*Neil v. Biggers,*
409 U.S. 188 (1972) ..................................................................... 4

*Newsome v. McCabe,*
256 F.3d 747 (7th Cir. 2001) ................................................ 12, 17

*Paradis v. Arave,*
130 F.3d 385 (9th Cir.1997) ...................................................... 12

*Pearson v. Callahan,*
555 U.S. 223 (2009) ................................................................... 16

*Pierce v. Gilchrist,*
359 F.3d 1279 (10th Cir. 2004) ............................................... 5, 6

*Pyle v. Kansas,*
317 U.S. 213 (1942) ..................................................................... 6

*Ricciuti v. N.Y.C. Transit Auth.,*
124 F.3d 123 (2d Cir. 1997) ...................................................... 16

*Riley v. City of Montgomery, Ala.,*
   104 F.3d 1247 (11th Cir. 1997).................................................. 7

*Scott v. Harris,*
   550 U.S. 372 (2007) ............................................................. 10, 13

*Sommer v. United States,*
   2011 WL 4592788 (S.D. Cal. 2011) ........................................ 12

*Spurlock v. Satterfield,*
   167 F.3d 995 (6th Cir. 1999)..................................................... 16

*Stemler v. City of Florence,*
   126 F.3d 856 (6th Cir. 1997)................................................... 7, 8

*Tennison v. City & County of San Francisco,*
   570 F.3d 1078 (9th Cir. 2009)............................................. 17, 22

*Ting v. United States,*
   927 F.2d 1504 fn. 2 (9th Cir. 1991) ........................................ 21

*Todd v. LaMarque,*
   2008 WL 149138 (N.D. Cal. 2008).......................................... 10

*Uboh v. Reno,*
   141 F.3d 1000 & n.4 (11th Cir. 1998)....................................... 5

*United States v. Abel,*
   469 U.S. 45 (1984) ................................................................. 19

*United States v. Cadet,*
   727 F.2d 1453 (9th Cir. 1984) ............................................... 18

*United States v. Changa,*
   901 F.2d 741 (9th Cir. 1990)................................................... 18

*United States v. Cutler,*
   806 F.2d 933 (9th Cir.1986).................................................... 19

*United States v. Dupuy,*
   760 F.2d 1492 (9th Cir. 1985)................................................. 12

*United States v. Griggs,*
   713 F.2d 672, 674 (11th Cir. 1983)......................................... 12

*United States v. Henthorn,*
   931 F.2d 29 (9th Cir. 1991).................................................... 18

*United States v. O'Keefe,*
   128 F.3d 885 (5th Cir. 1997)................................................... 15

*United States v. Skillman,*
   922 F.2d 1370 (9th Cir.1990)................................................. 19

*United States v. Various Slot Machines on Guam,*
    658 F.2d 697 (1981) ................................................................. 13

*United States v. Winslow,*
    962 F.2d 845 (9th Cir.1992) ..................................................... 19

*United States v. Zuno-Arce,*
    339 F.3d 886 (9th Cir. 2003) ..................................................... 4

*United States. v. LaPage,*
    231 F.3d 488 (9th Cir. 2000) ................................................... 15

*Vlaylock v. City of Philadelphia,*
    504 F.3d 405 (3rd Cir. 2007) ................................................... 13

*Vucinich v. Payne, Webber, Jackson & Curtis, Inc.,*
    739 F.2d 1434 (9th Cir. 1984) ................................................... 3

*Washington v. Wilmore,*
    407 F.3d 274 (4th Cir. 2005) ..................................................... 6

*Williams v. County of Santa Barbara,*
    272 F. Supp. 2d 995 (C.D. Cal. 2003) ................................. 4, 21

*Wilson v. Lawrence County,*
    260 F.3d. 946 (8th Cir. 2001) ..................................................... 7

*York v. City of Las Cruces,*
    523 F.3d 1205 (10th Cir. 2008) ............................................... 10

## FEDERAL STATUTES AND RULES

Federal Rule of Civil Procedure 56 ................................... 3, 14

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Summary Judgment should be denied on all grounds. Defendant Craig Ditsch ("Defendant" or "Ditsch") argues that Plaintiff's due process claims—which center around interactions between Defendant and eyewitness Scott Turner ("Turner")— fail because the record "uncontrovertibly demonstrates" the falsity of Turner's testimony about Ditsch's conduct during those interactions. To the contrary, not only is Turner's current testimony reconcilable with his previous testimony, it is supported by other evidence in the record.  Defendant's arguments regarding qualified immunity also must be rejected as the relevant Brady standards have been clearly established for decades.  Plaintiff has properly plead Due Process violations not malicious prosecution claims, negating Defendant's arguments that these should be construed as malicious prosecution claims and subjected to prerequisites of probable cause and prosecutorial independence.  Finally, Plaintiff's conspiracy claims are sufficiently plead and amply supported by circumstantial evidence.

## II.   STATEMENT OF FACTS[1]

On January 18, 1991, none of the six teenage eyewitnesses to the drive-by shooting of Donald Sarpy could see the facial features of the shooter; it was too dark. SAF 94-98. However, they all believed the shooter was a Young Crowd gang member. UF 15. Later that same night, Ditsch, a member of the Los Angeles Sheriff's Department who specialized in gang investigations, interviewed one of the eyewitnesses, Scott Turner, a known cooperating witness from prior cases. GI 18, SAF 102, 104-106, 109, 110, 115-117.  Of all the eyewitnesses interviewed that night, only Scott Turner was asked to make a photo identification, and Defendant Ditsch only interacted with Turner. UF 17, 18, SAF 108.  At the end of the

---

[1] References are abbreviated: "UF"-Undisputed Fact; "GI"- Genuine Issue;  and "SAF" - Statement of Additional Fact.

interview, Plaintiff Frankie Carrillo, Jr. ("Plaintiff") was identified as the shooter.

The parties dispute what occurred during the interview. According to Turner's testimony, Ditsch showed Turner the Young Crowd gang book, and Turner selected several photographs. Through pressure, improper influence, and direct suggestion, Ditsch manipulated Turner's selection of Plaintiff's photograph, first in the gang book[2] and then again in a photo six pack (in the No. 1 position). GI 18. The six pack was created for an earlier case ("Sarabia case") that also involved false eyewitness evidence, with charges filed against Plaintiff and later dismissed. GI 66-67, GI 85, UF 91-92. Ditsch collaborated with the gang investigators on the Sarabia case (Kevin Goran and Loy Luna) prior to showing Turner the same photos. GI 65-66, 78, 93, SAF 116-118. Following the Ditsch-Turner interview, Ditsch wrote reports stating that Mr. Turner's selection of Plaintiff's photograph was independent, unequivocal, and based on recognizing the shooter from prior incidents. GI 66. The reports misrepresented and omitted numerous material facts. GI 18, GI 66, GI 68.

Turner, in turn, influenced the six-pack identifications made by the other five eyewitnesses. GI 25-29. Later, at Mr. Carrillo's second trial, Turner recanted his false testimony against Mr. Carrillo, who he knew was innocent. SAF 137. He knew that he could not see the shooter on the night of January 18, 1991, and had an altercation with another Young Crowd member who admitted to the shooting. GI 37. After learning about Turner's recantation, Ditsch confronted Turner in lock-up and threatened him. SAF 122-127. Ditsch then testified that Turner was not believable and his recantation was based on fear of retaliation in custody. SAF 129. Twenty years later, the remaining five witnesses recanted under oath, leading to the vacating of Plaintiff's conviction and Plaintiff's release from custody. GI 25-29. The only

---

[2] Plaintiff, although affiliated with the Young Crowd gang had engaged in no acts of violence and had no criminal convictions prior to his arrest in the Sarpy case. SAF 132.

1  evidence that ever linked Plaintiff to the Sarpy case was the now-recanted testimony

2  of the six eyewitnesses.  SAF 140.

3  **III.   STANDARD OF REVIEW**

4         Under Federal Rule of Civil Procedure 56, summary judgment is granted only

5  if "there is no genuine dispute as to any material fact [such that] the movant is

6  entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Anderson v.*

7  *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Because "[c]redibility

8  determinations, the weighing of the evidence, and the drawing of legitimate

9  inferences from the facts are jury functions, not those of a judge," when reviewing a

10  grant of summary judgment, "[t]he evidence of the non-movant is to be believed,

11  and all justifiable inferences are to be drawn in his favor." *Id.* at 255. For summary

12  judgment, neither party may rely on conclusory statements in a declaration. Fed. R.

13  Civ. P. 56; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

14  **IV.   ARGUMENT**

15  **A.   Factual and Legal Basis for Plaintiff's Claims**

16         Defendant has disregarded and/or misconstrued the better part of Plaintiff's

17  theories of liability in this case, which are amply supported by the evidence and

18  relevant § 1983 case law.  Mr. Carrillo asserts that he was deprived of his *Brady*

19  right to exculpatory evidence (Claim 1); his *Manson/ Biggers* right to have witness

20  identification free from suggestion (Claim 3); and his right under the Fifth and

21  Fourteenth Amendments not to have false evidence used in his prosecution (Claim

22  5); and, to his right not to have the officers conspire to do these things (Claims 2, 4

23  & 6). All six claims are based on Plaintiff's Due Process rights and right to a fair

24  trial under the Fifth and Fourteenth Amendments. Generally speaking, each claim

25  focuses on the manufacture and use of false and tainted eyewitness identifications to

26  convict Plaintiff, the suppression of exculpatory evidence relating to those

27  identifications, and the suppression of other impeachment evidence for prosecution

28  witnesses. The elements and particular facts for each claim vary:

**Brady (Claims 1& 2)** Establishing a Brady violation requires proof that: evidence was (1) suppressed, (2) exculpatory, and (3) material. *Hovey v. Ayers*, 458 F.3d 892, 916 – 917 (9th Cir. 2006) (listing the elements of a Brady violation).

**Tainted Eyewitness Procedures (Manson / Biggers) (Claims 3 & 4)** Establishing a *Manson/Biggers* violation requires proof that: the officers (1) conducted improper and suggestive eyewitness identification(s), with (2) deliberate indifference/reckless disregard for the truth or Plaintiffs constitutional right established under *Manson v. Braithwaite*, 432 U.S. 98 (1977), and *Neil v. Biggers*, 409 U.S. 188 (1972).

**False Evidence (Claims 5 & 6)** To prove a false/fabricated evidence claim, Plaintiff must show: (1) falsity of the evidence; (2) knowledge (defendants knew or should have known it was false); and (3) materiality. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir.2005)(*en banc*);*United States v. Zuno-Arce*, 339 F.3d 886, 89(9th Cir.2003).

**Conspiracy to Violate Civil Rights (Claims 2, 4 & 6)** Establishing a conspiracy to violate civil rights requires proof that the purported conspirators reached some agreement together to deprive plaintiff of a constitutional right. *Williams v. County of Santa Barbara*, 272 F. Supp. 2d 995, 1017 (C.D. Cal. 2003) (citing *Mendocino Enviro. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir.1999)).

**B.    Plaintiff Has Not Asserted a Malicious Prosecution Claim, Rendering Defendant's Arguments Seeking Summary Judgment on Claims 1, 3 & 5 Based on Probable Cause and Prosecutorial Independence Inapplicable.**

Defendant argues that the Due Process claims asserted by Plaintiff in this case must be viewed as malicious prosecution claims and must be dismissed for failure to satisfy certain elements of malicious prosecution.  MSJ 19-22. Defendant's malicious prosecution arguments are beside the point and need not be reached by the Court.  As set forth herein, Plaintiff has alleged well-recognized and distinct Due Process claims with established elements of liability and *has not alleged* a malicious prosecution claim. Defendant's confusion derives from a failure to distinguish between the use of false evidence to support an arrest and charges otherwise lacking in probable cause and the use of false evidence at trial to secure a conviction—the latter of which deprives a criminal defendant of his right to a fair trial thus violating Due Process.[3]

_____

[3] Plaintiff notes that part of Defendant's confusion undoubtedly results from courts

1    The existence (or non-existence) of probable cause, the presumption of

2  prosecutorial independence, and reasons for the termination of the prosecution (*i.e.*,

3  whether they reflect the innocence of the accused) are relevant, if at all,[4] to the

4  former claim, but not the latter. *See Awabdy v. City of Adelanto*, 368 F.3d 1062,

5  1066 (9th Cir. 2004) (setting forth the elements of a § 1983 malicious prosecution

6  claim premised on false evidence); *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir.

7  2005) (setting forth the elements of a Due Process claim for wrongful conviction

8  based on false evidence).

9    In this case, Plaintiff alleges that he was both charged and convicted on the

10  basis of false evidence and, therefore, could assert both a Fourth Amendment claim

11  (to contest the false arrest and prosecution itself) and Due Process claims under the

12  Fifth/Fourteenth Amendments (to contest his wrongful conviction). *See Castellano

13  v. Fragozo*, 352 F.3d 939, 960 (5th Cir. 2003) (parsing Fourth & Fourteenth

14  Amendment claims premised on falsification of evidence).  Nevertheless, the thrust

15  of this case is clearly focused on the Due Process violations leading to Plaintiff's

16  wrongful conviction and ensuing wrongful incarceration.

17

18  _____

19  (…continued)
    referring to Due Process claims using "malicious prosecution" language. *Gregory v. City of

20  Louisville*, 444 F.3d 725, 747 (6th Cir. 2006) (referring to the "malicious prosecution" label as a
    "misnomer"); *see, e.g.*, *Pierce v. Gilchrist*, 359 F.3d 1279, 1285 (10th Cir. 2004) (analyzing

21  Fourth and Fourteenth Amendment claims under the "malicious prosecution" umbrella).
    Similarly, the landscape is complicated by numerous cases over time which have, in the Supreme

22  Court's words, created "an embarrassing diversity of judicial opinion" on the question of whether
    a *common law* malicious prosecution claim may be actionable under the constitution. *Albright v.*

23  *Oliver*, 510 U.S. 266, 270 n.4 (1994).

24    [4] Courts have debated the source and viability of constitutional malicious prosecution
    claims. *See Uboh v. Reno*, 141 F.3d 1000, 1002-03 & n.4 (11th Cir. 1998) ("[T]here has been a

25  remarkable divergence of opinion among the circuit courts as to both the extent to which the claim
    of malicious prosecution gives rise to a federal cause of action and, assuming that such a claim is

26  cognizable, its constitutional source[.]") The Ninth Circuit has recognized the existence of
    constitutional malicious prosecution claims, and has identified the source of such claims as the

27  Fourth Amendment.  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004).

28

**1.  The Use of Fabricated Evidence to Secure a Conviction Constitutes a Violation of Due Process and Must Be Analyzed under Fourteenth Amendment Standards.**

In 1935, the Supreme Court established the Due Process right not to be convicted on the basis of fabricated evidence. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (Due process of law is violated where a conviction is obtained "through a deliberate deception of court and jury by the presentation of known perjured testimony).  The Supreme Court has consistently confirmed this constitutional principle.  *Pyle v. Kansas*, 317 U.S. 213, 216 (1942) (deprivation of rights occurs where "imprisonment result[s] from [knowing use of] perjured testimony.. .."); *see also Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Miller v. Pate*, 386 U.S. 1, 7 (1967).

Accordingly, federal circuit courts widely recognize that the state's use of manufactured evidence to obtain a conviction supports §1983 liability for violation of the *right to a fair trial*, which is secured by the Due Process Clause of Fourteenth Amendment.  *Pierce v. Gilchrist,* 359 F.3d 1279, 1285 (10th Cir. 2004) (The Fourteenth Amendment provides the "right not to be deprived of liberty without due process of law, or more specifically, as the result of the fabrication of evidence by a government officer acting in an investigative capacity."); *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) (§ 1983 wrongful conviction claim based on police officer procuring false identification by unlawful means); *cf. Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001) (extending the due process right set forth in *Pyle* to recognize the "clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government").[5]

---

[5] *Accord Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008); *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008); *Gregory v. City of Louisville*, 444 F.3d 725, 737, 760 (6th Cir. 2006); *Atkins v. County of Riverside*, 151 F. App'x 501, 506 (9th Cir. 2005); *Washington v.*

## 2. Fourth Amendment and Malicious Prosecution Principles Are Not Relevant to Plaintiff's Due Process Claims

All of the cases cited by Defendant—cases that discuss issues relating to probable cause, prosecutorial independence, and the nature of the termination of the prosecution—arise in the context of prosecutions that did not result in conviction and therefore alleged wrongful *arrests*, wrongful *prosecutions*, and wrongful *pretrial detention*. *See* MSJ 19-22 (citing cases addressing pre-conviction torts); *see also Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (describing a § 1983 malicious prosecution claim premised on false evidence and discussing relevant elements). Nothing about those cases indicates that Plaintiff, in this case, must plead and prove an *Awabdy*-type malicious prosecution claim or a Fourth Amendment claim instead of, or in addition to, the more appropriate Due Process claims that have been asserted by Plaintiff. *See Gregory*, 444 F.3d at 725 (rejecting district court's characterization of plaintiff's fabrication of evidence claims as "malicious prosecution," noting that plaintiff, in fact, asserted separate Fourth Amendment (unconstitutional pretrial detention) and due process (violation of the right to a fair trial) claims); *Dominguez*, 545 F.3d at 589 (manipulating and fabricating evidence to be used in a criminal trial is more than a Fourth Amendment claim; it is also a due process claim.).

Further, nothing about Defendant's cited cases suggest that the elements of an *Awabdy*-type malicious prosecution claim are the same as, or should be imposed on, the Due Process claims asserted in this case or on any Fourth Amendment claims that could have been asserted. *See Gregory*, 444 F.3d at 750 ("A plaintiff must pursue relief under the appropriate constitutional guarantee, and the Court must

_____

(…continued)
*Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005); *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004); *Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001); *Castellano v. Fragozo*, 352 F.3d 939, 955 (5th Cir. 2003) (en banc); *Stemler v. City of Florence,* 126 F.3d 856, 872 (6th Cir. 1997); *Riley v. City of Montgomery, Ala.*, 104 F.3d 1247, 1253 (11th Cir. 1997).

1   apply the appropriate legal standard."); *see also Stemler*, 126 F.3d at 871-72

2   (holding that fabrication of evidence reasonably likely to influence the decision of a

3   jury violates due process, a claim that "does not require a conclusion that the state

4   did not have probable cause to prosecute the claimant").

5         Finally, even if Plaintiff had pled an *Awabdy*-type malicious prosecution

6   claim or a Fourth Amendment claim, the evidence presented by Plaintiff is sufficient

7   to raise genuine disputes of material facts regarding the elements of such claims,

8   where they are premised on the falsification of evidence by police and the failure to

9   disclose material exculpatory facts. *See Beck v. City of Upland*, 527 F.3d 853, 869

10  (9th Cir. 2008) (observing that police officers may not rely on the presumption of

11  prosecutorial independence, which is relevant to the question of damages flowing

12  from an arrest without probable cause, where the prosecutor's decision is based on

13  representations by the police); *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir.

14  1988) (same); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004)

15  (The presumption of probable cause following a preliminary hearing may be

16  rebutted "by showing that the criminal prosecution was induced by fraud,

17  corruption, perjury, fabricated evidence, or other wrongful conduct. . . ").

18  **C.    Defendant's Argument as to the "Irreconcilable" Turner Testimony (A)
        Improperly Seeks to Give Defendant the Benefit of an Inference to Which**

19  **He Is Not Entitled at the Summary Judgment Stage, (B) Does Not
        Destroy Plaintiff's Claims and (C) Is Not Supported by the Evidence.**

20        Defendant argues that Turner's habeas testimony that Ditsch improperly

21  influenced his identification of Mr. Carrillo[6] "cannot be reconciled with Turner's

22

23  _____

24        [6]Turner was unable to see the shooter well enough at the scene to identify him, so he
    randomly chose two photographs from the gang book.  (*See* GI 18). Ditsch told him that those two

25  could not be the shooter, and pressured Mr. Turner further stating:  "Focus, man. [ ] Get this shit
    together. [ ] Look at the pictures and this – you're not going to let this guy get away with this. It's

26  your friend's dad there. He's in the hospital. You going to let that ride? . . . Find the guy who did
    this to your friend's dad. Don't let him get away with this. You're enemies. I know you want to

27  take him down."  *Id.* Upon then choosing Mr. Carrillo's picture, Ditsch confirmed Turner's

28  selection stating "He's a new member, you know. He's trying to get his bones, you know. He's

1   [original] explanation for the change in his identification testimony." MSJ 13-16.

2   However, it was not illogical for Turner to believe both that the confessor at the

3   Jack-In-The Box was the shooter <u>and</u> believe that it was not Mr. Carrillo because of

4   Ditsch's suggestive influence on his picture identifications.  The confession

5   undermined his (earlier) belief that it was Mr. Carrillo, which was derived from

6   Ditsch's manipulation.  Turner, who was facing criminal charges at the time and

7   who had been threatened by Defendant Ditsch, had good reason to limit his

8   testimony during the second trial to avoid accusing the police of misconduct.  This

9   evidence supports Turner's habeas testimony:

10      **1)** Turner was susceptible to suggestion and manipulation as a 16-year –old
        under the influence of Deputy Ditsch an authority figure as an OSS gang
11      officer. Turner had twenty prior contacts with Ditsch (SAF 103) and was a
        cooperating witness for him in a drive by shooting (UF 6-7, GI 18, SAF 100,
12      103, 105-7);

13      **2)** the fact that Ditsch led him to his selection of Mr. Carrillo as the shooter
        and reinforced the selection as accurate by telling him the suspect was earning
14      his reputation and coming up in Young Crowd (UF 50-51, GI 18, GI 59-66);

15      **3)**  the fact, established by the lighting expert, that the light was not sufficient
        for anyone, including Turner, to have seen the shooter well enough to identify
16      anyone, and therefore Ditsch who testified that he was at the scene that night,
        should have questioned the reliability of any photo identification (GI 94-98);
17
        **4)** Turner's corrupted identification in turn poisoned the other eyewitnesses
18      who testified at trial, when six months later they were shown the same
        photospread after speaking with Turner who told them he had selected the
19      shooter in picture No. 1 (UF 24, UF 34, GI 25-29);

20      **5)** Ditsch met Turner in lockup before he testified in the second trial and after
        he had told the DDA he no longer believed Carrillo was the shooter (UF 36)
21      and Ditsch threatened Turner (SAF 128), supporting an inference that Turner
        up would thereafter be even more unlikely to disclose manipulation by
22      Ditsch; and,

23      **6)** Turner then testified that he had previously positively identified Carrillo

24   (…continued)
     fresh on, so he's got to get his respects, so it could be him. He's a young guy, you know, he's
25   coming up. Yeah. Yeah. You know, could be him. Matter of fact, it is him." *Id.* Ditsch then
     presented Turner the six pack [from the Sarabia investigation] that contained a different picture of
26   Mr. Carrillo from the gang book, and when Turner did not chose  Mr. Carrillo Ditsch had to tell
     him, "No, No, this guy right here.  That's the one you picked."  (GI 18).
27

28

---

but that he no longer believed it was Carrillo because the shooter confessed to him at the Jack in the Box (UF 34-36, 39-47, GI 37-8).

**7)** Turner testified in the habeas proceedings that he was not able to see well enough to identify the shooter, explained how he came to select the photos in the six pack and photospread and why he no longer believed the shooter was Mr. Carrillo.[7]  UF 49-50, GI 51-52.

The defendant asks this Court to disregard the summary judgment mandate to view the facts in the light most favorable to the plaintiff by invoking a little used and inapposite "exception" under *Scott v. Harris*, 550 U.S. 372, 380 (2007).  *Scott* involved a claim of whether officers used excessive force following a high speed chase in which plaintiff alleged he was no threat to others as the roads were empty and he was in control.  There was a videotape which captured the entire event and blatantly contradicted plaintiff's account.  Accordingly, the Supreme Court held that no reasonable juror could believe it, and that the district court should have granted summary judgment.  *Id.* at 379-380.

Subsequent case law demonstrates that *Scott* is limited to its unique facts, and did not disturb the fundamental principle that all reasonable inferences must be drawn in favor of the non-moving party.  *See, eg., Creal v. City of Fairfiled*, 2007 WL 2019624, *1 (E.D. Cal. 2007) (recognizing unique facts of *Scott* and that it is for jury to weigh disputed testimony and evidence); *Todd v. LaMarque*, 2008 WL 149138, *15 (N.D. Cal. 2008) (unlike video in *Scott*, nothing remotely akin incontrovertible evidence of the incident). Indeed, cases have been reluctant to apply the *Scott* holding in situations that actually involve "objective" evidence such as audio recordings, let alone in a case like this one that lacks any such "indisputable" evidence. *See, e.g.*, *Mills v. City of Harrisburg*, 589 F. Supp. 2d 544, 553 n.5 (M.D. Pa. 2008)(unlike Scott, audio recording was "susceptible to multiple reasonable

---

[7] Although the state court reserved judgment concerning the alleged misconduct by Defendant Ditsch during the Turner interview, the court relied on Turner's testimony that he could not see the shooter and did not identify Mr. Carrillo as the shooter based on his own observations, finding Turner to be a credible witness. Def. Exh F.

1  interpretations"); *York v. City of Las Cruces*, 523 F.3d 1205 (10th Cir. 2008) (unlike

2  *Scott*, audiotape captured only part of the incident and plaintiff's version of facts

3  must be accepted on summary judgment).

4      Plaintiff has demonstrated that Turner's recantation can be construed as

5  consistent with his being manipulated by Ditsch and is not "mutually

6  irreconcilable."  Moreover the so called "irreconcilable " testimony is really

7  evidence of impeachment and defendant's arguments about whether Turner's

8  recantation testimony should be believed are for the jury.

9  **D.    Defendant's *Brady* Arguments Regarding Suppression and Prejudice
        Misstate the Law and Rely on Disputed Facts**

10     Plaintiff's evidence creates a genuine dispute whether the evidence was

11  suppressed and whether there was a reasonable probability of a different verdict.

12      **1.    Suppression Standard**

13     Defendant's suppression argument is essentially that, had the defense

14  properly interviewed or cross-examined the relevant witnesses, it could have (a)

15  established that the witness statements contained in the reports and later testified to

16  were false and (b) could have discovered facts for which there were no leads. This

17  type of argument—placing the onus on a criminal defendant to *force* the truth out—

18  has consistently been rejected when the *Brady* claim is based on the failure by the

19  government to disclose that evidence is false, or there has been a false or misleading

20  representation by the government, or the evidence is more available to the

21  government.  The Supreme Court in *Banks v. Dretke,* 540 U.S. 668, 696 (2004)

22  rejected the warden's argument that exculpatory evidence withheld could have been

23  discovered from other sources finding that: "[a] rule thus declaring 'prosecutor may

24  hide, defendant must seek,' is not tenable in a system constitutionally bound to

25  accord defendants due process." *See also*, *Gantt v. Roe*, 389 F.3d 908, 912-13 (9th

26  Cir. 2004)(defense lawyer entitled to rely on prosecution representation it shared

27  fruits of investigation and Brady obligation not absolved by defense lawyer's failure

28

1   to investigate undisclosed facts); *Benn v. Lambert*, 283 F.3d 1040, 1061-62 (9th Cir.

2   2002) (prosecution's failure to disclose evidence that the state's arson expert had

3   expressed the opinion that the fire was accidental, which "actually misled the

4   defense," violated *Brady*).[8]

5        Numerous opinions have held that it violates the constitution to fail to

6   disclose officers' manipulation of witnesses to obtain false identifications. *Geter v.*

7   *Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) (the conduct of a lineup to

8   influence a witness' identification); *Newsome v. McCabe*, 256 F.3d 747, 753 (7th

9   Cir. 2001) (officers' pressuring a witness into false testimony); *McMillian v.*

10   *Johnson*, 88 F.3d 1554, 1569 (11th Cir.1996) (deliberate concealment of the

11   existence of an eyewitness to a crime).

12        The cases upon which Defendant relies do not, as our case does, involve

13   determinations of governmental failure to disclose known false evidence.  MSJ 17-

14   19.  Rather the Defendant's cases appear to address evidence functionally known or

15   readily available to the defense, which was not the circumstance here.[9]  By

16

17      [8]*See also Paradis v. Arave*, 130 F.3d 385 (9th Cir.1997) (fact that prosecution violated

18   *Brady* not altered by the defendant's knowledge of and ability to interview the prosecution's
      medical expert and obtain the undisclosed exculpatory material); *Belmontes v. Woodford*, 350 F.3d

19   861, 881 (9th Cir. 2003) (rejecting argument that defense awareness defeated false testimony
      claim, recognizing independent duty of government to "protect the system against false

20   testimony") (citation omitted).

21      [9] MSJ 17-19, citing *United States v. Dupuy,* 760 F.2d 1492, 1502 (9th Cir. 1985)(Ninth

22   Circuit found no suppression under *Brady* where prosecutor disclosed notes with exculpatory
      witness interview to court and court then provided names of witnesses to defense); *United States*

23   *v. Griggs*, 713 F.2d 672, 674 (11th Cir 1983)(no suppression of undisclosed notes as defendant
      found to be in better position than prosecutor to obtain the exculpatory information from the

24   witnesses who were former defense employees known to be favorable to defendants); *Sommer v.*
      *United States*, 2011 WL 4592788 (S.D. Cal. 2011)(inapposite case analyzing the scope of

25   discovery of a defense attorney's files in a malicious prosecution case; moreover, dicta quoted by
      Defendant, see MSJ 17-18 actually supports Plaintiff's position inasmuch as the "essential facts"

26   of the exculpatory evidence in this case were, in fact, suppressed while only the most general non-
      exculpatory facts (*i.e.*, that Turner made an identification of Plaintiff) were disclosed).

27

28

1   definition, false evidence provided by a witness such as Turner here, is being

2   concealed, and the evidence is therefore not just as available to the defense.

3   Defendant suggests that the defense attorney could have questioned Turner more

4   effectively and elicited the improper influence, but Ditsch's report deliberately

5   misrepresented what occurred in the Turner interview, giving the defense attorney

6   no basis or leads that would support proper impeachment questioning.  SAF 139.[10]

7       **2.**    **Prejudice Standard**

8       Plaintiff's evidence shows that there was a "reasonable probability" of a

9   different verdict had the suppressed evidence been disclosed before trial. The first

10  trial resulted in a hung jury, 7 for not guilty and 5 for guilty. UF 33. This strong split

11  indicates that the jury was troubled even by the evidence that was revealed.  Ditsch

12  was a pivotal prosecution witness in the second trial.  SAF 128-130. He testified to

13  Turner's positive identification from the gang book and photospread of Mr. Carrillo

14  and provided the motive for him to recant, i.e., that he was deathly afraid of serving

15  time known as a snitch because of Mr. Carrillo's gang connection and the Mexican

16  _____

17      [10] Furthermore, Defendant failed to disclose numerous other exculpatory facts relating to

18  the Turner identification.  Ditsch's report makes no reference to the suggestive influence of
    Ditsch, including his remarks to Turner that he was wrong about certain selections and his remarks

19  to Turner reinforcing his ultimate selection of Carrillo from the gang book (UF 50-51, GI 18, GI
    59-66); to Ditsch's use of the same photospread from another investigation (UF 24); to Turner's

20  selection of other photos from the gang book (GI 18); to Turner's failure to pick the same picture
    in the photospread and his pointing to the correct picture (GI 18); to his prior contacts  with Turner

21  and/or other OSS officers' prior relationship with Turner as a witness and cooperator (SAF 103,
    105-107, 110); or ultimately to Ditsch's threat to Turner in lockup after his recantation in 1992

22  which effectively silenced the 16 year old from revealing any wrongdoing or manipulation by
    Ditsch (SAF 122, 126). The officers did not disclose the suggestive eyewitness showing to Salway

23  and Fanshaw in the Sarpy investigation nor to Turner in the Sarpy investigation.  GI 85, GI 90,
    SAF 139. The officers' reports falsely made it appear that on January 19, 1991 Turner made a

24  positive identification of Carrillo without first selecting any other persons and without being
    influenced by any suggestive procedures.  *Id.* Deputy Ditsch's threat, also not in any report, served

25  to further suppress the exculpatory evidence of Ditsch's misconduct. SAF 139. The reports
    concerning the November 28, 1990, Salway identification were similarly false and misleading,

26  stating Salway immediately picked no. 1, and did not disclose the remarks by Luna leading her to

27  picture number 1 (of Carrillo) when she was unsure if it was 6 or 1.  GI 85, 90.

28

1  Mafia's violent presence in the jails. SAF 128-129.  Ditsch's non-disclosure of his

2  Viking membership[11] denied the defense attorney powerful evidence of his bias and

3  motive to arrest and incarcerate Mr. Carrillo whom he believed was an up and

4  coming shooter in the Young Crowd gang. SAF 139.

5  The prosecutor's case would have been destroyed had the jury been told that

6  Turner did not independently choose Mr. Carrillo from the gang book or photo six-

7  pack, but either had been led to that selection by Ditsch's influence and

8  manipulation, or that Deputy Luna similarly influenced an eyewitness only a few

9  weeks before to pick Carrillo using the same photo six-pack of a assault case or that

10  Deputy Ditsch threatened Turner in lock up during the second trial when he recanted

11  after the confession to him by the true killer removed his confidence in having

12  identified Carrillo. SAF 139. Finally, the fact that Deputy Ditsch was a Viking, a

13  member of a select group of racist aggressive deputies in Lynwood known to use

14  unlawful means to eradicate gang members from Lynwood, would have given

15  insight into the motive the detectives had to frame Mr. Carrillo (a Young Crowd

16  gang member), rather than him being an unbiased investigator who interviewed the

17  critical eyewitness. GI 78, SAF 119-21.

18  Here, the prosecutor reinforced the officers' deception by capitalizing on it

19  when eliciting testimony and in her closing argument.  DDA Escalante argued that

20  the jury should believe that Turner's January 1991 identification was the truthful

21  evidence, and that his recantation during the second trial in 1992 was not.  SAF 130.

22  She further argued that the only reason Turner recanted was that he was scared to

23  death about retaliation while in custody.  SAF 130.  DA Escalante specifically

24  _____

25  [11] It is indisputable that Ditsch was a Viking. (GI 80). Plaintiff's evidence shows that both
26  District Court Judge Terry Hatter in the Thomas case, and the Kolts Commission, an independent
   Commission which investigated wrongdoing at the Lynwood Sheriffs station in 1990-91 found
27  that the Vikings to be a Neo Nazi gang like group committing constitutional violations back in
   1991 – when our client was wrongfully imprisoned.  GI 80.

28

argued the gang expert opinion testimony from Defendant Ditsch that Turner, an inmate would be scared of retaliation by gangs in prison if he testified. SAF 130. Rather than his recantation did not, as Defendant suggests, remedy the violation, but rather it amplified the prejudice caused by the suppression of the exculpatory facts pertaining to the original interview which would have corroborated his recantation. *See Mills v. Scully*, 826 F.2d 1192, 1195 (2d Cir. 1987) (even where defense is aware of falsity, there may be a deprivation of due process if the prosecutor reinforces the deception by capitalizing on it in case, such as closing argument); *United States v. O'Keefe*, 128 F.3d 885, 894-95 (5th Cir. 1997) (same).

Plaintiff was further prejudiced because without the suppressed evidence of the influence on the Turner's identification, the defense could not undermine the seemingly independent identifications by the other boys, which were, in actuality, a product of the poisoned well of Turner's original identification.  The corrupting influence spread to their six-pack identifications because Turner had told them he had identified picture No.1 in the six pack. UF 24, GI 18, 26-29.  All recanted their testimony that Mr. Carrillo was the shooter in the 2011 habeas proceedings.  UF 49.

**E.    Defendant Is Not Entitled to Qualified Immunity Because the Relevant Brady Standard Was Clearly Established, at Least, by 1990-91.**

Defendants claim they are entitled to qualified immunity from Plaintiff's Brady claim[12] arguing in effect that it was not clearly established in 1991 that the

---

[12] Defendant has not argued that Defendant Ditsch is entitled to qualified immunity on Plaintiff's other Due Process claims alleging the falsification of evidence and improper eyewitness influence. Accordingly, Plaintiff limits this opposition to the qualified immunity arguments raised by Defendant with respect to Plaintiff's *Brady* claims. Nevertheless, on the issue of qualified immunity for Plaintiff's due process claims of creation of false identifications and use of false evidence at trial, see *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc) (no qualified immunity for officers who induced a witness to provide statements they knew or should have know was false even though no cases recognizing specific right; the "proposition is virtually self-evident", and "clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government"); *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004) (no qualified immunity for

1    constitutional parameters of *Brady v. Maryland* applied to police officers or

2    misconduct by officers.  MSJ 9-12.   Clear case law defeats this argument.  It was

3    clearly established in 1991 that the police could not suppress exculpatory

4    information, including false evidence, misconduct, and other impeachment

5    evidence, from the prosecution, the court, and/or the defense.

6         **1.    Legal Standard for Qualified Immunity**

7         A qualified immunity defense fails where a reasonable official would have

8    known his actions would violate a constitutional right that was clearly established at

9    the time of the incident.  *Pearson v. Callahan*, 555 U.S. 223, 239-41 (2009). "[A]

10   right is clearly established if the contours of the right [are] sufficiently clear that a

11   reasonable official would understand that what he is doing violates that right."

12   *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Directly on-point authority is not

13   necessary to establish that a right has been clearly established, especially where the

14   existence of such a right is obvious. *Id.*; *Headwaters Forest Defense v. County of*

15   *Humbolt*, 276 F.3d 1125, 1131 (9th Cir. 2002).  Nor is it required that prior cases

16   even be "materially" or "fundamentally" similar. *Hope v. Pelzer*, 536 U.S. 730, 740-

17   74 (2002).  Here, Defendant cannot convincingly argue that he was not on notice in

18   1991 that it was unconstitutional to (a) write false and misleading police reports that

19   failed to disclose numerous material exculpatory facts and (b) suppress material

20   impeachment information regarding his membership in the Lynwood Vikings, in

21   violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405

22   U.S. 150 (1972), seminal and exceedingly familiar prior Supreme Court cases.

23   _____

     (…continued)

24   fabricated evidence in 1968 conviction; "some truths are self-evident . . . [for the law] goes back
     some seventy years"); *Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir. 1999) (denying

25   qualified immunity for fabrication in 1989, citing *Brady* and *Mooney*); *Geter v. Fotenberry*, 882
     F.2d 167, 171 (5th Cir. 1989) (no qualified immunity for police giving "false information to Dallas

26   County prosecutors" in 1983); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)
     (no qualified immunity; Supreme Court cases from 1935, 1972 and 1976 establish that police may

27   not generate false information likely to influence a jury's decision and forward it to prosecutors).

28

### 2.    QI and Brady for Police (As Opposed to Prosecutors)

Defendant concedes that it is, at this point in time, clearly established that prosecutors *and police officers* violate the constitution when they fail to disclose exculpatory information. MSJ 10 (citing *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1087 (9th Cir. 2009)). Nevertheless, Defendant argues that as of 1991, this constitutional violation only applied to prosecutors, not police officers. MSJ 9-11. Even while citing *Tennison*, Defendant disregards the clear holding of *Tennison* itself, which rejects the very same historical contention made by the defendants in that case. *Id.* at 1086-87.  Further removing any ambiguity, the Ninth Circuit cited *Newsome v. McCabe,* 256 F.3d 747, 752-53 (7th Cir. 2001) for the proposition "that it was clearly established in 1979 and 1980 that police could not withhold exculpatory information about fingerprints and the conduct of a lineup from prosecutors." *Tennison*, 570 F.3d at 1087. The Court's analysis need go no further, as *Tennison* is binding precedent on this issue.

### 3.    QI and Brady for "Misconduct"

Defendant makes a related, but distinct, argument that he is entitled to qualified immunity because police officers are not constitutionally required to disclose their own "misconduct" if that disclosure would subject them to criminal prosecution and/or civil liability. MSJ 11-12. Accordingly, Defendant claims that his failure to disclose his alleged misconduct, *i.e.* the facts relating to his improper manipulation of the Turner's identification and his membership in the Vikings, did not violate Plaintiff's rights. This argument is simply absurd. It is beyond self-evident that the falsification of evidence is "material" and "exculpatory" information which must be disclosed. It is similarly obvious that defendant's membership in a police gang constitutes highly relevant impeachment information subject to disclosure.

In *Brady*, *Napue*, and *Giglio*, the Supreme Court put officers on notice that they could not suppress exculpatory facts relating to false evidence or impeachment

1   evidence. In 1972, the Supreme Court held in *Giglio* that failure to disclose evidence

2   of a deal or promise of leniency to a key prosecution witness in the trial violated the

3   due process clause pursuant under the criteria established in *Brady* and *Napue*.

4   *Giglio v. United States*, 405 U.S. 150, 153-55 (1972) (citing *Brady v. Maryland*, 373

5   U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959)).  Failure to correct false

6   evidence at trial results in the same deliberate deception of a court and jury as when

7   false evidence is knowingly presented.  *Napue*, 360 U.S. at 269. As these cases

8   make absolutely clear, there is no exception to the Due Process requirements just

9   because the disclosure of the exculpatory material might expose the non-disclosing

10  government official to liability or other sanction (such as, *e.g.*, suborning perjury, as

11  was at issue in *Napue*).

12      Indeed, the *Giglio* case set in motion a well-established line of cases

13  demonstrating that impeachment evidence must be disclosed under *Brady*. The

14  *Brady* mandate clearly extends to impeachment information relating to officer

15  misconduct that is contained in a police officer's personnel file or otherwise

16  available to the government. *United States v. Cadet*, 727 F.2d 1453, 1467 (9th Cir.

17  1984) (holding that the government must review and turn over those portions of a

18  police personnel file that contain information favorable to the accused, *i.e.*,

19  impeachment information); *see also United States v. Henthorn*, 931 F.2d 29, 30-31

20  (9th Cir. 1991) (affirming *Cadet* and noting that it is an affirmative government duty

21  to disclose impeachment evidence relating to officer misconduct, not one that

22  depends on an initial showing by the defendant).

23      Moreover, evidence of bias and/or motive is the most critical type of

24  impeachment evidence. *United States v. Changa*, 901 F.2d 741, 743 (9th Cir. 1990);

25  *Evans v. Lewis*, 855 F.2d 631, 634 (9th Cir. 1988); *Cf. Davis v. Alaska*, 415 U.S.

26  308, 315 (1974) (describing cross-examination directed toward bias, prejudice, and

27  ulterior motive as a more particular attack on the witness credibility).  The Supreme

28  Court has also established that gang membership is clearly impeachment evidence.

1  *United States v. Abel*, 469 U.S. 45, 52 (1984) (evidence that the defendant and his

2  defense witness were members of a secret prison gang which members protected

3  each other, was evidence of bias admissible to impeach the witness).[13] Thus,

4  Defendant's argument that he is allowed, under the Constitution, to suppress

5  information of his own misconduct during the Turner interview and as a Viking

6  member rings particularly hollow.

7  Defendant relies on a single unpersuasive district court case, *Bastidas v. City*

8  *of Los Angeles*, 2006 WL 4749706 (C.D. Cal. 2006),[14] that, in addition, can be

9  easily distinguished on its facts. MSJ 12. The case arose in very unusual factual

10  circumstances. The defendant officers arrested the civil rights plaintiff for

11  possession of marijuana leading to charges and the entry of a nolo contendere plea.

12  After the arrest, but prior to the entry of the plea, the defendant officers falsified a

13  police report *in an unrelated case*. The falsity of that police report was not

14  discovered until after the plaintiff's plea was entered, but when it was discovered, it

15  resulted in admissions of guilt by the officers. The civil rights plaintiff argued that

16  the defendants had *Brady* duty to "confess" their misconduct in the unrelated,

17  undiscovered, and later occurring case. The district court rejected Plaintiff's

18  argument, reasoning that such a requirement would run afoul of the officer's Fifth

19  Amendment rights against self-incrimination and was not a clearly established

20  component of *Brady*. 2006 WL 4749706, at *5, 8. The *Bastidas* case, which

21  _____

22  [13]In addition circuit cases establish the highly probative nature of gang membership as
impeachment evidence, over challenges that such evidence is unfairly prejudicial. *United States v.*

23  *Winslow*, 962 F.2d 845, 850 (9th Cir.1992) (admitting testimony on Aryan Nation as relevant for
motive to bombing of gay bar by group members); *United States v. Skillman*, 922 F.2d 1370, 1374

24  (9th Cir.1990) (admitting testimony, over Rule 403 objection, that defendant asked to attend a
"skinhead" picnic as relevant on issue of racial animus in civil rights case); *United States v.*

25  *Cutler*, 806 F.2d 933, 936 (9th Cir.1986) (admitting evidence of affiliation with Aryan Nation to

26  show defendant's motive to hire hit man to kill persons who might testify against the group).

27  [14] A search of Westlaw shows that no subsequent case has cited, much less relied on, the
*Bastidas* holding.

28

1  grappled with difficult factual circumstances, ultimately does not, Plaintiff would

2  argue, reflect the proper qualified immunity analysis under *Brady*. Evidence that a

3  police officer has a pattern or habit of falsifying police reports or other evidence

4  must certainly be considered *Brady* impeachment evidence under *Giglio* and

5  *Henthorn*.

6  More to the point, however, *Bastidas* should, at the very least, be limited to its

7  unique facts.  As distinct from the present case, in *Bastidas*, at the time of the arrest

8  and prosecution of the plaintiff in the underlying criminal case, the defendant

9  officers were non-testifying witnesses. They had not yet committed the misconduct

10 that was later claimed to be *Brady* information, and they were not yet accused of the

11 misconduct (through an official complaint) prior to the entry of the plaintiff's plea.

12 The case, therefore, presented strange factual circumstances, which led the court to

13 rule that the "confession" of the misconduct in an unrelated, and earlier occurring

14 case was not required.

15 In this case, by contrast, the allegations concerning the Vikings and their

16 unconstitutional conduct arose prior to plaintiff's arrest. The government, including

17 Defendant Ditsch who was named in a lawsuit challenging the unconstitutional

18 conduct of the Lynwood Station deputies, was aware of the Vikings allegations and

19 their significance. Defendant Ditsch testified in both of the criminal trials, giving

20 rise to the requirements of *Giglio* and *Henthorn*. His testimony was critical to the

21 prosecution, including in relation to his expertise of gangs and gang rivalries. His

22 own membership in a gang, or allegations of the same, constituted obvious and

23 significant impeachment evidence that would have significantly undermined his

24 testimony.  Here, Defendant Ditsch need not have "confessed" to any particular

25 misconduct, but was required to disclose the fact of his gang membership which

26 would have allowed cross-examination on his bias and motive in the investigation.

27 / /

28 / /

**F.     Disputed Issues of Material Fact Preclude Summary Judgment on Plaintiff's Conspiracy Claims (Claims 2, 4, 6).** [15]

Conspiracies are typically proven through circumstantial evidence. Defendant argues that Plaintiff's conspiracy claims are not supported by "concrete" evidence[16], implying that Plaintiff must produce a confession by one or more co-conspirators, a tape recording of the conspiratorial agreement, or some other kind of unlikely evidence. Contrary to gist of Defendant's argument, Plaintiff's circumstantial evidence of a conspiracy to violate his constitutional rights is strong and more than sufficient to defeat summary judgment.

Evidence alleging co-conspirators engaged in a series of acts and communications can "demonstrate to a reasonable person the existence of an agreement either tacit or express to act in concert to achieve their shared objective." *Hampton v. Hanrahan*, 600 F.2d 600, 620–24 (7th Cir. 1979), *judgment rev'd in part on other grounds*, 446 U.S. 754 (1980); *see also Ting v. United* States, 927 F.2d 1504, 1515 fn. 2 (9th Cir. 1991) (Reinhardt, J. concurrence) ("Circumstantial evidence may provide a sufficient basis to allow a jury to find that a conspiracy existed."); *Williams v. County of Santa Barbara*, 272 F. Supp. 2d 995 (C.D. Cal. 2003) ("[P]laintiffs need not provide direct evidence of the agreement between the conspirators; what is required is circumstantial evidence sufficient for a jury to infer from the circumstances (that the alleged conspirators)…reached an understanding to achieve the conspiracy's objectives." (internal quotation omitted)).

---

[15] Defendant also argues that Plaintiff's conspiracy claims are not ripe for adjudication, but this argument is based on a misreading of a Ninth Circuit case that alleged allegations of a cover-up by police officers that prevented the Plaintiff from accessing the evidence that would have successfully proved his § 1983 claims, which were brought in the same suit. MSJ 23; *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 625 (9th Cir. 1988).

[16] Defendant appears to assert that Plaintiff has thus far relied on "conclusory allegations" of a conspiracy. MSJ 24. To the contrary, the factual basis for Plaintiff's conspiracy claims was specifically pled in the complaint (*see* Compl. ¶¶ 85-89; ¶¶96-100; ¶¶109-113) and is supported in this Opposition with citations to the relevant evidence.

Circumstantial evidence was the basis for the reversal of the lower court's directed verdict for defendants on the civil rights conspiracy allegation in *Hampton v. Hanrahan.* In *Hampton*, Plaintiffs brought a civil rights action against law enforcement officers arising from a gun battle which occurred during raid on a Black Panther Party (BPP) apartment. *Id.* The court held in relevant part that plaintiffs had established a prima facie case for conspiracy to violate their civil rights stating:

> [Plaintiff] need not prove that the individual motives underlying a common, illegal desire to achieve the conspiratorial objective were identical. The essence of a conspiracy is the agreement, and a reasonable jury could find that the actions of these defendants demonstrate that they had agreed at least tacitly to work together to eliminate the BPP. [*Id.* at 624.]

In *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970), a leading Supreme Court case establishing the summary judgment standard, the plaintiff's circumstantial evidence of a conspiracy to violate her civil rights was sufficient to survive summary judgment, even in the absence of direct evidence of communication between the alleged conspirators :police officer and restaurant owner who allegedly denied her service based on her race. *Id.* at 158. The officer asserted that his motive was to avoid a riot, not to deny her civil rights. Despite his direct denial, in defeating summary judgment, the plaintiff was entitled to rely on circumstantial evidence from which a reasonable juror could find the officer had an unlawful motive, that is to deny her civil rights based on her race. In his concurrence, Justice Black noted *"[t]he existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide.* In this case petitioner may have had to prove her case by impeaching the store's witnesses and appealing to the jury to disbelieve all that they said was true in the affidavits." *Id.* at 176 (Black, J. concurring) (emphasis added); *see also Mendocino Enviro. Center v. Mendocino County* 192 F.3d 1283 (9th Cir. 1999) (quoting emphasized portion.)

As stated above, a plaintiff is entitled to the inferences and facts in the light most favorable to plaintiff. "Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, 'so long as there is a possibility that the jury can 'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached a understanding' to achieve the conspiracy's objectives." *Hernandez v. City of Napa*, 781 F. Supp. 2d 975, 997 (N.D. Ca. 2011) (quoting *Mendocino Enviro.*, 192 F.3d at 1301).

The Plaintiff's evidence is sufficient to defeat summary judgment on the conspiracy causes of action. GI 66, GI 78, GI 93. The circumstantial evidence of the chain of events and interactions between the alleged conspirators Ditsch, Goran and Luna support that they agreed to a common goal of arresting and incarcerating Mr. Carrillo whom they believed to be the up and coming shooter of the Young Crowd gang, using false eyewitness evidence. The Plaintiff's evidence easily meets the summary judgment standard, in that it supports the "possibility that the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds . . . to achieve the conspiracy's objectives." *Mendocino*, 192 F.3d at 1301-02 (internal quotations omitted). Plaintiff's evidence includes that:

> **1)** Ditsch used the same photospread with Turner that Deputies Luna and Goran had used with Katrina Salway, a Sarabia case eyewitness. GI 59-68 Using the same six pack was a suspect procedure in and of itself. Plaintiff's Eyewitness Identification Expert Gary L. Wells, and Police Practices Expert Thomas R. Parker, both with over 30 years experience in their respective fields, have never seen nor heard of the use of the same photo six-pack in two different cases. GI 66. Consistent with this expert evidence, Ditsch admitted in his deposition that other than this case, neither has any recollection of ever using the same six-pack in two different investigations, GI 66;

> **2)** Luna suggested and influenced Salway's identification[17] to pick "Spider,"

---

[17] Ms. Salway testified in the preliminary hearing as follows: Salway: I had said 'I'm not sure if it's no. 1 or no. 6' and then Detective Luna said, 'is it no. 1?' Defense counsel: And after he said that, what did you say? Salway: I said, 'I'm pretty sure it is.' Defense counsel: Okay. But prior to that you weren't sure; is that right? Salway: No, I wasn't.
Investigator Luna testified in his deposition that it might have occurred. GI 85. Luna's partner Deputy Goran's report stated that Salway immediately pointed to Picture no. 1 and failed to state

an event (GI 81-85) remarkably similar to Ditsch's improper and suggestive photo identification conduct with Turner (GI 62-66);

**3)** Goran and Ditsch communicated in the OSS trailer in the early morning hours of January 19, 1991 about there being a pre-existing photospread containing Frankie Carrillo.  GI 66, 93.  Goran created it.  UF 83.  Although denying it for twenty years, Ditsch now admits that Goran gave it to him in the trailer on the night of January 19, 1991 when Ditsch showed it to Turner. GI 93;

**4)** Ditsch--similar to Luna's conduct--influenced Turner's selection of the Carrillo photo first from the gang book, then from the photospread.GI 62-68;

**5)** Ditsch's repeated lies for twenty years about creating the photospread himself, rather than telling the truth -- that the photospread was previously created and used by Goran in the overlapping Sarabia investigation in which Carrillo was the suspect--  evidences a effort by Ditsch to conceal their goal of getting Mr. Carrillo off the streets, GI 78, 93;

**6)** Deputies Goran, Luna and Ditsch's intent is further evidenced by their identical misidentification of "Spider" as Mr. Carrillo's moniker – contrary to all the Young Crowd documentation of the O.S.S. group showing that his moniker was "lil spider" and also showing that a different Young Crowd gang member – Juan Luis -- EE 37, had the moniker "Spider," (GI 66, 78, Exh. ZZ).  They would consult the gang book index of names and monikers to identify the person in the corresponding photo of the gang book. GI 82. Ditsch did so that night. GI 65. Mr. Carrillo was "lil" Spider, not Spider, in January, 1991.  SAF 135;

**7)** Their written reports falsely attributing the name Spider to Mr. Carrillo (SAF 135), further evidenced their goal of obtaining evidence of and convicting Mr. Carrillo. GI 66, 78, 82;

**8)** Ditsch was not assigned to the Sarpy investigation, he inserted himself into the case by administering the photo identification to Turner (SAF 108) with whom he had 20 prior contacts (SAF 103) and whom he used as a cooperating witness to arrest a Young Crowd member a few months before (SAF 105-7). Luna also had prior contact with Turner as Luna was the investigator on a October 1990 drive by shooting involving Young Crowd in which Turner was a victim and eyewitness and identified for Luna three YC members from the gang book as perpetrators.  SAF 110-115;

**9)** OSS was a small unit consisting of 10 officers who worked closely together in a trailer on the station property (UF 1, 7, GI 93), and daily shared intelligence concerning the gangs, gang members and trends and specifically discussing their cases including information if someone was a suspect in a shooting with corroboration that there was a firearm, which unit had regular

---

(…continued)

that Salway chose two photos and was unsure.  GI 90.  At his deposition, O.S.S. investigator Goran testified that he had no independent recollection of any aspect of the Sarabia investigation. Consequently, any evidence reflecting the events of the Sarabia investigation depicted by Investigator Goran should be disregarded.  GI 81-85.

Monday morning meetings to share information about gang activity over the weekend. SAF 113-118.  Luna testified that with respect to this case he would likely have shared with his partner Goran that Turner had picked three suspects from the YC gang book in the October drive by (SAF 114); that Turner was a target of the YC gang in the incident which involved two rival gangs [Young Crowd and Turner's gang N-Hood]. GI 78, SAF 114-115;

**10)** The evidence of how closely the OSS investigators shared information about the gangs in Lynwood and about their investigations undermines Ditsch claim  that he did not know anything about Sarabia, or that Mr. Carrillo was a suspect in that case. GI78, GI 93.  SAF 113-118. The OSS investigators had Monday meetings about any new gang crimes and in particular would have talked about armed suspects in shootings (SAF 117-118).  Luna would have told his partner Goran that Mr. Carrillo was the shooter he suspected in his Sarabia case.  GI 82, GI 93, SAF 113-118. Ditsch's statement to Turner on the night of January 19 that Mr. Carrillo was the up and coming shooter in YC was a direct reference to him having that information from the Sarabia investigation (GI 18, GI 66);

**11)** Ditsch was an admitted Viking, which both a federal judge and a independent county commission found was a gang like group that engaged in unconstitutional conduct against minority residents of Lynwood in 1990-91. GI 78, GI 80;

**12)** Numerous residents of Lynwood declare that Lynwood deputies targeted Young Crowd Gang members harassing them, beating them, stopping them without reason, and otherwise engaging in gang like behavior themselves in the early-mid 1990s.  SAF 119.  Luna was known in the community to be excessive, disrespectful, aggressive and otherwise reckless towards YC members.  SAF 119-121.

Ditsch's conclusory denial in his declaration (GI 78-79) does not undermine Plaintiff's circumstantial proof of events which support the existence of an agreement between Ditsch, Luna and Goran.  Based on the ample circumstantial evidence, and viewed in the light most favorable to Plaintiff, a jury could infer from the circumstances that the Defendant conspired as alleged in the 2nd, 4th & 6th claims.

## V.     CONCLUSION

For all the above reasons Summary judgment should be denied.

Respectfully submitted,
KAYE, McLANE & BEDNARSKI, LLP

DATED: August 20, 2012          By _____/S/_____

RONALD O. KAYE
Attorneys for Plaintiff Francisco Carrillo, Jr.