RONALD O. KAYE (No.145051)
MARILYN E, BEDNARSKI (No. 105322)
CAITLIN S. WEISBERG (No. 262779)
KAYE, McLANE & BEDNARSKI
234 E. Colorado Blvd. Suite 230
Pasadena CA 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
E-mail: rok@kmbllp.com
E-mail: mbednarski@kmbllp.com
E-mail: cweisberg@kmbllp.com

Attorneys for Plaintiff,
FRANCISCO CARRILLO, JR.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| FRANCISCO CARRILLO, JR.,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES, CRAIG DITSCH AND DOES 1 THROUGH 10, inclusive,<br><br>Defendants. | CASE NO. CV 11-10310 SVW (AGRx)<br><br>**PLAINTIFF FRANCISCO CARRILLO JR.'S NOTICE OF MOTION AND MOTION IN LIMINE # 4 TO ADMIT PORTIONS OF THE KOLTS REPORT**<br><br>DATE:       October 1, 2012<br>TIME:        3:00 p.m.<br>COURT:    Hon. Stephen V. Wilson<br><br>Action Filed: December 14, 2011<br>Pretrial Conference: October 1, 2012<br>Trial: October 16, 2012 |

PLEASE TAKE NOTICE that on Monday, October 1, 2012 at 3:00 p.m. or as soon thereafter as the matter may be heard, Plaintiff, by and through his counsel of record, will move *in limine* to admit portions of the Report on the Los Angeles County Sheriff's Department by Special Counsel James G. Kolts & Staff, dated July

1992, submitted herewith as Exhibit B.

Pursuant to Local Rule 7-3, counsel for Plaintiff conferred with counsel for Defendants on August 22, 2012 prior to filing this motion. Defendants do not consent to the relief requested in this motion.

Plaintiff's motion is based on the attached Memorandum of Points and Authorities, the concurrently filed Declaration of Caitlin S. Weisberg and exhibits thereto, all pleadings and papers on file in this action, and such other evidence and argument as may be presented on behalf of Plaintiff at the hearing on this motion.

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

DATED: September 3, 2012        By        /s/ Ronald O. Kaye
                                          RONALD O. KAYE
                                          Attorneys for Plaintiff Francisco Carrillo, Jr.

1

# **<u>TABLE OF CONTENTS</u>**

2  TABLE OF AUTHORITIES ........................................................................... ii

3  MEMORANDUM OF POINTS AND AUTHORITIES ............................................1

4  I.      INTRODUCTION ...................................................................................1

5  II.     BACKGROUND .....................................................................................2

6          A.     Defendant Ditsch's Vikings Membership.................................2

7          B.     Historical Backdrop of the Kolts Report and the Vikings .....................3

8          C.     Kolts Commission Investigation and Report .........................7

9          D.     The Portions of the Kolts Report Addressing Deputy Gangs................9

10 III.    ARGUMENT ........................................................................................11

11         A.     The Kolts Report, As a Highly Authoritative Public Record, Is
                  Admissible Under Federal Rule of Evidence 803(8)(A)(iii) ................11

12 V.      CONCLUSION ....................................................................................14

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Cases

*Beech Aircraft Corp. v. Rainey,*
   488 U.S. 153 (1988) ................................................................11, 12, 13, 14

*Brink's Ltd. v. S. African Airways,*
   93 F.3d 1022 (2d Cir. 1996)........................................................14

*Gilbrook v. City of Westminster,*
   177 F.3d 839 (9th Cir. 1999)............................................12, 13, 14

*Hill v. Marshall,*
   962 F.2d 1209 (6th Cir. 1992)....................................................12

*In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988,*
   37 F.3d 804 (2d Cir. 1994).........................................................14

*In re Aircrash in Bali, Indonesia,*
   871 F.2d 812 (9th Cir. 1989).......................................................12

*Johnson v. City of Pleasanton,*
   982 F.2d 350 (9th Cir.1992)........................................................13

*United States v. DeWater,*
   846 F.2d 528 (9th Cir. 1988).......................................................13

*United States v. Loera,*
   923 F.2d 725 (9th Cir. 1991).......................................................13

*Zicherman v. Korean Airlines Co.,*
   516 U.S. 217 (1996) ....................................................................14

## Rules

Fed. R. Evid. 803(8) ..................................................................11, 12, 14

Fed. R. Evid. 803(8)(A)(iii).........................................................2, 11, 13

Fed. R. Evid. 803(8)(B) ..................................................................13

Advisory Committee's Notes on Fed. R. Evid. 803(8),
   56 F.R.D. 183, 313 (1972)............................................................14

1                         **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **I.**        **INTRODUCTION**

3         In this wrongful conviction case, Plaintiff Francisco Carrillo, Jr. alleges that

4 Defendant Craig Ditsch, an Operation Safe Streets ("OSS")[1] Investigator from the

5 Lynwood Station of the Los Angeles Sheriff's Department, falsified and suppressed

6 material evidence that led to his conviction.[2] Among other *Brady* violations,

7 Plaintiff alleges that Defendant Ditsch failed to disclose his membership in the

8 Lynwood Vikings, a police gang within the Lynwood Sheriff's Station that was

9 known for adopting mannerisms and unlawful conduct commonly associated with

10 street gangs.

11         In December 1991, former Judge James G. Kolts was appointed by the Los

12 Angeles County Board of Supervisors as Special Counsel to investigate and review

13 the operations of the Los Angeles Sheriff's Department, with a particular focus on

14 problems of excessive force and the poor relationship between the police force and

15 the community. Special Counsel Kolts issued his findings in July 1992, in a report

16 titled *The Los Angeles County Sheriff's Department* ("Kolts Report").[3] A portion of

17 _____

18      [1] The OSS was the street gang investigation unit within the Sheriff's

19 Department. During the relevant period of this lawsuit, there were approximately ten
OSS investigators detailed to the Lynwood Station along with approximately ten

20 OSS patrol deputies. Defendant Ditsch was promoted from an OSS patrol deputy to

21 an OSS Investigator in approximately January 1989, two years prior to the Sarpy
murder for which Plaintiff was wrongfully convicted.

22

23      [2] The underlying criminal matters at issue in this case are Plaintiff's
prosecution and conviction for the murder of Donald Sarpy ("Sarpy case") and his

24 prosecution in an unrelated case ("Sarabia case") that was dismissed prior to trial.
The offenses underlying these cases occurred on January 18, 1991 and December

25 28, 1990, respectively. Both offenses were gang-related and were investigated by

26 Lynwood OSS officers.

27      [3] The full Kolts Report is 326 pages, describing extensive investigation and

28 findings, most of which are not directly relevant to this litigation. Submitted with

Special Counsel Kolts's investigation and findings were devoted to allegations of police gangs within the Sheriff's Department, particularly the Lynwood Vikings. (Ex. B ("Chapter 24 – Deputy Gangs")). The Kolts Report found that while evidence of racist deputy gangs was generally inconclusive, "it appears that some deputies at the Department's Lynwood Station associate with the 'Viking' symbol, and appear at least in times past to have engaged in behavior that is brutal and intolerable and is typically associated with street gangs." (Ex. B, p. 56).

For the reasons set forth in this motion, Plaintiff respectfully moves for the admission at trial of the portions of Kolts Report that address the existence and malfeasance of the Lynwood Vikings. This motion does not address the admissibility of Vikings evidence *per se*, which the parties are litigating in the context of a motion *in limine* to be filed by Defendants seeking the exclusion of all evidence reflecting the Vikings.  Rather, this motion concerns the admissibility of the Kolts Report, itself, as a public record under Federal Rule of Evidence 803(8)(A)(iii) which provides for the admissibility of "a record or a statement of a public office if . . . it sets out . . . factual findings from a legally authorized investigation."

## II.     BACKGROUND

### A.     Defendant Ditsch's Vikings Membership

Defendants in the instant litigation have taken the position that the Vikings

_____

(…continued)
this motion, attached as exhibits to the Declaration of Caitlin S. Weisberg ("Weisberg Decl."), are relevant excerpts of the Kolts Report for purposes of this motion (Exhibit A) and the proposed exhibit that would be submitted to the jury (Exhibit B). In addition, the full report is available online at http://www.parc.info/client_files/ Special%20Reports/3%20-%20Kolts%20Report%20-%20LASD.pdf. The exhibits to the Weisberg Declaration are continuously paginated and are referred to herein by those page numbers as opposed to any internal page numbering.

1    did not exist or, alternatively, if there was some group of "Vikings," there was

2    nothing untoward about them. This is the position taken by Defendant Ditsch: "The

3    Vikings were nothing scandalous. The Vikings were a group of hard workin' proud

4    deputies to work that area [Lynwood]."[4] (Ex. C (Ditsch Dep.), p. 76). Defendant

5    Ditsch has stated that he was a Viking, and that he thought all of the Vikings at

6    Lynwood station were doing a great job.  (*Id.*, pp. 75, 78-79). He has denied any

7    misconduct by himself or knowledge of misconduct by any other Viking.

8        The character and unconstitutional ethos of the Vikings is a highly contested

9    fact in this litigation that is directly relevant to Plaintiff's *Brady* claim based on

10   Defendant Ditsch's suppression of his membership in the Vikings. It is also highly

11   relevant evidence of Defendant Ditsch's motive for the unconstitutional actions

12   alleged in this case. The stronger the evidence that the Vikings were a band of

13   "thugs" prone to abuses of power and unconstitutional conduct, the greater the value

14   of the impeachment evidence and the duty to disclose it. Ultimately, this is an issue

15   for the jury to decide, based on the evidence presented by the parties.

16        **B.    Historical Backdrop of the Kolts Report and the Vikings**

17        The misconduct of law enforcement officers assigned to the Lynwood station,

18   both Vikings and non-Vikings, became the subject of intense public scrutiny in 1990

19   and 1991. The historical events of this period provide important context both for the

20   motivation behind the Kolts Commission and the information that was available to

21   the Kolts Commission at the outset of its investigation. The Kolts Commission built

22   on this information and expanded its investigation by reviewing internal documents,

23   conducting hearings, and interviewing witnesses. (Ex. B, p. 56; Ex. A, p. 42; *see,*

24   _____

25        [4] Aligning with Defendant Ditsch, Defendant County has refused to produce

26   *any* documents relating to the existence and/or activities of the "Vikings," claiming
     that no such documents exist. This discovery dispute is currently being litigated

27   before Magistrate Judge Rosenberg.

28

1    *e.g.*, *id.*, pp. 20, 25, 41).

2          On September 26, 1990, approximately 75 residents of Lynwood, CA filed a

3    class action lawsuit ("Thomas case") against approximately 20 law enforcement

4    officers of the Lynwood Sheriff's Station, along with the County of Los Angeles,

5    the Los Angeles County Sheriff's Department, and the City of Lynwood. *Thomas et*

6    *al. v. County of Los Angeles et al.*, Civ. No. 90-5217-TJH (C.D. Cal. filed Sept. 26,

7    1990); Weisberg Decl. ¶ 8. The introduction of the Complaint asks for damages,

8    injunctive relief, and receivership of the Lynwood Sheriff's Station as a remedy for

9    "systematic acts of shooting, killing, brutality, terrorism, house-trashing and other

10   acts of lawlessness and wanton abuse of power" by law enforcement officers of the

11   Lynwood Sheriff's Station. The misconduct alleged in the Thomas Complaint

12   occurred primarily in 1989 and 1990. (Weisbeg Decl. ¶ 9). The lawsuit was later

13   expanded to include over 100 individual law enforcement officer defendants,

14   including Defendant Ditsch, Loy Luna, and Kevin Goran, the three OSS officers

15   who were involved in the Sarpy and Sarabia investigations at issue in this case. (*Id.*

16   ¶ 8). The Thomas case was litigated for over five years, ultimately resulting in a

17   publicized settlement of several million dollars.[5] (*Id.* ¶ 9).

18         On December 2, 1990, the Long Beach Press-Telegram, concluded a ten-

19   week investigation with an article reporting that "a sizable group of deputies in the

20   Lynwood Sheriff's Station"—the Vikings—"has taken on characteristics of a street

21   gang, and their harassing activities within the department have led their commander

22   _____

23         [5] The case was heavily litigated and procedurally complex, as demonstrated
24   by the docket which includes over 1900 entries. Prior to settlement, the parties
     proceeded to trial on one of the excessive force incidents alleged in the Complaint,
25   resulting in a jury verdict against two individual defendants and a subsequent jury
26   verdict against the County and other *Monell* defendants. The settlement of the
     Thomas case also incorporated settlements of several other cases against the
27   Sheriff's Department. (Weisberg Decl. ¶ 9).

28

1   to label them a 'malignancy' that must be dealt with quickly." (Ex. I, p. 160). One

2   deputy quoted in the article stated that "[t]he Vikings are in a war against (their)

3   supervisors and the street gangs. There's been a breaking down of standards." (*Id.*).

4   The article then went on to describe gang-like traits that had been adopted by

5   members of the Vikings, including hand signs, street jargon, and tattoos. (*Id.*, pp.

6   163-64). The story was picked up by other newspapers, including the *Los Angeles*

7   *Times* and the *New York Times*, and follow-up articles were printed in 1991 and

8   thereafter.

9        In the summer of 1991, the *Thomas* plaintiffs filed a motion for a preliminary

10   injunction that targeted the high incidence of excessive force by the Lynwood

11   deputies. (Weisberg Decl. ¶ 10). Both sides presented numerous declarations in

12   support of and in opposition to Plaintiff's motion. (*Id.*). Following a pair of

13   hearings, the court granted the motion on September 23, 1991 and issued findings

14   of fact and conclusions of law on October 8, 1991, which included the following

15   findings:

16       • "Several plaintiffs were charged with crimes after they were allegedly
17         brutalized by deputies. These individuals were charged pursuant to an
           unwritten Sheriff's Department policy of charging a person injured in the
18         course of a routine stop. Because of the unreasonable force used in
           effectuating their arrests, many of these victims had their criminal charges
19         dropped at arraignment."

20       • "Witnesses who attempted to file misconduct reports regarding some of
           the brutality incidents were discouraged from doing so by deputies and
21         their superiors."

22       • "The actions of many deputies working in the Lynwood sub-station are
           motivated by racial hostility; these deputies regularly disregard the civil
23         rights of individuals they have sworn to protect. Many of the incidents
           which brought about this motion involved a group of Lynwood area
24         deputies who are members of a neo-nazi, white supremacist gang—the
           Vikings—which exists with the knowledge of departmental policy
25         makers."

26       • "As a result of the terrorist-type tactics of deputies working in Lynwood,
           and policy makers' tolerance of such tactics, plaintiffs are being
27         irreparably injured—both physically and mentally—and their civil rights
           are being violated."

28   (Ex D, pp. 82-83).

1       Although various Sheriff's Department officials and employees took the

2  position, during the Thomas litigation, that the "Vikings" were a non-entity,

3  numerous witnesses in the Thomas case acknowledged, under oath, the existence

4  and reputation of the Vikings. For example, Deputy Andre Pinesett, who was

5  involved in the initial investigation of the Sarpy Case, testified that there was a

6  clique of "Vikings" at the Lynwood Station who engaged in racist conduct, referred

7  to themselves as "OGCF" (Original Gangster Chango Fighter),[6] had Viking tattoos,

8  and used gang-like hand signals. (Ex. E, pp. 92, 95, 100-02, 106-11, 116-18).

9  Another Lynwood deputy, Jason Mann, testified that he was the forty-eighth

10  Lynwood deputy to get a Viking tattoo and that some Viking tattoos included the

11  nickname of the deputy, such as "Dog Head," "PV," "Mr. Fig," or "Chongo

12  Fighter," names clearly akin to gang monikers. (Ex. F, pp. 126-27). One sheriff's

13  department supervisor sent a memo to his superior on August 15, 1991 that

14  criticized the department's tolerance of police groups like the Vikings, identifying

15  the culture as "you fabricate reports, you beat people up, use deadly force. Don't

16  worry about it, you're part of a group here." (Ex. G, p. 149).

17       The Vikings controversy was one relatively small part of a much bigger

18  picture of alleged police misconduct in Los Angeles around 1990. This was the

19  same period as the Rodney King incident, which occurred on March 3, 1991, and

20  the Christopher Commission, which was appointed on April 1, 1991 and issued its

21  report several months later in July 1991. (Ex. A, pp. 6-7). Statistics reported by the

22  *Los Angeles Times* in 1990 indicated that excessive force lawsuits against the

23  Sheriff's Department per year had doubled since five years earlier and that such

24  lawsuits had resulted in $8.5 million in settlements and verdicts over three years

25

26

27      [6] Deputy Pinesett explained that "chango" was a Spanish word for "monkey" and was used as a derogatory reference to African-Americans.

28

1  ending in September 1989. (Ex. H, p. 152).

2          C.      Kolts Commission Investigation and Report

3          In December 1991, prompted by the events discussed in the previous section,

4  including the publication of the Christopher Commission report in July and Judge

5  Hatter's preliminary injunction ruling in *Thomas*, the Board of Supervisors of Los

6  Angeles County appointed retired Judge James G. Kolts[7] as Special Counsel "to

7  conduct a review of 'the policies, practices and procedures of the Sheriff's

8  Department . . . as they relate to allegations of excessive force, the community

9  sensitivity of deputies, and the Department's citizen complaint procedure." (Ex. A,

10  pp. 5-7; Ex. B, p. 56). Of particular concern, prompting the Board of Supervisors to

11  take action, were increases in the number of officer involved shootings and the

12  payment by the County of $32 Million in claims arising from LASD operations over

13  the previous four years. (Ex. A, p. 5).

14          Special Counsel Kolts assembled a staff that included Merrick Bobb, who has

15  issued semiannual follow-up reports since the publication of the Kolts Report, and

16  "more than 60 lawyers, certified public accountants, a psychologist, a newspaper

17  editor, and other academics and professionals."  (Ex. A, p. 42). The Kolts

18  Commission held public hearings, reviewed internal investigations, complaints, and

19  discipline records, considered documentation relating to cases that resulted in

20  verdicts and settlements, interviewed hundreds of witnesses and department

21  personnel, and consulted relevant interest groups. (*Id.*). The investigation "took

22  nearly six months and involved the review of hundreds of thousands of records."

23  (*Id.*). The goal of the investigation was to provide an evaluation of the efficacy of

24  Sheriff's Department policies and practices and formulate recommendations for

25  _____

26          [7] Special Counsel James Kolts was a deputy district attorney in Los Angeles
   for seventeen years prior to his twenty year service as a judge for the Los Angeles
27  County Superior Court. He retired from the court in 1989.

28

1    improvement. (*Id.*, pp. 5-9).

2         The final report, published in July 1992 on the heels of Plaintiff's trial in June

3    1992, addressed numerous deficiencies in the policies and practices of the

4    Department with regard to internal investigations of police misconduct, complaint

5    procedures, and lack of discipline. (*See* Ex. A, pp. 5-9, 42-45).The report also

6    recognized steps that had already been taken by the Department to curb law

7    enforcement misconduct. (*See, e.g., id.* at 7, 9).

8         Chapter 4 of the Report states the Commission's evaluation of the Sheriff's

9    Department's excessive force settlements and verdicts. Of the Department's twenty-

10   one substations, the Lynwood Station led the Department in the number of civil

11   rights cases alleging excessive force that led to settlements and verdicts greater than

12   $20,000 in the years 1987-1992.[8] (Ex. A, pp. 25-27). The Kolts Report identified a

13   pattern of false reporting and charging in relation to the excessive force cases that is

14   consistent with the allegations of Plaintiff in this case in relation to his wrongful

15   conviction:

16        Our review showed that the arrest report almost always was at wide
          variance with the allegations made by the plaintiff in a lawsuit. In fact,
17        the two versions were often so diverse that a deputy's report alone
          could not have alerted a supervisor to [an excessive force] problem."

18   (*Id.*, p. 34). These and related findings were the bases for the Kolts Report's

19   recommendations aimed at reducing the incidence of excessive force within the

20   Department and the Department's exposure to liability resulting from such police

21   misconduct. In addition, as these sections make clear, the Kolts Report draws a

22

23   _____

24        [8] The Report further notes that "[t]he cases reviewed may merely be the tip of
     the iceberg with respect to the use of excessive force by Department members. . . .
25   The number of complaints made against the Department greatly exceeds the number
     of cases that end in substantial settlements or verdicts, yet the allegations of force
26   made by injured parties who register complaints against the Department are often
     very similar to the allegations made in these cases." (Ex. A, pp. 31-32).
27

28

1  direct correlation between incidents of excessive force, a particular problem at the

2  Lynwood Station, and false report writing.

3      **D.**    **The Portions of the Kolts Report Addressing Deputy Gangs**

4      This is not an excessive force case and the majority of the Kolts Report is not

5  directly relevant to Plaintiff's claims against Defendant Ditsch. However, one

6  chapter of the Kolts Report addresses "the controversial allegation that racist deputy

7  gangs exist within the LASD, allegedly including, among others, the 'Vikings' at

8  the Lynwood Station. These allegations merited investigation because they are of a

9  profoundly serious nature, touching the fundamental fitness of the LASD to perform

10 its mission." (Ex. B, p. 56). To address this allegation, the Commission reviewed the

11 record and testimony in the *Thomas* litigation and a Vikings-related employment

12 lawsuit;[9] the Commission also "reviewed other case files concerning deputy

13 misconduct and interviewed members of the Department, members of the

14 community, lawyers serving as plaintiffs' counsel in suits against the Department,

15 former deputies and others." (*Id.*, p. 56).

16     The Kolts Commission found as follows:

17     [I]t appears that some deputies at the Department's Lynwood Station

18     associate with the "Viking" symbol, and appear at least in times past, to
    have engaged in behavior that is brutal and intolerable and is typically

19     associated with street gangs. Such conduct would, at a minimum, erode

20     the community's trust in the LASD, which is essential for the
    Department to perform its mission.

21

22     . . . .

23     [A]n inner group of deputies with peculiar and unique hard attitudes

24     likely did exist at the Lynwood Station. Those attitudes manifested

25     [9] Around the time of the Vikings controversy, several deputies were

26 transferred out of the Lynwood Station. Those deputies challenged their transfers,

27 alleging that the transfers branded them as Vikings, thereby harming their reputation
    and employment status within the department. (Ex. B, p. 57).

28

themselves in the form of excessive force and disciplinary problems between deputies and their supervisors. The spirit of this group was symbolized by the Viking emblem, and was clearly expressed by the sporting of tattoos and their use at one time of gang-style hand signals, jargon, and graffiti.[10]

Sources within the LASD said that such cliques tend to be formed around "hard chargers" who are assigned to the early morning and late night shifts. It is said that those who prefer to work from about midnight to 8:00 a.m. are a different breed who promote and perpetuate an "Us vs. Them" and "kick ass and take names" super-macho culture at various stations.

. . . .

We were told by at least one reliable firsthand observer that the members of a former early morning clique at the Lynwood station had been trained by field training officers who were nothing more than "thugs." . . . As one seasoned observer from within the LASD put it, "The rough station used to be Firestone. When they opened Lynwood, Firestone transferred all of its 'heavies' to Lynwood. Everyone else caught on. Lynwood started out like a penal colony—like Australia."

(Ex. B, pp. 62-63).

The Kolts Commission also made a related finding that the evidence of *racist* deputy gangs within the Department, including the Vikings, was inconclusive. After the above quoted passage, the report goes on to state "[n]evertheless, whether or not the spirit exhibited by the Vikings is racist in nature is less clear. . . . [The] evidence describing the Vikings as racist is largely second and third-hand, anecdotal, and uncorroborated." (Ex. B, p. 64). Thus, the report concludes: "While there may be some support for the allegations that a racist deputy gang existed at Lynwood, there

_____

[10] The Report also notes, when discussing the importance of the Department taking strong action to "identify, root out, and punish severely any lingering gang-like behavior by its deputies," that 16 deputies were transferred out of Lynwood. (Ex. B, pp. 64-65).

1    is no persuasive evidence to date. There is no doubt, however, that certain deputies'

2    resort to gang mannerisms feeds a public perception that racist deputy cliques may

3    exist within the Department."  (*Id.*).

4        Exhibit B to this motion is a proposed exhibit that contains the relevant

5    portions of the Kolts Report. Plaintiff seeks the admission of this Exhibit in

6    evidence.

7    **III.    ARGUMENT**

8        The Kolts Report, the product of an independent investigation of alleged

9    abuses of power by employees of the Los Angeles Sheriff's Department, is highly

10   reliable evidence. It reflects an extensive and thorough investigation incorporating

11   information from hundreds of witnesses and thousands of documents. As an official

12   report containing "factual findings from a legally authorized investigation," the

13   Kolts Report is presumptively admissible under Fed. R. Evid. 803(8)(A)(iii).[11]

14   **A.    The Kolts Report, As a Highly Authoritative Public Record, Is Admissible Under Federal Rule of Evidence 803(8)(A)(iii)**

15

16       Federal Rule of Evidence 803(8)(A) contains the public records exception to

     the hearsay rule. Subsection (iii) allows for the admission, in civil actions, of

17   evaluative reports resulting from legally authorized investigations. Fed. R. Evid.

18   803(8)(A)(iii); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 162 (1988). The text

19   of the rule states, in pertinent part:

20

21   _____

22       [11] Prior to the relatively recent amendments to the Federal Rules of Evidence,
     this hearsay exception was found in Rule 803(8)(C), and many of the cases cited in

23   this motion refer to the provision by that citation.  The Advisory Committee Notes

24   for the 2011 Amendments state as follows: "[t]he language of Rule 803 has been
     amended as part of the restyling of the Evidence Rules to make them more easily

25   understood and to make style and terminology consistent throughout the rules.

26   These changes are intended to be stylistic only. There is no intent to change any
     result in any ruling on evidence admissibility." Advisory Committee's Notes, Fed.

27   R. Evid. 803 (2011).

28

[Rule 803](8) *Public Records*. A record or statement of a public office [is not excluded by the rule against hearsay] if:

> (A) it sets out:
>
> > (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>
> (B) neither the source of the information nor other circumstances indicate a lack of trustworthiness.

The Kolts Report falls squarely under this exception. The Report was created pursuant to an appointment by the Board of Supervisors of the County of Los Angeles for the express purpose of investigating the Los Angeles Sheriff's Department.  Indeed, in all salient aspects, the report is indistinguishable from the report that the Ninth Circuit held admissible in *Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999) (factual findings and recommendations issued by a citizen's committee convened to study operational issues and potential malfeasance within a city fire department); *see also Hill v. Marshall*, 962 F.2d 1209, 1212 (6th Cir. 1992) (holding that a report on prison medical services issued by a committee established by the Ohio legislature for the purpose of investigating an issuing such reports was admissible under Rule 803(8)).

The fact that the Kolts Report contains opinions and recommendation does not remove it from the purview of the public records exception. *See Gilbrook* at 858-59; *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988); *In re Aircrash in Bali, Indonesia*, 871 F.2d 812, 816 (9th Cir. 1989) (FAA report on airline's safety record, commenced shortly after a crash, was properly admitted in civil suit arising out of crash, despite the fact that the report contained "evaluative" and "normative" findings). Like the report that is at issue in this case, the report that the Ninth Circuit held admissible in *Gilbrook* was created primarily for the purpose of offering opinions and recommendations regarding the way a local government agency (the Westminster fire department) functioned. *See Gilbrook* at 848. The Ninth Circuit made it clear that "all portions" of the report were admissible, including the

1  recommendations and opinions.  *Gilbrook* at 858-59.  Likewise, all relevant portions
2  of the Kolts Report are admissible.

3      In *Beech Aircraft Corp.*, the Supreme Court definitively held that evaluative
4  reports containing statements of opinion are admissible under Rule 803(8)(A)(iii),
5  overruling an appellate court decision that statements of opinion needed to be
6  excised from factual reports. *Beech Aircraft Corp.*, 488 U.S. at 161-162, 170. The
7  focus of Rule 803(8)(A)(iii) analysis, the Supreme Court held, is the circumstances
8  of the report's creation, not on parsing the various statements in the report as "fact"
9  or "opinion." *See id.* at 164-67. The report at issue in Beech Aircraft Corp was an
10 investigative crash report created by a Navy investigator, which, much like the
11 commission report at issue in the current case, was written mainly as for the purpose
12 of analyzing and evaluating what went wrong. *Id.* at 157. The Court found that the
13 report was admissible, including portions containing opinion, because the report was
14 based on adequate investigation and the circumstances did not indicate
15 untrustworthiness. *Id.* at 170.

16     Because the presumption is that public entities and employees perform their
17 jobs correctly and utilize reliable sources of information, Defendants bear the
18 burden of showing that the Kolts Report is untrustworthy if they intend to oppose its
19 admission under Rule 803(8)(B).

20     A trial court may presume that public records are authentic and
21 trustworthy.  The burden of establishing otherwise falls on the opponent
   of the evidence, who must come forward with enough negative factors
   to persuade a court that a report should not be admitted.

22 *Gilbrook*, 177 F.3d at 858 (internal quotation marks and citations omitted); *Johnson*
23 *v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir.1992) (holding that district court
24 must presume planning department reports and declarations are trustworthy and may
25 not require proof of planning officials' qualifications unless opponents of the
26 evidence first present specific evidence the reports to be untrustworthy); *United*
27 *States v. Loera*, 923 F.2d 725, 728-729 (9th Cir. 1991) (citing *United States v.*
28

1  *DeWater*, 846 F.2d 528, 530 (9th Cir. 1988)).

2       The report must be admitted unless Defendants can show specific reasons

3  why this report should be considered untrustworthy.  *See Gilbrook*, 177 F.3d at 858;

4  *see also In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804,

5  827 (2d Cir. 1994), *overruled on other grounds by Zicherman v. Korean Airlines*

6  *Co.*, 516 U.S. 217, 229 (1996), *as recognized in Brink's Ltd. v. S. African Airways*,

7  93 F.3d 1022, 1029 (2d Cir. 1996) ("Here there was no explicit finding of

8  trustworthiness, but no such finding is required before an official report under Rule

9  803(8)[(A)(iii)] may be received. The plain language of the rule establishes general

10  admissibility, unless a report is deemed to be untrustworthy.").  Minor reasons will

11  not suffice. *See Gilbrook*, 177 F.3d at 858. Rather, Defendants must show that the

12  Kolts Commission lacked a "factual foundation" for this report or "failed to perform

13  their duties properly," for example, acting with a prejudicial motive. *See id.*

14       Indeed, the factors proposed by the Advisory Committee's Notes for the

15  trustworthiness of a public record all point to the admission of the Kolts Report.

16  Those factors are: 1) timeliness of the investigation, 2) the investigator's skill or

17  experience, 3) whether a hearing was held, and 4) possible bias or motivation

18  problems in the report. Advisory Committee's Notes on Fed. R. Evid. 803(8), 56

19  F.R.D. 183, 313 (1972) (cited in *Beech Aircraft Corp.*, 488 U.S. at 167 n.11). The

20  Kolts investigation occurred in close proximity to the allegations of misconduct that

21  it was reviewing. The Kolts Commission held public hearings, interviewed

22  numerous witnesses, and reviewed extensive public and intra-Departmental

23  documents. James Kolts was a well-respected lawyer, with almost 40 years of

24  experience as a prosecutor and superior court judge. There is absolutely no reason to

25  believe that the Kolts Commission lacked a factual basis, acted with prejudice or

26  malice, or otherwise did not properly discharge its investigative duties.

27  //

28  //

1  **V.      CONCLUSION**

2      For all of the foregoing reasons, Plaintiff respectfully requests that the Court

3  grant Plaintiff's motion *in limine* to admit the portions of the Kolts Report identified

4  in Exhibit B, submitted herewith.

5

6                          Respectfully submitted,

7                          KAYE, McLANE & BEDNARSKI, LLP

8

9  DATED: September 3, 2012          By      */s/ Ronald O. Kaye*

10                         RONALD O. KAYE

11                         Attorney for Plaintiff Francisco Carrillo, Jr.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28